**EXHIBIT 3**

833UDONC.txt

```
                                                                        1
         833UDONC
    1    UNITED STATES DISTRICT COURT
    1    SOUTHERN DISTRICT OF NEW YORK
    2    ------------------------------x
    2
    3    LISSANDER DONES,
    3
    4                   Plaintiff,
    4
    5             v.                           07 CV 3085(SAS)
    5
    6    NEW YORK CITY, et al.,
    6
    7                   Defendants.
    7
    8    ------------------------------x
    8
    9                                          New York, N.Y.
    9                                          March 3, 2008
   10                                          4:40 p.m.
   10    Before:
   11
   11                 HON. SHIRA A. SCHEINDLIN
   12
   12                                          District Judge
   13
   13                       APPEARANCES
   14
   14    CRONIN & BYCZEK
   15         Attorneys for Plaintiff
   15    BY:  ROCCO AVALLONE
   16
   16
   17    NEW YORK CITY LAW DEPARTMENT
   17    OFFICE OF CORPORATION COUNSEL
   18    BY:  CAROLYN WALKER-DIALLO
   18         Assistant Corporation Counsel
   19
   19
   20
   20
   21
   22
   23
   24
   25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                        2
         833UDONC
    1             (Case called)
    2             THE COURT:  I have received two letters, one from the
    3    City dated February 25, 2008 explaining that it would like to
    4    make a summary judgment motion and a response dated February
    5    27, 2008 from Mr. Avallone opposing the motion, first based on
    6    timeliness of the premotion conference but, more importantly,
    7    on the merits.
    8             I am going to essentially -- "overrule" is too strong
    9    a word, but I am going to disagree with you on the timeliness.
   10    I understand you would like to have the transcript, but it is
   11    just a conference.  It is really an informal procedure.  You
```

Page 1

833UDONC.txt
```
12   are not being forced to defend the motion without a transcript.
13   So I don't think it is premature.
14              I think that we should definitely have our
15   on-the-record premotion conference today based on this exchange
16   of letters. So we are going forward with a conference.
17              And the City plans to make a fully dispositive motion,
18   is that right?
19              MS. WALKER-DIALLO: Yes, your Honor.
20              THE COURT: Do you think that you could move on all of
21   it?
22              MS. WALKER-DIALLO: Yes, your Honor.
23              THE COURT: I would like to get a sense from Mr.
24   Avallone, what he thinks the case is about in terms of the
25   injury and settlement value, what you have done to settle this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

3

```
833UDONC
 1   thing. I understand the storyline only from the letters. That
 2   is all I know about the case, what I read in these two letters.
 3   But it is injury, and what is he looking for?
 4              MR. AVALLONE: Your Honor, the injury is basically
 5   economic. His loss is basically more loss of overtime and how
 6   that affects his pension.
 7              I spoke to Ms. Walker-Diallo -- I'm sorry --
 8   Diallo-Walker.
 9              THE COURT: I think you were right the first time, but
10   anyway.
11              MR. AVALLONE: We have had numerous cases together.
12              THE COURT: That's good.
13              Go ahead.
14              MR. AVALLONE: I informed her that my client is
15   under -- we could settle this for under $100,000. I could
16   probably get rid of it for 50,000, plus attorney's fees, but we
17   are not looking for the moon.
18              THE COURT: That's a good start.
19              What is the support even for those kind of numbers?
20   What did he suffer? I know it is not emotional.
21              MR. AVALLONE: A lot of it is economic damages. He
22   was placed on modified duty for over one year.
23              THE COURT: What does that mean, "economic"?
24              MR. AVALLONE: Economically, overtime, we compared his
25   W-2s, tax returns for at least three years prior to this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

4

```
833UDONC
 1   incident and the decrease in salary --
 2              THE COURT: So there are objective numbers that show
 3   the difference once he was placed on modified duty?
 4              MR. AVALLONE: Correct.
 5              THE COURT: What else?
 6              MR. AVALLONE: Basically, that's it and, obviously,
 7   the effect that it had on his pension. He has been a police
 8   officer for, I believe it is approximately 15 years, close to
 9   the 20 years. So this definitely had a big effect.
10              THE COURT: Is he back to the full-time?
11              MR. AVALLONE: Yes. He was put on administrative --
12   I'm sorry -- modified duty for one year. He lost 20 days,
13   vacation days.
14              THE COURT: So the effect on the pension is based on
15   the one year and the lower numbers?
16              MR. AVALLONE: Correct. We believe that we are being
```
Page 2

833UDONC.txt
17  reasonable. The case, I think, should settle. We are not
18  asking for an astronomical amount.
19           THE COURT: Yes. If the City decides at the end of
20  the day they did something wrong, the numbers might be
21  reasonable; but if they didn't do anything wrong, I don't think
22  they just give away money or we would all be in line. But they
23  have to figure out in their own mind if they did something
24  wrong. So that's what we are here to talk about.
25           The way the moving letter is structured it says, first
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    5
833UDONC
1   of all, that he cannot establish that his due process rights
2   were violated. And then it says he cannot establish that
3   anybody conspired to violate his constitutional rights.
4           On the second point in the letter in response,
5   Mr. Avallone does point out that in responding to your argument
6   that you can't conspire within the agency, that this particular
7   case happened to have an FBI agent working together with the
8   NYPD, so he said, as a matter of law, that would at least
9   defeat the argument that it wasn't just NYPD officers
10  conspiring with themselves.
11          So I point that out as a reasonably strong argument,
12  just to answer the argument that you cannot conspire within the
13  agency because there is another agency, and that's a fact that
14  there was an FBI agent who seemed to have been part of this
15  from the beginning, going to the home, taking him to Yankee
16  Stadium, the whole story. So I suppose that answers at least
17  that argument.
18          But let's go to the more important argument about the
19  due process rights. The first argument you make is that there
20  is no proof of a policy or practice. There is no Monell claim
21  against the City that officers were, as a policy or practice,
22  denied their rights to attorneys or union representatives when
23  they are questioned in connection with ongoing official
24  investigations. And I don't know if you feel you have proof of
25  that, Mr. Avallone.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    6
833UDONC
1           You did write in your letter that you are sure that
2   the City's aware of the case -- Latino Officers Association
3   class action suit -- and that there was a custom and policy and
4   practice of discrimination by NYPD, but I don't know if it had
5   anything to do with denying the officers their right to
6   attorneys and union representations.
7           And then you cite the Rodriguez case where the
8   detective was denied his attorney, and he was terminated
9   because he wouldn't answer without the attorney. I don't know
10  the importance of the Rodriguez case to this case.
11          By the way, is this plaintiff Hispanic?
12          MR. AVALLONE: Yes.
13          THE COURT: You are alleging that it was partly
14  because of his race. The other part of the conspiracy charge
15  is that you cannot conspire within the agency, but there has to
16  be a forbidden class subject to the discrimination.
17          MR. AVALLONE: We don't have a Title 7 claim --
18          THE COURT: Right.
19          MR. AVALLONE: -- but race did play a part, your
20  Honor. All of the parties involved, including the individuals,
21  they wanted my client to --
                              Page 3

```
                                    833UDONC.txt
     22              THE COURT:  I know, they wanted him to testify or talk
     23    to a guy named Diaz.  I saw that.
     24              MR. AVALLONE:  Right.
     25              THE COURT:  So you are alleging that it was part of
                            SOUTHERN DISTRICT REPORTERS, P.C.
                                      (212) 805-0300
```

                                                                         7
```
           833UDONC
      1    the conspiracy, that if there was a conspiracy, it was in part
      2    based on race?
      3              MR. AVALLONE:  Correct.
      4              THE COURT:  Anyway, back to the Monell claim, the
      5    support for the Monell claim is Latino Officers Association
      6    case, Rodriguez case.  How does the Rodriguez case play into
      7    this?
      8              MR. AVALLONE:  Your Honor, that is another example of
      9    a Hispanic detective who was accused of taking a credit card
     10    from a perpetrator and using that credit card for personal
     11    gain, like $316.  They brought him up on criminal charges.  He
     12    was prosecuted and he was acquitted in Queens County.
     13              After being prosecuted and acquitted in Queens County,
     14    they decided to bring charges and prosecute him in Suffolk
     15    County where the alleged purchase took place and, again, he was
     16    acquitted.
     17              While these criminal trials were taking place, the IAB
     18    decided to question him about the incident, and without giving
     19    proper notice -- I believe that he was supposed to have been
     20    given 48 hours' notice of the interrogation, and he was not.
     21              When he was taken down to One Police Plaza to be
     22    interrogated, he asked that his criminal attorney be present
     23    because it was a criminal action that was pending that was all
     24    ready to go to trial.  That was denied.  He claimed he did have
     25    an attorney.  The union attorney was present.  On the record
                            SOUTHERN DISTRICT REPORTERS, P.C.
                                      (212) 805-0300
```

                                                                         8
```
           833UDONC
      1    the union attorney stated that he could not defend him because
      2    of the criminal trial, it is not fair to Mr. Rodriguez, and he
      3    excluded himself as the attorney for him.
      4              Despite that, they decided to charge him for not
      5    answering questions pursuant to the patrol guide and he was
      6    terminated for that reason.  And at no time did he refuse to
      7    answer questions he was --
      8              THE COURT:  I must have lost concentration.  He was
      9    terminated for what reason?
     10              MR. AVALLONE:  Failing to answer questions in what
     11    they call a GO-15, which he never did.  He was just asking that
     12    his attorney be present before he answered the questions and
     13    they refused, and that is documented on transcripts.
     14              THE COURT:  So your point is, because this happened to
     15    Detective Rodriguez, that helps to establish a Monell claim,
     16    that the City has a pattern and practice of forcing the
     17    officers to testify without their counsel present?
     18              MR. AVALLONE:  That is one.
     19              And then we have the discriminatory practice of
     20    disciplinary actions taken by NYPD against Hispanics in the LOA
     21    case.
     22              THE COURT:  In the LOA case, there are allegations of
     23    disciplinary actions taken?
     24              MR. AVALLONE:  Absolutely.
     25              THE COURT:  That is the gravamen of that case?
                            SOUTHERN DISTRICT REPORTERS, P.C.
                                      Page 4
```

833UDONC.txt
(212) 805-0300

833UDONC

9

          MR. AVALLONE: Absolutely. That was the main focal
point of that case that disciplinary actions were being taken
against Hispanics mostly Hispanics but minority police officers
in violation of their rights based on their race.
          THE COURT: Well, I did notice that you wrote in your
letter, plaintiff was charged with interfering with an
investigation for which he was found not guilty, of making
false and misleading statements during an additional interview
for which he was found not guilty, operating an NYPD car
without permission for which he was found not guilty.
          You also said, I think, somewhere in this letter,
something about a set-up or false charge of domestic violence,
domestic incident?
          MR. AVALLONE: After he refused to tape his friend or
cooperate in their investigation, he was taken to two different
IAB locations where after the second one he was told to give up
his gun and he was placed on modified, and the official reason
given to him was because they had received a domestic violence
complaint.
          THE COURT: Had they?
          MR. AVALLONE: My client was not married. He had a
girlfriend at the time. She never called. To this day they
are still together. She would come and testify that she has
never made a report. Basically, it was done as a reason form
more of what we claim to punish, retaliate --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

833UDONC

10

          THE COURT: Totally false, made up of whole cloth?
          MR. AVALLONE: Absolutely.
          THE COURT: That's pretty bad --
          MR. AVALLONE: Absolutely.
          THE COURT: -- if that's true.
          MR. AVALLONE: Absolutely. As far as my client's
concerned and talking to my client's girlfriend, it never
happened. She never called. No one ever called. He was
living at home with his mother. It was not that they lived
together.
          THE COURT: The mother didn't call? No children,
nothing?
          MR. AVALLONE: No.
          THE COURT: Ms. Walker-Diallo, you have listened
patiently. I don't know, reading the two letters and listening
to Mr. Avallone, there may be bunches of questions of fact for
a jury.
          MS. WALKER-DIALLO: The first issue, when it comes to
the LOA, the Latino police officers case, that case was
settled. So our argument is that plaintiff cannot use that as
a preclusive --
          THE COURT: It is not preclusive enough to raise an
issue of fact. If there was a complaint there making similar
allegations that he has some evidence that he could offer to a
jury that there's been a pattern and practice -- it is not like

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

833UDONC

11

he comes in with no evidence. Some people walk through the
door with no evidence. It is easy if counsel points that out.

Page 5

833UDONC.txt

```
 3              It is not a matter of preclusive, no.  They can't put a
 4     judgment in there.  You are right.  It is a settled case.  They
 5     cannot put the judgment in, but they can put in the allegation,
 6     end up in the trial that way, but you can call the plaintiffs.
 7              MS. WALKER-DIALLO:  The complaint itself, however, is
 8     devoid of any mention of race.
 9              THE COURT:  which complaint?
10              MS. WALKER-DIALLO:  The complaint in this case,
11     plaintiff does not allege that he believed all of this happened
12     to him because he is Hispanic.
13              THE COURT:  Now, he does.
14              MS. WALKER-DIALLO:  At the deposition when asked, he
15     did not raise that as an issue to say, I believe this happened
16     to me because I am Hispanic.  And it seems to have now come out
17     when the defendant wants to move for summary judgment.
18              THE COURT:  Do you have any evidence then other than
19     the fact that he is Hispanic, Mr. Avallone?
20              MR. AVALLONE:  In what way, your Honor?
21              THE COURT:  She says you don't allege it, but in
22     writing the letters it suddenly occurs to you and you say, aha,
23     he is Hispanic, I got lucky.  Now I can say that the conspiracy
24     has a racial --
25              MR. AVALLONE:  It was always our belief --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

12

```
       833UDONC
 1              THE COURT:  But he didn't testify, and it is not in
 2     the complaint so she is saying, where is the evidence?
 3              MR. AVALLONE:  I was not at the deposition, so I
 4     cannot say if he did or not.
 5              THE COURT:  Ms. Walker-Diallo was there, so she knows
 6     he didn't say it, right?
 7              MS. WALKER-DIALLO:  Yes, your Honor.
 8              THE COURT:  She is not making it up.  You have had
 9     cases with her.  So he didn't testify that that's what he
10     thought.  Now you really seek to  -- I don't know what -- amend
11     the complaint.  He wasn't specifically asked,
12     Ms. Walker-Diallo -- I don't know how to put it -- to state
13     definitively that he didn't think so, or did he?
14              MS. WALKER-DIALLO:  No, he didn't.
15              THE COURT:  So if he put in an affidavit -- you
16     couldn't.  It is unusual if somebody tries to fix a problem
17     with an affidavit.  There is plenty of law that an affidavit
18     cannot contradict the deposition testimony, but I don't know if
19     it really contradicts, whether he didn't close the door or he
20     just didn't say it.  It is a fine point, unfortunately.
21              MS. WALKER-DIALLO:  Our position is, also, your Honor,
22     that the LOA case and the Rodriguez case that they cite to is
23     dealing with a totally different issue.  Those cases -- and I
24     am not really sure about the LOA case so I don't want to talk
25     about it, but the Rodriguez case was about an official
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

13

```
       833UDONC
 1     departmental interview and the plaintiff in that case, from my
 2     understanding, was brought up on criminal charges.
 3              In this case plaintiff was never ever brought up on
 4     criminal charges, the subject of investigation.  And when they
 5     went to his house on July 8, 2004, he was not the subject of an
 6     investigation.  They were questioning him about --
 7              THE COURT:  I understand but, subjectively, he is
```

Page 6

833UDONC.txt

8  going to say that he did not feel free to leave. He thought
9  that he had to come. They really put him in the car. They
10 really took him to headquarters.
11           MS. WALKER-DIALLO: At his deposition, he testified
12 that he willingly went in the car because it was 7 or 8 o'clock
13 in the morning and his neighbors started to come out so he was
14 embarrassed. And I asked him specifically, did you ask them to
15 come into your house so that people would not see you and he
16 said no, I was OK with getting into the car and going with
17 them. It wasn't as if they forced him to go.
18           THE COURT: But he does say, at least again in the
19 letter, that he asked for counsel a couple of times and they
20 basically ignored him and kept questioning him and he kept
21 answering.
22           MS. WALKER-DIALLO: And that could be a disputed fact,
23 whether he asked or not. But assuming that he did ask for
24 counsel, our position is that he was not being officially
25 questioned as part of an official investigation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

833UDONC

1            THE COURT: But it was. At one point it turned into
2  an IAB questioning. He was taken to IAB headquarters. He was
3  detained in the lunchroom. He made a second request for
4  counsel -- his version, which is what you do on summary
5  judgment. He made a second request for counsel and it was
6  denied. And then he testified --
7            MS. WALKER-DIALLO: No, he didn't testify that day.
8  That is not accurate. It is my understanding that --
9            THE COURT: No.
10           MS. WALKER-DIALLO: After July 8, 2004, he was
11 officially interviewed by the NYPD, and at that point his union
12 representative and attorney was present. That was, I believe,
13 in September of 2004.
14           On this particular date, July 8, 2004, after he was
15 brought back to IAB, he was placed on modified duty. The
16 NYPD's policy concerning modified duty is, once they decide to
17 place you on modified duty, you cannot leave until they remove
18 your guns.
19           THE COURT: Right.
20           MR. AVALLONE: So at that point when they placed him
21 on modified, when he requested it, they did tell him no because
22 they had to take his gun from him.
23           THE COURT: What about this idea that he was charged
24 with --
25           MS. WALKER-DIALLO: -- domestic incident?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

833UDONC

1            THE COURT: That is a little troubling if it is not
2  true.
3            MS. WALKER-DIALLO: It is true, and I will tell you
4  why it is true. And plaintiff, we discussed it at his
5  deposition.
6            The NYPD's position was that plaintiff never disagreed
7  to assist in the investigation. When he agreed to assist in
8  the investigation, they placed him on modified duty. They put
9  in the computer system, domestic incident, in case someone
10 looked it up -- it was for his protection. They didn't want
11 anyone to know that he was participating in an investigation
12 concerning Mr. Orozco and Mr. Diaz.

Page 7

833UDONC.txt

```
13              At the deposition I asked plaintiff about that.  He
14   said yes, the deputy inspector who is one of the defendants,
15   told him that he was placing him on modified duty, and the
16   reason that he was going to put in the computer system as a
17   domestic incident was so that, if someone looked it up, they
18   couldn't see that he was cooperating in an investigation.
19              It is my understanding that if other officers find out
20   that an NYPD officer is snitching on someone else, that could
21   possibly cause a problem, so that was the rationale behind it.
22   So I can't deny that it didn't happen.
23              THE COURT:  But I thought that he never did cooperate?
24              MS. WALKER-DIALLO:  No, he never did provide
25   information.  The day on July 8, 2004 --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

16

833UDONC

```
1               THE COURT:  Yeah.
2               MS. WALKER-DIALLO:  -- plaintiff did not agree to call
3    Mr. Diaz that day, but it is my understanding that he said that
4    he would assist if he could with the investigation.
5               It is our understanding that calling Mr. Diaz was not
6    the only way that he could assist with the investigation, so
7    while he did not agree that day, he wasn't closed to the
8    possibility of helping out with the investigation.
9               It wasn't until after the next day plaintiff went and
10   told all of his colleagues what happened that day which
11   alleviated him serving -- wrong word -- eliminated him serving
12   as a confidential informant at that time.  That's when they
13   pretty much found out that he had made the decision not to
14   assist at all.
15              And if I could back up a little bit, it was initially
16   an FBI investigation.  Mr. Diaz and Mr. Orozco were being
17   criminally indicted by the FBI.  The FBI took the NYPD along
18   with them to his residence to question him about his contact
19   with these two individuals.
20              After the FBI agent determined that, while he did
21   contact the person, he didn't have any information to think
22   that the plaintiff was lying about it or that he committed a
23   crime.  The FBI basically backed out of the situation, which I
24   believe is why he is not named as a defendant.
25              THE COURT:  Well, they sure charged him with a lot
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

17

833UDONC

```
1    of --
2               MS. WALKER-DIALLO:  The NYPD?
3               THE COURT:  Yes.  He was charged with interfering with
4    an investigation, making false and misleading statements during
5    an official interview, operating a car without permission --
6    who was the one that found him not guilty on all of that?
7               MS. WALKER-DIALLO:  The administrative law judge.  The
8    official interview was not on July 8, 2004.
9               THE COURT:  You said that it was in September or
10   something.
11              MS. WALKER-DIALLO:  I believe it was September.
12              THE COURT:  By then he had counsel?
13              MS. WALKER-DIALLO:  Yes.
14              THE COURT:  Still they seem to be after this guy.
15              I cannot predict for sure, but some cases are better
16   off just skipping right over to the trial phase and having a
17   short two-day trial and let the jury decide.
                              Page 8
```

```
                                        833UDONC.txt
       18           And there might be enough facts here to push it out of
       19      the summary judgment box and into the other box.  You have to
       20      remember, when you do draft your papers, if I don't talk you
       21      out of it, you have to take his version of it at all times.  So
       22      if he says he asked for counsel, well then he asked for
       23      counsel.  If he said he didn't feel free to go, he didn't feel
       24      free to go.  He is going to say that he asked for a union
       25      rep -- you have to assume at this stage that everything is
                               SOUTHERN DISTRICT REPORTERS, P.C.
                                         (212) 805-0300
```
                                                                            18
```
               833UDONC
        1      true.
        2           MS. WALKER-DIALLO:  I understand that, and according
        3      to the patrol guide which he says that we violated, our
        4      position is that, assuming that he did ask, he was not entitled
        5      to counsel or a union attorney because he was not being
        6      officially interviewed.
        7           THE COURT:  You mean the second time?
        8           MS. WALKER-DIALLO:  The second time he did have the
        9      counsel, and that is in the record.
       10           THE COURT:  The first time back in July is when they
       11      take away the gun and put him on --
       12           MS. WALKER-DIALLO:  -- modified duty.
       13           THE COURT:  They sort of meted out a punishment right
       14      then.  It was an adverse employment action right then.
       15           MS. WALKER-DIALLO:  Placement on modified duty was an
       16      adverse employment action?
       17           THE COURT:  That's what I said, yes.  So that occurred
       18      right then in July when he did ask for counsel.  So I can see
       19      two sides of the thing.  It is not a major case.  It is not
       20      obviously a million dollar case.  Mr. Avallone admits that, but
       21      there may be just enough to scrape past summary judgment and
       22      require a trial.
       23           what efforts have you made to settle it?
       24           Did I refer it to the magistrate judge?
       25           MS. WALKER-DIALLO:  Yes, you did.  We have a
                               SOUTHERN DISTRICT REPORTERS, P.C.
                                         (212) 805-0300
```
                                                                            19
```
               833UDONC
        1      settlement conference in the next two weeks.
        2           MR. AVALLONE:  I know there is a date coming up.
        3           THE COURT:  I guess that we have discussed it as much
        4      as we can.  After this discussion, you think you should make a
        5      motion or think you shouldn't make a motion -- let's just set
        6      the schedule.  If you are going to make it, when are you going
        7      to file the moving papers?
        8           MS. WALKER-DIALLO:  If we could have until April 15,
        9      that will be great only because I have two summary judgment
       10      motions back to back.
       11           THE COURT:  And also maybe -- I am trying to be
       12      hopeful -- the settlement conference will be helpful or you
       13      will decide not to make it when you have considered everything
       14      that we have said.
       15           How long do you need to respond, Mr. Avallone,
       16      assuming she goes ahead?
       17           MR. AVALLONE:  Three weeks, your Honor.
       18           THE COURT:  I was going to suggest exactly that.
       19      May 6.
       20           And reply?
       21           MS. WALKER-DIALLO:  May I have until the 20th?
       22           THE COURT:  That's two weeks?
                                         Page 9
```

```
                              833UDONC.txt
        23          MS. WALKER-DIALLO:  Yes.
        24          THE COURT:  OK.  So if the motion comes in, that is
        25     that.  If you write a letter after the settlement conference
                            SOUTHERN DISTRICT REPORTERS, P.C.
                                    (212) 805-0300
                                                                          20
               833UDONC
         1     that says, unfortunately, we couldn't settle it but we also
         2     don't see a summary judgment, if you would then write me, I
         3     will call you in to talk about a trial date.  Otherwise, I
         4     won't set it because, if the motion is coming, it is coming.
         5          MS. Walker-Diallo, please remember to inform me which
         6     way, so I don't lose track of the case.
         7          MS. WALKER-DIALLO:  Yes, your Honor.
         8          THE COURT:  Thank you very much.  I appreciate it.
         9
        10                           o   0  o
        11
        12
        13
        14
        15
        16
        17
        18
        19
        20
        21
        22
        23
        24
        25
                            SOUTHERN DISTRICT REPORTERS, P.C.
                                    (212) 805-0300
```