# ORIGINAL

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------------------------------X
3    LISSANDER DONES,

4                                          PLAINTIFF,
                                           Index No:
                          -against-        07 CV 3085
5
6    THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, in
     his official capacity, SERGEANT FRANK TERAN, in his official
     capacity and individual capacity, CAPTAIN THOMAS SCOLLAN, in
7    his official and individual capacity, LIEUTENANT RON MEJIA,
     in his official and individual capacity, and SERGEANT JULIUS
8    MORTON, in his official and individual capacity,

9                                          DEFENDANTS.
10   --------------------------------------------------------X

11                       DATE:   February 20, 2008

12                       TIME:   12:52 P.M.

13

14            EXAMINATION BEFORE TRIAL of the Plaintiff,

15   LISSANDER DONES, taken by the Defendants, pursuant to a Court

16   Order, held at the offices of CORPORATION COUNSEL, 100 Church

17   Street, New York, New York 10007, before Goldy Gold, a Notary

18   Public of the State of New York.

19

20

21

22

23

24

25

```
 1      A P P E A R A N C E S:

 2


 3      CRONIN & BYCZEK, LLP
                Attorneys for Plaintiff
 4              1983 Marcus Avenue
                Lake Success, New York 11042
 5              BY:  HOWARD GREENWALD, ESQ.

 6


 7      MICHAEL A. CARDOZO, ESQ.
                CORPORATION COUNSEL
 8              New York City Law Department
                Attorneys for the Defendants
 9              100 Church Street
                New York, New York 10007
10              BY:  CAROLYN WALKER-DIALLO, ESQ.
                File #:  2007-104884
11              Control #:  EEE-010656A

12

13                    *           *           *

14

15

16

17

18

19

20

21

22

23

24

25
```

DONES

1    L I S S A N D E R    D O N E S, called as a witness, having

2    been first duly sworn by a Notary Public of the State of New

3    York, was examined and testified as follows:

4    EXAMINATION BY

5    MS. WALKER-DIALLO:

6         Q.    Please state your name for the record.

7         A.    Lissander Dones.

8         Q.    Where do you reside?

9         A.    1859 Loring Place South, Bronx, New York, 10453.

10        Q.    Good afternoon.

11        A.    Good afternoon.

12        Q.    My name is Carolyn Walker-Diallo.  I am an

13   assistant corporation counsel here at the New York City Law

14   Department, and I represent the defendants in this case, the

15   defendants being the City of New York, Police Commissioner

16   Raymond Kelly, Sergeant Frank Teran, Deputy Inspector Thomas

17   Scollan, Lieutenant Ronald Mejia, and Sergeant Julius Morton.

18            I am here today to conduct the deposition of

19   plaintiff, Mr. Lissander Dones, in the matter filed Dones

20   versus City of New York, et al, docket number 073085, which

21   is currently pending in United States District Court for the

22   Southern District of New York.

23            This deposition is taken pursuant to the federal

24   rules of civil procedure, with all objections, except as to

25   form and privilege, being reserved until the time of trial.

DONES

1          MS. WALKER-DIALLO:  Is that correct, sir?  Do

2          we agree?

3          MR. GREENWALD:  Yes, we do.

4     Q.    Hello, Detective Dones.

5     A.    Hello.

6     Q.    Before we start the deposition, I want to go over

7     some ground rules with you.  I will be asking you a series of

8     questions today concerning the allegations in your federal

9     complaint, as well as some general questions concerning your

10    background.

11         Your testimony is being transcribed by a Court

12    Reporter, which means that she cannot record any nonverbal

13    responses, such as nods of the head or hand movements.  I

14    would ask that you just give me verbal responses for that.

15    Okay?

16    A.    Yes.

17    Q.    Please listen to my questions and wait until I have

18    finished asking a question before responding.  The Court

19    Reporter can't record us talking over one another.  If you do

20    not understand a question, please tell me, and I will try my

21    best to rephrase it so that you do understand.  If you don't

22    ask me to clarify, I will assume that you did understand the

23    question.  Is that okay?

24    A.    Yes.

25    Q.    A copy of the transcript will be provided to you at

DONES

1    some time after this deposition by your attorney.  At that

2    time you will have an opportunity to review and sign the

3    transcript or make any changes.

4           If you need to take a break at any point during the

5    deposition, please let me know.  We'll definitely do that.  I

6    just ask, if there is a question pending, that you answer the

7    question first before we take a break.  Is that okay?

8       A.    Yes.

9       Q.    You were just placed under oath by the Court

10   Reporter.  It is the same oath you would take if you were

11   testifying in a court before a judge and jury.  It requires

12   that you to answer my questions truthfully and as fully and

13   accurately as you can.  If you answer falsely, that's

14   considered perjury.  Do you understand?

15      A.    Yes.

16      Q.    I am going to ask you some questions about your

17   fitness to testify today.  Have you taken any medications

18   today, prescriptions or otherwise?

19      A.    No.

20      Q.    Have you taken any medication in the last five

21   days, prescription or otherwise?

22      A.    No.

23      Q.    Were you supposed to take any medication within the

24   last 24 hours that you did not take?

25      A.    No.

DONES

1    Q.    Are you currently under a doctor's care for any

2    kind of illness?

3    A.    No.

4    Q.    Have you taken any controlled substances within the

5    last 24 hours?

6    A.    No.

7    Q.    Have you consumed any alcoholic beverages within

8    the last 24 hours?

9    A.    Yes.

10    Q.    What was it?

11    A.    Vodka.

12    Q.    Do you believe your consumption of vodka 24 hours

13    ago, or more or less, will affect your ability to understand

14    my questions today?

15    A.    No.

16    Q.    Do you suffer from any condition, either mental,

17    medical, or physical, that will impair your memory?

18    A.    No.

19    Q.    Is there any reason you can think of today why you

20    would not be able to answer my questions?

21    A.    No.

22    Q.    Besides me not phrasing them correctly?

23    A.    None.

24    Q.    Have you ever been a witness at a trial,

25    deposition, or a hearing before?  I can break it down.

DONES

1          Have you ever been a witness at a trial before in a

2  court, either state court or federal court?

3      A.    During my general work capacity, yes.

4      Q.    Were you a witness at a trial in court or were you

5  a defendant?

6      A.    No, most of the time the witness.

7      Q.    Have you ever been a plaintiff or defendant in a

8  lawsuit before, besides this one?

9      A.    No.

10     Q.    Aside from speaking with your attorney today or any

11  other day, what did you do to prepare for this deposition, if

12  anything?

13     A.    Really nothing, just, you know, just spoke to the

14  attorney.

15     Q.    Did you review any papers or documents in

16  preparation for today's deposition?

17     A.    Not lately, no.

18     Q.    When you say lately, "not lately," what do you mean

19  by that?

20     A.    I haven't looked at my paperwork for a while.

21     Q.    When you say a while, how long would that be,

22  approximately?

23     A.    It's been a while; five, six, seven months.

24     Q.    Could you please state your full name for the

25  record?

DONES

1      A.     Lissander Dones.

2      Q.     Is that how your name appears on your birth

3  certificate?

4      A.     Yes.  I think that's Vasquez also.  You know, in

5  Puerto Rico they use mother's and father's last name.

6      Q.     So would it appear Dones Vasquez?

7      A.     Yes.

8      Q.     Not hyphenated, though?

9      A.     No.

10     Q.     Have you been known by any other name than

11  Lissander Dones or Lissander Dones Vasquez?

12     A.     Alex.

13     Q.     On any official documentation, that is?

14     A.     No.

15     Q.     Can you please state your date and place of birth?

16     A.     Date of birth is January 7, 1962, and I was born in

17  Puerto Rico.

18     Q.     Could you tell me your Social Security number, just

19  for the record?

20             MR. GREEENWALD:  For the record, I have an

21             objection to that.  More and more judges have

22             reserved that because of identity theft problems.

23             You could not promise me who is going to ultimately

24             -- which hands this deposition is going to pass

25             through, and who is going to ultimately have access

DONES

1          to that information.  So I am going to assert a

2          privilege here to protect him, and I don't think

3          you are entitled to a Social Security number.

4                   MS. WALKER-DIALLO:  Do you want to mark that

5          for a ruling?

6                   MR. GREENWALD:  Again, what need do you have

7          of that vis-à-vis his thread of the possibility of

8          identity theft to him?  Again, clearly, whatever

9          small means that you might get out of it, if

10         anything, he's exposed to something that he

11         shouldn't be exposed to.

12                  MS. WALKER-DIALLO:  The reason why I'm asking

13         the question is to find out if that's the only

14         Social Security number he's used, or has he used

15         any other Social Security number.  But if you want

16         to object to it, that's fine, we'll mark it for a

17         ruling.

18    Q.    Let me ask you a question.  Have you ever used more

19    than one Social Security number?

20    A.    No.

21                  MR. GREENWALD:  Just for the record, so if we

22         ultimately have to go for a ruling on this, I have

23         had two clients already that had that problem with

24         identity theft, that I am handling personal injury

25         cases for, so I am particularly sensitized to this.

DONES

1          I can't think of a single reason why you need it,

2          but I can understand why it's a danger to him, and

3          that's why I'm asserting the privilege.

4      Q.    The Social Security number that you used when you

5   worked for the New York City Police Department, is that the

6   same Social Security number that you use today?

7      A.    Yes.

8      Q.    Are you married?

9      A.    No.

10     Q.    Do you have any children?

11     A.    No.

12     Q.    Have you been previously married?

13     A.    Never.

14     Q.    Can you tell me your current address again?

15     A.    1859 Loring Place South, Bronx, New York, 10453.

16     Q.    How long have you lived there?

17     A.    I think it's since '86.

18     Q.    Do you own or rent?

19     A.    We own.

20     Q.    Approximately how much is your mortgage?

21     A.    I think it's like 1,050 a month.

22     Q.    Who pays that?

23          MR. GREENWALD:  Objection.

24          MS. WALKER-DIALLO:  This goes to mitigation of

25          damages.

DONES

1          MR. GREENWALD:  How does it go to mitigation

2     of damages?

3          MS. WALKER-DIALLO:  Are you telling your

4     client not to answer?

5          MR. GREENWALD:  I'd like to know what the

6     purpose of this line of questioning is.

7          MS. WALKER-DIALLO:  It goes to mitigation of

8     damages.

9          MR. GREENWALD:  How does it go to mitigation

10     of damages?

11          MS. WALKER-DIALLO:  Specifically expenses.

12     These are standard questions.

13          MR. GREENWALD:  I know.  Social Security is a

14     standard question, too.

15          MS. WALKER-DIALLO:  Right.  I am not asking

16     him his account number with the mortgage company.

17     I am asking him approximately, I didn't ask him

18     specifically how much.  I didn't ask him how he

19     paid it.  I didn't ask him anything about the bank

20     account.

21          MR. GREENWALD:  Explain to me how this goes to

22     mitigation of damages.

23          MS. WALKER-DIALLO:  Are you telling your

24     client not to answer?

25          MR. GREENWALD:  I ask you, what does this have

DONES

1          to do with this case?

2              MS. WALKER-DIALLO:  Because if this case ever

3          goes maybe to settlement, we're going into his

4          situation now, we'll get into questions of if he

5          works, where he works, how much he makes, how much

6          is going towards expenses currently as opposed to

7          when he was employed with the NYPD, we consider

8          that when we're trying to figure out a settlement.

9              MR. GREENWALD:  I have only been doing this --

10         this is my 29th year of practice, and I have never,

11         ever, ever, seen any defendant factor in what the

12         mortgage payments of my client was with reference

13         to a settlement.  The case is worth what the case

14         is worth.  He's seeking compensation.

15             MS. WALKER-DIALLO:  I am not going to really

16         accept speaking objections.  If you are telling

17         your client not to answer a question, that is fine,

18         we'll mark that for a ruling.

19             MR. GREENWALD:  Fine.  Good.

20             MS. WALKER-DIALLO:  It's already one o'clock

21         in the afternoon.  I don't want to have Mr. Dones

22         here longer than he needs to be.  If you want to

23         object, fine, we'll mark that for a ruling.

24             MR. GREENWALD:  Okay.

25     Q.    And do you pay your mortgage?

DONES

```
 1        A.    Yes.

 2        Q.    You say you've lived there since 1986; is that

 3   correct?

 4        A.    Correct.

 5        Q.    What is the highest level of education that you

 6   have achieved?

 7        A.    High school.

 8        Q.    When did you graduate from high school?

 9        A.    1980.

10        Q.    What high school is that?

11        A.    Alfred E. Smith High School in the Bronx.

12        Q.    After high school, did you receive any job training

13   or vocational training?

14        A.    It was a vocational high school.

15        Q.    What type of training did you receive during high

16   school?

17        A.    Carpentry.

18        Q.    After high school did you work, right after you

19   graduated from high school?

20        A.    Odds and ends.

21        Q.    Would that have been in the carpentry field?

22        A.    Yes.

23        Q.    After high school, did you go to any other

24   institution like a job training school or institute?

25        A.    No.
```

DONES

1     Q.    Have you ever served in the US military?

2     A.    No.

3     Q.    Have you ever received unemployment benefits?

4     A.    No.

5     Q.    Have you ever received disability or Workers'

6     Compensation benefits?

7     A.    I don't think so, no.

8     Q.    Have you ever received welfare or Public

9     Assistance?

10    A.    No.

11    Q.    Have you ever been convicted of a crime?

12    A.    No.

13    Q.    Have you ever pled guilty to a crime?

14    A.    No.

15    Q.    Are you currently employed?

16    A.    No.

17    Q.    What was the last job you had?

18    A.    NYPD.

19    Q.    Did you retire from the NYPD?

20    A.    Yes.

21    Q.    When was that?

22    A.    The official date I think was August of 2006.

23    Q.    When did you start working for the NYPD?

24    A.    January 21, 1985.

25    Q.    When were you eligible to retire?

DONES

```
 1        A.   I was supposed to retire January 21st of 2005.

 2        Q.   That would be 20 years of service?

 3        A.   Yes.

 4        Q.   Is there a particular reason why you didn't retire

 5   in 2005?

 6        A.   Yes, the department didn't let me.

 7        Q.   Did they tell you why you couldn't retire in 2005?

 8        A.   They had placed me on modified assignment.

 9        Q.   Do you recall when you were placed on modified

10   duty?

11        A.   Excuse me?

12        Q.   Do you recall when you were placed on modified

13   duty?

14        A.   I think it was -- the exact date I don't remember,

15   I think it was right around July of -- I don't know exact

16   date.  It was July of -- give me a minute, I'll think about

17   it.

18             MR. GREENWALD:  If you can't remember we can

19             leave I blank in the transcript.

20        A.   I don't remember the year exactly that's why.

21             MR. GREENWALD:  We request a blank be left and

22             he will fill in information.

23             Do you have information at home that will tell

24             the year?

25             THE WITNESS:  Yes, I do.
```

DONES

1      Q.    Did the department explain why they wouldn't allow

2   -- withdrawn.  Did you submit a request in January 2005 to

3   retire in 2005?

4      A.    No.

5      Q.    So how did you know that they wouldn't let you

6   retire in 2005?

7      A.    I was pending trial room, so I know they told me I

8   couldn't retire until after the outcome of the trial room.

9      Q.    Do you recall who told you that you couldn't retire

10   until the trial was over?

11      A.    I don't exactly remember now.

12      Q.    Was it someone from the NYPD or was it someone from

13   the union?

14      A.    I think it was somebody from both.

15      Q.    When they told you that --

16              MR. GREENWALD:  Objection, who is "they"?

17              MS. WALKER-DIALLO:  He said somebody from NYPD

18              and somebody from the union.

19              MR. GREENWALD:  Please delineate.

20      Q.    The NYPD, did you ask someone from the NYPD about

21   retirement?

22              MR. GREENWALD:  Could you please seek the

23              identity of the person?

24              MS. WALKER-DIALLO:  I did.  He said he didn't

25              know.

DONES

1          MR. GREENWALD:  Do you know who said it?

2          THE WITNESS:  No, it was somebody from the

3     department, but I don't exactly know who.

4     Q.    When the person from the NYPD told you that you

5  couldn't retire, was that in response to a question that you

6  asked him or her?

7     A.    I don't remember exactly.  I know I asked.  You

8  know, I think even in the trial room my lawyer had asked if I

9  could retire, and they told him no, we have to go through the

10 trial room.

11    Q.    Are you currently a member of a union?

12    A.    I pay union -- you know, they ask you for, like, a

13 union fee at the end of the year so you could get a card and

14 the itinerary book.  I don't know if I'm a member of a union,

15 I doubt it.

16    Q.    What union do you pay the dues to?

17    A.    DEA.

18    Q.    Can you tell me what that means?

19    A.    Detective Endowment Association.

20    Q.    When did you first become a member of this union,

21 the Detective Endowment Association, if you recall?

22    A.    I think it was 1991, when I became a detective.

23    Q.    Were you a union member from 1991 until you

24 retired?

25    A.    Yes.

DONES

1    Q.    Were you active in the union?

2    A.    What do you mean?

3    Q.    Did you serve on any committees?

4    A.    No.

5    Q.    Did you run for any union office?

6    A.    No.

7    Q.    Have you ever been self-employed?

8    A.    No.

9    Q.    When you first started working for the department

10   in 1985, what was your position or rank?

11   A.    Regular police officer.

12   Q.    Excuse me if I don't know the correct terms.

13   A.    No problem.

14   Q.    Were you a patrol officer when you first started?

15   A.    Yes.

16   Q.    Where were you stationed?

17   A.    After the academy I was stationed at NSU-9, which

18   is Neighborhood Stabilization Unit 9.  It covered the 50, 46,

19   47, and the 52 precinct.  And then after that I was assigned

20   to the 50 precinct in January of '86, I think it was.

21   Q.    Were you still a patrol officer in '86?

22   A.    Yes.

23   Q.    Did you get promoted?  Did there come a time that

24   you were promoted from patrol officer to a different rank?

25   A.    To detective.

DONES

1    Q.    You said that was in '91; is that correct?

2    A.    Something like that, I think it was '91, yes.

3    Q.    Where were you, for lack of a better word,

4    stationed when you were promoted to detective in '91?

5    A.    I was an undercover in Manhattan North Narcotics.

6    Q.    As an undercover, what do you do?

7    A.    Basically I was making street purchases and some

8    apartment drug purchases.

9    Q.    How long did you work as an undercover?

10   A.    As an undercover or --

11   Q.    As an undercover in Manhattan Narcotics?

12   A.    Till '95, I think it was.

13   Q.    From '91 to '95, did you work overtime when you

14   were an undercover?

15   A.    Yes.

16   Q.    Do you know approximately how much overtime a week

17   you worked when you were an undercover in Manhattan

18   Narcotics?

19   A.    If we went out three times a week, we made four,

20   five hours every time we went out.

21   Q.    Per week?

22   A.    Yes.

23            MR. GREENWALD:  Per day?

24            THE WITNESS:  Yes, per day, every time we went

25        out.  Three times a week we were going out,

DONES

1                 sometimes more.

2        Q.    Would that be five days a week, seven days a week?

3        A.    It was five.

4        Q.    Then in '95 were you moved somewhere else?

5        A.    Yes, I was moved to Internal Affairs Bureau.

6        Q.    Where is that located?

7        A.    Our office was on 12th Street in the Village, I

8    think it was 12th by University, the PAL building, Police

9    Athletic League building.

10       Q.    What did you do at Internal Affairs?

11       A.    It was a new unit that we were doing integrity

12   tests, and also they had started a new program, making

13   narcotic purchases also.

14       Q.    When you say you were doing the integrity test,

15   exactly what is that?

16       A.    The integrity test, we had a proactive unit that we

17   went out and we did integrity tests with different precincts,

18   and different officers that had high level of civilian

19   complaints or allegations of corruption.

20       Q.    You would investigate the complaints or your office

21   would investigate the complaints?

22       A.    The office would.

23       Q.    Did you have any role in the integrity tests, and

24   what was your role?

25       A.    I was an undercover.  We either did the test or we

DONES

1    went out and bought drugs.

2        Q.    When you say you did the test, exactly how would

3    you administer the test or do the test?

4        A.    We may get an allegation of a police officer, let's

5    say, in the 34, that he's stealing money from drug dealers on

6    the street or peddlers.  We might go out there and stand on

7    the corner, and one of the field team would make a 911 call

8    saying that there's a guy selling drugs fitting my

9    description on the corner, and we try to get that officer to

10   come and stop us and see how he'd interact with us.

11       Q.    Aside from integrity tests, you said you were also

12   doing undercover drug buy-and-busts?

13       A.    Yes, it was a new program in IAB, Internal Affairs

14   Bureau.

15       Q.    How did the new program and the IAB differ from

16   what you were doing as an undercover in Manhattan Narcotics,

17   buying drugs?

18       A.    Well, the program in IAB was targeting members of

19   the service.

20       Q.    Do you recall when that program came into

21   existence, was it in '95, when you first went there?

22       A.    The drug program, I think, started in the middle of

23   '95, beginning of '96.  It was called group 52.

24       Q.    How long did you stay at IAB?

25       A.    I was in IAB all the way until they transferred me

DONES

1    to Viper 9 in the Bronx, when I got -- that was after I was

2    placed on modified.

3        Q.    When you were at IAB in '95 until you were

4    transferred, do you know approximately how many hours of

5    overtime a week you worked?

6        A.    Exactly weekly, I can just give you a figure, I

7    don't know exactly how much it was, because it all depends

8    how many times we went out.  I would say maybe ten or

9    15 hours a week, maybe.

10        Q.    Did they have a procedure as to who would work the

11    overtime?

12        A.    Most of the time it was -- it was members of the

13    field team.

14        Q.    And you were on the field team?

15        A.    I was the undercover.

16        Q.    Approximately how many people were on the field

17    team?

18        A.    Maybe about six detectives and police officers, and

19    one or two sergeants and a lieutenant.

20        Q.    Did you ever have an opportunity to meet a Thomas

21    Rachko?

22        A.    Never.

23        Q.    What about a Julio Vasquez?

24        A.    Yes.

25        Q.    When did you meet Mr. Vasquez?

DONES

1          A.    I met Mr. Vasquez when I went into the narcotics

2     unit.

3          Q.    That is in '91?

4          A.    '89, I think I went into Narcotics.

5          Q.    Narcotics in Manhattan?

6          A.    Manhattan North Narcotics.

7          Q.    Was Mr. Vasquez also a detectives at Manhattan

8     North Narcotics, if you recall?

9          A.    When I got there, I don't remember if he was a

10    detective or police officer, exactly.

11         Q.    Were you friends with Mr. Vasquez?

12         A.    Yes, he was the one who trained me, how to buy

13    drugs.

14         Q.    Did you socialize with Mr. Vasquez outside of work?

15         A.    Yes, the whole office, we used to socialize.

16         Q.    The whole office in Manhattan North Narcotics,

17    about how many people were in that office?

18         A.    In the office, a lot.  We used to go out every once

19    in a while, maybe like our module, like the people in our

20    team.

21         Q.    How many people were in your team at the Manhattan

22    Narcotics?

23         A.    I think it was about six, five or six.

24         Q.    Mr. Vasquez was one of them, correct?

25         A.    Yes.

DONES

1        Q.    After you left Manhattan Narcotics and went to IAB

2    in approximately '95, did you stay in contact

3    with Mr. Vasquez?

4        A.    We spoke occasionally.

5        Q.    When you say occasionally, would that be once a

6    month, once every six months?

7        A.    I don't exactly recall.  It was, yes, around once

8    every two or three months.

9        Q.    Would that be by telephone or in person, if you

10   recall?

11       A.    Sometimes when we used to see each other when we'd

12   go to court, you know, you run into people.

13       Q.    Since you've been retired from the Police

14   Department, have you been in contact with Mr. Vasquez?

15       A.    No.

16       Q.    Have you ever met Luis Nieves-Diaz?

17       A.    Yes.

18       Q.    When did you meet Mr. Diaz?

19       A.    I met Mr. Diaz when I worked in the 50, he worked

20   there also.

21       Q.    And do you recall what his rank or title was?

22       A.    He was a patrol officer.

23       Q.    Did you ever, outside of work, socialize with

24   Mr. Diaz?

25       A.    Yes.

DONES

1    Q.    Were you friends with Mr. Diaz?

2    A.    Yes.

3    Q.    When you left Manhattan Narcotics and went to IAB,

4    did you stay in contact with Mr. Diaz?

5    A.    Occasionally, yes.

6    Q.    For clarification, when you say occasionally, would

7    it be the same amount as you testified with Mr. Vasquez?

8    A.    Yes.  Remember, they went to different units, so

9    it's hard keeping in touch with them.  I mean, I went to a

10   different unit.

11   Q.    When you went to IAB, do you know where Mr. Diaz

12   went, or was he still at Manhattan Narcotics?

13   A.    I think he was still in Manhattan until he

14   transferred to OCCB Inspections.

15   Q.    Did there come a time that you learned

16   that Mr. Vasquez was involved in stealing drugs and money

17   from drug dealers?

18            MR. GREENWALD:  I will object but allow him to

19            answer.

20   A.    Yes.

21   Q.    Do you recall when you became aware of that?

22   A.    I think it was on two or three days before

23   Thanksgiving in 2004.

24            MR. GREENWALD:  For the record,

25            has Mr. Vasquez been convicted of the offense that

1          you just said that he did?

2                    MS. WALKER-DIALLO:  I have no idea.

3                    MR. GREENWALD:  That's why I objected to the

4          question.

5                    MS. WALKER-DIALLO:  But his name is in the

6          complaint, and plaintiff's allegations of what

7          happened to him are surrounding the investigation

8          of Mr. Vasquez.

9                    MR. GREENWALD:  But you're saying that you're

10         positive that it's a fact.

11                   MS. WALKER-DIALLO:  I said he was

12         investigated.  I didn't say he was convicted.  And

13         it is a fact that he was investigated.

14    Q.    How did you learn that Mr. Diaz was being

15    investigated by the NYPD?

16    A.    Mr. Diaz or Mr. Vasquez?

17                   MS. WALKER-DIALLO:  Can you back it up, the

18         question, and read it back so we know for sure.

19                   (Whereupon, the referred-to question was read

20         back by the Reporter.)

21                   MS. WALKER-DIALLO:  Let me rephrase it.

22    Q.    Did there come a time that you learned

23    that Mr. Vasquez was being investigated for stealing drugs

24    and money from drug dealers?

25                   MR. GREENWALD:  I have no objection to that

DONES

1              question.

2        A.    I found out because we were out on a call-out, and

3    I found out that the Queens team had gone out on a call-out,

4    and later on it was found out that a police officer had

5    ripped off, I think it was an informant for OCID.

6        Q.    How did you find out about that?

7        A.    I worked in the police impersonations unit, so the

8    sergeant we were with got the call that the Queens team was

9    going out on a call-out.

10       Q.    Did the sergeant tell you that Mr. Vasquez was

11   being investigated, if I am understanding your answer?

12       A.    Not at that time.  They just said they went out on

13   a call-out, because allegedly a cop was involved in the

14   incident.

15       Q.    When did you find out that they thought it

16   was Mr. Vasquez that was involved?

17       A.    I think it was later on that night.

18       Q.    Do you recall who told you?

19       A.    It was the sergeant.  I don't remember if it was

20   Sergeant Schumacher or Garland, I don't know which one of the

21   two.

22       Q.    Just for clarification, you said that was in or

23   around Thanksgiving of 2004?

24       A.    Yes, about two or three days before, I think it

25   was.  The year could be 2004, 2003, I don't remember exactly.

DONES

1      Q.    Do you recall whether you found this out before or

2    after you were questioned in July of 2004 by the defendants?

3      A.    I was questioned by the defendant?

4      Q.    In your complaint, you allege that in July of 2004

5    you were questioned by defendants Teran, Mejia, Scollan, and

6    Morton.  I am trying to find out whether you recall finding

7    about Vasquez being investigated.  Was that before or after

8    the incident that's alleged in your complaint?

9      A.    That was before.

10      Q.    You said a Sergeant Schumacher or Garland may have

11    told you about Vasquez being investigated.  Did you speak to

12    Vasquez after you found out about the investigation into him?

13      A.    No.

14      Q.    To your knowledge, did Mr. Vasquez ever try to

15    contact you after you found out about the investigation

16    involving him?

17      A.    Not to my knowledge, no.

18      Q.    Did you ever come to find out that Mr. Diaz was

19    being investigated for stealing drugs and money from drug

20    dealers?

21      A.    I think I found that out when these guys showed up

22    at my door.

23      Q.    "These guys" meaning the defendants?

24      A.    The defendants.

25      Q.    Except for Raymond Kelly?

1          A.    Correct.

2          Q.    When you say you think you found it out when they

3     showed up, is it your testimony that the defendants told you

4     that Mr. Diaz was being investigated?

5                MR. GREENWALD:  Well, could we break it down,

6                because we have several defendants, so let's get it

7                down, who said what now.

8          Q.    You just testified that you found out when they

9     showed up at your door.  How did you find out?

10         A.    Well, they wanted me to place a phone call in to

11    Detective Nieves-Diaz.

12         Q.    Who was that?

13         A.    It was mostly -- Sergeant Teran was the one asking

14    me if I would do it, and Captain Scollan.

15         Q.    When you found out on or about Thanksgiving 2003

16    about Vasquez being investigated, did you speak to anyone in

17    the department about the investigation?

18         A.    In which way?

19         Q.    Did you have any discussions about specifically

20    Vasquez, about the FBI or the NYPD investigating Vasquez?

21         A.    No, just what was out there, general knowledge of

22    the stuff that was in the newspaper and word of mouth.

23         Q.    When was the first time you met defendant Deputy

24    Inspector Thomas Scollan?

25         A.    The first I met him was when he was in front of my

1    house.

2        Q.    That would be in or about July 2004?

3        A.    Yes.

4        Q.    What about Lieutenant Ronald Mejia?

5        A.    I had seen him before.  He used to work in

6    Manhattan North Narcotics also.

7        Q.    Did you have an opportunity to formally meet him

8    when he worked in Manhattan Narcotics?

9        A.    Well, he wasn't in my team, but I knew of him, and

10   I've seen him in the offices.

11       Q.    Did you ever have any conversations with him,

12   whether professionally or socially, with Lieutenant Mejia, if

13   you recall?

14       A.    No, I might have just said hello to him in the

15   offices there.

16       Q.    When was the first time you met Sergeant Frank

17   Teran?

18       A.    That was the same day.

19       Q.    When was the first time you met Sergeant Julius

20   Martin?

21       A.    Same day also.

22       Q.    When was the first time you met FBI Agent Kenneth

23   Hosey?

24       A.    Same day.

25       Q.    On July 8, 2004, can you tell me what happened that

1    morning?

2        A.    Was it the 8th or the 7th?  I don't remember the

3    exact date.

4        Q.    In or about July 2004.

5        A.    I got out of my apartment, I was going to go to my

6    car to meet my partner at the 48 precinct in the Bronx, when

7    I saw a car parked in front of my -- almost by my driveway

8    with the engine running.  And the person got out and he

9    identified himself as an FBI agent, and he asked me if he

10   could ask me a few questions.

11       Q.    When Agent Kenneth Hosey got out of the car, did

12   you see who else was in the car?

13       A.    I think he was alone in his car.

14       Q.    So he wanted to ask you a couple of questions?

15       A.    Yes.

16       Q.    What did you say, if anything?

17       A.    I told him no problem.

18       Q.    Did you know why at that point, why an FBI agent

19   had shown up at your apartment?

20       A.    Well, I figured it was because of this incident.

21            MR. GREENWALD:  The question was did you know.

22            THE WITNESS:  Did I know?

23            MR. GREENWALD:  Why he was there.

24            THE WITNESS:  No, no.

25       Q.    So when he showed up that day, you had no idea why

DONES

1    he had shown up?

2                    MR. GREENWALD:    That's a mischaracterization.

3             You have on the record that he figured and your

4             question was correcting him.   He suspected it, but

5             now you're --

6         Q.    Why did you suspect or figure that he had shown up?

7         A.    Well, there was an FBI agent at my door, I figured

8    that was the only incident.   I didn't think he would be there

9    for anything else.

10        Q.    Let me just back up.   When you say that was the

11   only incident, what incident specifically are you referring

12   to?

13        A.    I'm saying I never had an FBI agent come to my

14   door, so I figured the incident with Julio Vasquez, that's

15   why he was there.

16        Q.    Up until that day that the FBI agent showed up at

17   your apartment, have you had any recent conversations with

18   Mr. Vasquez?

19        A.    When I found out Mr. Vasquez had that problem, I

20   didn't even want to talk to the guy because he was the

21   subject of an investigation, and I didn't want to get

22   involved with Mr. Vasquez because now he's a subject.   In

23   other words, we're not supposed to associate with that type

24   of people.

25        Q.    So you hadn't spoken to him, right?

DONES

1        A.    No.

2        Q.    What did the FBI agent say next?

3        A.    At that time, when he identified himself, then the

4    rest of the field team, which was Sergeant Teran, Captain

5    Scollan, and the rest of the people showed up, and they

6    surrounded me right by the -- with the FBI agent.

7        Q.    Were they in a separate car?

8        A.    They came in separate cars, yes.

9        Q.    How many cars were there, total?

10       A.    I think it was three.

11       Q.    So you said they came up and they surrounded you.

12   At that point what did Sergeant Teran say, if anything?

13       A.    Well, they identified themselves also.

14       Q.    Then happened next?

15       A.    Then the FBI agent and Sergeant Teran proceeded to

16   ask me questions.

17       Q.    Let's start with the FBI agent.  Do you recall what

18   questions he asked you?

19       A.    Well, he asked me general questions, if I knew

20   Detective Vasquez, and he also asked me if I knew Detective

21   Nieves-Diaz, if I knew a Lieutenant Concepcion, who worked in

22   -- I think he worked in Brooklyn South Narcotics.

23       Q.    And did he tell you why he was asking you whether

24   or not you knew them?

25       A.    No.

DONES

1       Q.    What did you say when he asked you if you knew

2    Vasquez?

3       A.    Yes, that I knew him.

4       Q.    What was his response?

5       A.    Then he asked me if I knew Detective Nieves-Diaz.

6       Q.    What did you say?

7       A.    Yes.

8       Q.    What did he say, if anything?

9       A.    They just kept asking questions.

10      Q.    What happened -- so after you told them that you

11   knew them, what, if anything, did the FBI agent say next?

12      A.    Well, he had asked me if I had spoken to Detective

13   Vasquez.  I told him no.  He also asked me if I had spoken to

14   Detective Nieves-Diaz.  I told him yes, I have.

15      Q.    When you told him yes, what did Agent Hosey say?

16      A.    He started asking me how many times.

17      Q.    And at that time, how many times had you spoken to

18   him?

19      A.    A couple of times.

20      Q.    How long before this day, on or about July 8, 2004,

21   had you spoken to Mr. Diaz?

22      A.    From the time of the incident to about that time,

23   maybe about six, seven times.

24      Q.    In any of those times, did you talk about the

25   investigation into the drugs and money stealing?

DONES

1   A.   Investigation in which way?

2   Q.   Did the conversations with Nieves-Diaz focus on him

3   being a subject of investigation and what was going on in the

4   case?

5   A.   I didn't know he was a subject of investigation.

6   Q.   Did you talk with him about Vasquez?

7   A.   Yes.

8   Q.   Do you recall exactly what you talked about?

9   A.   With him, most of the conversation was I couldn't

10  believe that Detective Vasquez did that.

11  Q.   What did Mr. Diaz say?

12  A.   The same thing.

13  Q.   Did you tell that to the FBI agent what you just

14  told me about the conversations with Mr. Diaz?

15  A.   He didn't ask me that question.

16  Q.   Had you spoken with Mr. Concepcion?

17  A.   No, I lost contact with Concepcion.

18  Q.   Do you recall when was the last time you had spoken

19  with him?

20  A.   With Concepcion?

21  Q.   Yes.

22  A.   I don't know, it could have been two or three

23  months before that, before the incident.

24  Q.   You said Sergeant Teran also started asking you

25  questions.  What did he say?

DONES

1       A.    Well, he was asking me questions also, how did I

2   know Nieves-Diaz, how did I know Vasquez.

3       Q.    Were they asking you at the same time or were they

4   taking turns?

5       A.    They were taking turns.

6       Q.    Did Lieutenant Mejia say anything at that point?

7       A.    I don't recall.  I know it was mostly Teran and the

8   FBI agent at that time.

9       Q.    At that time.  And we're talking about right in

10  front of your apartment, right?

11      A.    Yes.

12      Q.    What about Sergeant Morton, did he say anything?

13      A.    I don't recall him asking me anything, no.

14      Q.    What about Scollan at that time, right in front of

15  your house?

16      A.    Well, he was there, but I don't think he asked me

17  anything at that moment.

18      Q.    When you said that they surrounded you, can you

19  just identify who the "they" is?

20      A.    The whole field team that was there.

21      Q.    So they all got out of the car?

22      A.    Yes.

23      Q.    After they asked you, "they" meaning Agent Hosey

24  and Teran asked you about your communication with Vasquez and

25  Nieves, what else happened?

DONES

1  A. It wasn't a communication with Vasquez, I never

2 spoke to Vasquez -- Nieves.

3  Q. When they questioned you about whether or not you

4 had spoken to them or knew them, because you testified that

5 Agent Hosey asked you about any communications you had with

6 Vasquez, Mr. Diaz, and Concepcion, and then Mr. Teran said

7 how did you know?

8    MR. GREENWALD:  I object to the form, and I

9    think you've got to break them up.  As I recall, he

10    testified that they talked about one of the two,

11    but not conversations with both of them.  You're

12    putting both together in the conversation.  So

13    please break it up, Diaz and Vasquez, please.

14    Did they ask you about both Vasquez and Diaz?

15    The WITNESS:  Yes, they asked me about Vasquez

16    first, and then Nieves-Diaz.

17  Q. And then Concepcion?

18  A. Yes.

19  Q. I am asking after they asked you about them, what

20 else did they ask you about, if anything?

21  A. Agent Hosey asked me how many times had I spoken

22 to -- how many times have I called Detective Nieves-Diaz.

23  Q. What was your response?

24  A. I told him about five or six times.

25  Q. What else did he say, if anything?

DONES

1        A.    Then he became very condescending, and he told me,

2    "Suppose I tell you a couple of hundred times."  That's when

3    I told him, "You know what?  I think this sounds like an

4    official investigation.  I want to go to the 48 so I can get

5    a delegate and a lawyer."

6        Q.    What did he say?

7        A.    He didn't say anything.  He stopped questioning me,

8    but Captain Scollan told me, no, we're not going to the 48.

9        Q.    And when you said it sounded like an official

10   investigation, what did you mean?

11       A.    Well, he got very condescending, and I didn't like

12   his tone of voice.

13       Q.    At this point were you still in front of your

14   apartment?

15       A.    Yes.

16       Q.    Did Agent Hosey say anything else after that?

17       A.    I think he stopped questioning me after I told him

18   I wanted a lawyer.

19       Q.    You said you wanted a lawyer?

20       A.    A lawyer and a delegate.

21       Q.    Did at that point Sergeant Teran say that they were

22   investigating you?

23       A.    They never told me that.

24       Q.    What happened next?

25       A.    They asked me if we could get in the car so we can

DONES

1    get out of the neighborhood, because people were starting to

2    come outside, and I was embarrassed, so I told him, yes,

3    let's go.

4        Q.    Did anyone suggest going into your apartment to

5    discuss?

6        A.    No.

7        Q.    So you agreed to go in a car with him?

8        A.    Yes.

9        Q.    When you got into the car, what happened?

10       A.    Well, when I got into the car because they told me

11   let's go somewhere out of here, because I lived on that block

12   since '86 and I've never been in trouble, and a lot of the

13   people there don't even know that I'm a police officer.   So

14   we got in the car, we drove to Yankee Stadium, by the bat.

15       Q.    The back of Yankee Stadium?

16       A.    The bat, the baseball bat there.

17       Q.    Whose car did you get into?

18       A.    I think I was in the car with Lieutenant Mejia, and

19   I think it was -- I think his name was Sergeant Crowley.

20       Q.    Let me just clarify, this is my fault.   Was

21   Sergeant Crowley at the apartment -- withdrawn.

22             Did Sergeant Crowley show up at the apartment with

23   the FBI agent and the defendants?

24       A.    Yes, he was there also.

25       Q.    Was there anyone else there at the apartment

DONES

1    besides the defendants Mejia, Scollan, Morton, and Teran, and

2    FBI Agent Hosey, and Crowley?

3        A.    Yes.

4        Q.    Who else was there?

5        A.    That was it.

6        Q.    Did Sergeant Crowley say anything to you when you

7    were in the car?

8        A.    I don't recall, no.

9        Q.    Did Lieutenant Mejia say anything to you when you

10   were in the car?

11       A.    Not when we were driving to Yankee Stadium, no.

12       Q.    How long was the drive from your apartment to

13   Yankee Stadium, approximately?

14       A.    About ten minutes, five to ten minutes.

15       Q.    Did they talk to you at all in the car or was it

16   just silent?

17       A.    I don't recall exactly if we did speak in the car.

18       Q.    Where were you seated in the car?

19       A.    In the rear.

20       Q.    Where was Lieutenant Mejia seated?

21       A.    I think he was in the passenger side of the car.

22       Q.    The front passenger side?

23       A.    Yes.

24       Q.    And Sergeant Crowley was driving?

25       A.    Yes.

DONES

1    Q.   What, if anything, happened when you got to Yankee

2   Stadium?

3    A.   We got to Yankee Stadium, I stayed in the car, I

4   think Lieutenant Mejia, Sergeant Teran, Captain Scollan, and

5   the FBI agent were two or three cars behind me, they were

6   talking and they were on the phone.  And Sergeant Teran came

7   up to me a couple of times and asked me if I was willing to

8   place a phone call to Detective Nieves-Diaz.

9    Q.   When you were en route to Yankee Stadium, do you

10   recall whether your car was behind the other two cars or was

11   your car in front?

12    A.   I don't recall.  I know when we parked they were

13   behind us.

14    Q.   And do you recall, did they put on police lights,

15   were the lights flashing or anything like that?

16    A.   No.

17    Q.   They weren't flashing?

18    A.   No, they didn't put no police lights or anything.

19    Q.   So you stayed in the car, you said.  And then he

20   asked you whether you want to place a phone call, and what

21   did you say?

22    A.   I told him and asked him what.  They hadn't told me

23   he was a subject yet.

24    Q.   So up until this point they haven't mentioned any

25   investigation into drugs or money stealing?

DIAMOND REPORTING  (718) 624-7200  info@diamondreporting.com

DONES

1      A.    No.

2      Q.    Who answered you, if anybody?

3      A.    Who answered me?

4      Q.    I'm sorry, I thought you asked them for what?

5      A.    No, I told him and asked him what, what am I going

6    to ask Detective Nieves-Diaz when you're telling me to make

7    -- you know, place a phone call to him.   What did he do?

8    They didn't want to tell me.

9      Q.    What did Sergeant Teran say next?

10      A.    Well, he told me -- he was threatening me, telling

11    me that if I don't place the phone call, I'm going to lose my

12    detail, which was the police impersonations unit.

13      Q.    Then what did you say next, if anything?

14      A.    What did I say?

15      Q.    When he said that you would lose your detail if you

16    didn't make the phone call, what happened next?

17      A.    I told him I can't place a phone call in to this

18    guy.  The guy is a friend of mine, and if I don't know why I

19    got to make a phone call in to him, I'm not going to place a

20    phone call.

21      Q.    What happened next?

22      A.    They went back, the same people went to the back

23    again, they conferred, they were on the phone, and then from

24    there, they told me we were going to go to group one.

25      Q.    When you were at Yankee Stadium, and you said you

DONES

1   stayed in the car, when Sergeant Teran was talking to you,

2   were you still in the car?

3        A.    Yes.

4        Q.    Did he get in the car with you?

5        A.    No, he was asking me through the window.

6        Q.    Did they tell you that you couldn't get out of the

7   car?

8        A.    No, but I know they didn't want me to hear their

9   conversation.  That's why I didn't get out of the car.

10       Q.    How did you know that they didn't want you to hear

11  the conversation?

12       A.    Well, they didn't even want to tell me why I had to

13  place a phone call to Nieves-Diaz.  They didn't even tell me

14  he was a subject.  I mean, they didn't even want to tell me

15  what the investigation was all about.  They didn't even want

16  anybody to know that I was with them, because I told them,

17  "Listen, I got to call my partner because he waits for me at

18  the 48," they told me, "All right, call him and tell him

19  you're going to be late."  And then finally I had to call my

20  sergeant and tell him, "Listen, I can't come in," because I

21  didn't want to be marked AWOL.

22       Q.    Do you recall what time you called your sergeant?

23       A.    I think I called the sergeant when we were walking

24  into group one.

25       Q.    We didn't get to that point yet, right, in the

DONES

1    story.

2        A.    No.

3        Q.    You started to say, then, the group went to group

4    one.  Where is group one?

5        A.    I think it's right here, in the Woolworth building

6    down here.

7        Q.    Lower Manhattan.  And approximately, if you recall,

8    how long did it take you to get from Yankee Stadium to group

9    one?

10       A.    25, 30 minutes, approximately.

11       Q.    Were you in the same car with Lieutenant Mejia and

12   Sergeant Crowley at that time?

13       A.    I don't remember if it was with Lieutenant -- I

14   don't know if Lieutenant Mejia was in the car then.  I think

15   that Sergeant Morton, I think he got in the car with Sergeant

16   Crowley.

17       Q.    On the drive to the Woolworth building, was there

18   any conversation between you, Sergeant Morton, and Sergeant

19   Crowley?

20       A.    That I could recall, I don't remember.

21       Q.    What happened when you got to group one?

22       A.    When I got to group one, I told the sergeant that I

23   had to call my sergeant and let him know that I wasn't going

24   to come in to work.

25       Q.    Did you call your sergeant?

DONES

1    A.    Yes.

2    Q.    Did you give him a reason as to why you couldn't

3    come in to work?

4    A.    No, they had told me not to tell anybody that they

5    were with me, so I told him I had a family emergency.

6    Q.    Did they explain to you why you shouldn't tell your

7    sergeant that you were with them?

8    A.    No.

9    Q.    What was the name of your sergeant at that time?

10    A.    Sergeant Garland.

11    Q.    Did Sergeant Garland say anything to you?

12    A.    No.

13    Q.    So after you called your sergeant, what happened

14    next?

15    A.    I called the sergeant, we walked upstairs, I don't

16    remember what floor it was, and I guess the sergeant signed

17    in.  I guess you got to sign in every time somebody goes in

18    there.  And we sat in the -- I think it was like a TV room or

19    conference room, or their lunch room.

20    Q.    You said they signed in.  Did you sign in as well?

21    A.    No.

22    Q.    Is there a particular reason why you didn't sign

23    in?

24    A.    I don't know.  They just signed the books so I

25    figured --

DONES

1      Q.    When you got out of the car and walked upstairs,

2   were you restrained in any way?

3      A.    No.

4      Q.    So what happened when you got upstairs?

5      A.    Well, we walked into the -- I think it was their

6   lunchroom, the group one's lunchroom.  We were sitting there

7   for a little while, and sergeant -- I think it was Sergeant

8   Crowley, asked me if I could give him my weapon.  I told him

9   "Why do I have to give you my weapon?"  Then he gave me some

10  jive story that, you know, we're in group one, they don't

11  like people here with their weapon.  So I said, you know

12  what, here, I gave it to him.

13     Q.    Did he request anything else from you, like your

14  shield or anything like that?

15     A.    No.

16     Q.    So what happened after you gave him your weapon?

17     A.    After I gave him my weapon, I figured these guys --

18  I'm in custody, because I couldn't go anywhere, I felt like a

19  prisoner now.

20     Q.    Before you gave them your weapon, did you feel like

21  you were in custody?

22     A.    At the beginning, yes, when they were in front of

23  my house, they all surrounded me.  I wasn't free to go

24  anywhere.

25     Q.    Did they tell you that you weren't free to go

DONES

1    anywhere?

2        A.    No, just their body language.

3        Q.    Did they threaten you with discipline if you didn't

4    go with them?  Let's go back to your house, when you got in

5    the car with them to go to Yankee Stadium.  Did they threaten

6    you if you didn't go with them?

7        A.    No, they threatened me with losing my detail when I

8    was by Yankee Stadium, if I didn't make a phone call to

9    Nieves-Diaz.

10       Q.    At any point did either of the defendants, Agent

11   Hosey or Sergeant Crowley, tell you that you were under

12   arrest?

13       A.    No.

14       Q.    Sergeant Crowley, you said you gave him your

15   weapon.  What happened next, if anything?

16       A.    When I gave him my weapon I sat back in the room.

17   And I wanted to go to Thomas Street, to talk to the delegate

18   to get me a lawyer, 26 Thomas Street, the DEA building, but

19   now I couldn't leave because I had given him my gun.  Now, I

20   don't want him safeguarding my weapon and get in trouble for

21   that.

22          Second of all, I asked Sergeant Crowley, every time

23   I told Sergeant Crowley, listen, I am going to go to the

24   bathroom, because I wanted to see if I could get out of the

25   building, Sergeant Crowley followed me to the bathroom and he

DONES

1    stood guard, like if I was a prisoner, the way we take

2    prisoners to the bathroom and watch over them.  That's when I

3    knew I couldn't leave.

4         Q.    So you say he waited for you outside of the

5    bathroom?

6         A.    No, he stood at the door of the bathroom and

7    watched me do whatever I had to do in the bathroom.

8         Q.    Inside of the bathroom?

9         A.    Yes.

10        Q.    Did they question you at group one?

11        A.    No.

12        Q.    So what else happened, if anything, at group one?

13        A.    What I was at group one for, I about I think I got

14   there about the 8:00 or 9:00, I was about there until 5:00 in

15   the afternoon.  I wasn't able to go eat.  I was there all day

16   without a meal, without anything.  Then Captain Scollan

17   calls, one of the -- I don't know if it was Sergeant Crowley

18   or Sergeant Morton's phone, the cell phone, and they put me

19   on the phone and, you know, he asked me am I willing to place

20   a phone call to Detective Nieves-Diaz, and I told him no, I

21   am not going to place a phone call.

22             I explained to him, Captain Scollan, that he had

23   held me here for about ten or 12 hours, I don't exactly

24   remember how much.  I hadn't had a meal, I felt like a

25   prisoner.  He told me, "What are you worried about, you're

DONES

1    going to get paid." I told him, "I don't know if you

2    remember, but I had to call my sergeant and tell him that I

3    need the day off because I had a house emergency, because you

4    didn't want me to tell these people that I was with you," and

5    he goes, "Don't worry, we'll pull your 28." And I told him,

6    "I don't want you to pull my 28. You kept me here this long,

7    you're not pulling my 28. You kept me here for like

8    12 hours, I don't want to hear that."

9        Q.    What does that mean, pull your 28?

10       A.    Pull my 28 means that -- 28 is what we fill out

11   when we need a day off. He was just going to take it back

12   like if I had worked that day. Then he told me, he goes,

13   "Listen, if you change your mind, we're going to put on

14   modified assignment. We will say that you had a domestic

15   problem. That way, in case you want to work with us later on

16   nobody's going to know that you were placed on modified

17   because of this incident. You were placed on modified

18   because of a domestic incident."

19                MR. GREENWALD:  Change your mind about what?

20                THE WITNESS:  If later on I decide to make a

21            phone call to Nieves-Diaz.

22       Q.    Just for clarification, do you believe that you

23   were placed on modified duty because you would make the call

24   to Detective Nieves-Diaz?

25       A.    I believe so, yes.

DONES

1          Q.    Let's just back up a little bit.  Did you ever ask

2      any of the defendants to give you something to eat during the

3      day?

4          A.    Did I ever ask them, no.  Already I was hurt and

5      upset, because these people have violated our police rules,

6      and they have violated my civil rights.  These are people

7      that have college degrees.  All I have is a high school

8      education, and I knew that.

9          Q.    When you say they violated the police rules, what

10     rules are you referring to?

11         A.    The rules that if I'm a subject of investigation,

12     they're supposed to give me ample time to get a lawyer so

13     that they can question me with a recording during a GO15, you

14     know, an official investigation.  I was a subject, and they

15     tried to use the FBI as a go-between to ask me questions so

16     they can use, and Sergeant Teran still asked me questions

17     there.

18         Q.    Were you the subject, to your knowledge, the

19     subject of an investigation, or was it Vasquez that was the

20     subject of an investigation, and this is to your knowledge?

21              MR. GREENWALD:  I object to that form.  You

22              can ask him whether he was told that or not.

23         Q.    Were you told you were the subject of an

24     investigation?

25         A.    Not at that point , no.

DONES

1      Q.    Were you ever told that you were the subject of the

2    investigation?

3      A.    No.  I found out in the trial room that I was a

4    subject of the investigation.

5      Q.    And what investigation were you the subject of?

6      A.    During the trial room, they told me that my name

7    had popped up in their investigation because I have placed a

8    phone call to Nieves-Diaz.  So when they ran his phone

9    records and they got my name and they found out that I worked

10   in IAB, now they treated me like a subject.

11     Q.    At the trial they said that they treated you like a

12   subject?

13     A.    No.  At the trial they told me now I'm a subject

14   because I am involved in the investigation in whichever way

15   it was.

16     Q.    To your recollection, they knew this when they

17   showed up at your door in July of 2004?

18     A.    Yes.

19     Q.    So you said that you were placed on modified duty.

20   So where did you have to report to?

21     A.    Well, I was placed on modified but they left me.

22     Q.    At group one?

23     A.    At group one, but on modified, which means I don't

24   have a gun and I can't go out in the street.  I am sitting in

25   the office, doing administrative work.

DONES

1    Q.    How long were you on modified?

2    A.    I was on modified from that time until the time two

3    or three weeks before I retired.

4    Q.    What time did you leave group one on that day?

5    A.    It was in the afternoon, I think it was around

6    5:00, I think, around that time.  It was in the afternoon.

7    Q.    Did you go home afterwards?

8    A.    No, I had to go to group 52 so I could hand a

9    sergeant from group one my weapons.

10   Q.    What weapons would those be?

11   A.    My service revolver, whatever weapons I had at the

12   office, they're in my locker.

13   Q.    How many weapons did you have before that day, in

14   or about July 8, 2004?

15   A.    I had the regular Glock, the service revolver.  I

16   had my .38 service that I got when I first came on the job, a

17   .38 off-duty, and a .22.

18   Q.    Which gun did Sergeant Crowley take from you at

19   group one?

20   A.    The .38.

21   Q.    So you had to turn in the other weapons?

22   A.    Yes.

23   Q.    Where did you turn that into?

24   A.    It was a sergeant from group one went with us to my

25   office at group 51.

DONES

1       Q.    Did Scollan tell you what would happen if you

2    decided to place the call to Mr. Diaz?

3       A.    No.

4       Q.    So after you went back to group 51, what happened

5    next, if anything?

6       A.    After I gave him all my guns, they informed, the

7    sergeant that was there, I don't know if it was Schumacher,

8    that I was going to be placed on modified assignment, which

9    is very embarrassing.

10      Q.    Would that be Sergeant Garland?

11      A.    I don't know if he was there.

12      Q.    They told him while you were standing there that

13   you were going to be placed on modified?

14      A.    Yes.

15              MR. GREENWALD:  Who is "him" in that question?

16              THE WITNESS:  It was one of my sergeants, I

17              don't know which sergeant, it was a sergeant from

18              51.

19      Q.    Just for clarification, who were the two people

20   that went with you back to group 51?

21      A.    Sergeant Crowley went back with Sergeant Morton.  I

22   don't know if that was his name, I think it was Sergeant

23   Morton, I don't know if his name is Morton.

24      Q.    Can you describe Sergeant Morton or the person that

25   you said went back with you?

DONES

1      A.    It was a male, white, tall, black hair, big guy, he

2   was a big guy.

3      Q.    That's not Morton, he's an African American guy.

4      A.    So who was Crowley?  There was an African American

5   there with him, I thought that was Crowley.  But I don't know

6   their names.  Morton with his partner, whoever was with him,

7   so Crowley, I don't know if Crowley is the other guy or him.

8   So Morton is the black guy, then.

9      Q.    Just for clarification, when you said that Crowley

10  took your gun, was it Morton?

11     A.    It was Morton then, and he was the one that walked

12  me to the bathroom also.

13     Q.    So after they told your sergeant you were on

14  modified duty, did they tell the sergeant at that point why

15  you were on modified duty?

16     A.    I don't recall if they did, no.

17     Q.    So what happened next, after?

18     A.    Well, after that, after I gave him my -- I think I

19  had to give him my ID card also, and I think Sergeant Morton

20  and his partner drove me to my house in the Bronx.

21     Q.    Your ID card is separate from your shield, right?

22     A.    Yes, you could keep your shield but the ID card, I

23  think they put "modified" on it, no firearms.

24     Q.    Where would you use the ID card, is that getting in

25  and out of buildings?

DONES

1      A.    Yes.  Well, the ID card is more official than the

2  police badge, they really want to see the identification card

3  other than the badge, anywhere you go.

4      Q.    The badge is nicer, no?

5      A.    Yes, but they sell badges anywhere, so they don't

6  want you impersonating.

7      Q.    So the next day, where did you report to?

8      A.    The next day I went to my office, group 51.

9      Q.    So you were on modified but still at group 51?

10      A.    I was still there, yes.

11      Q.    When you were on modified, what did you do every

12  day?  Did it vary or was it --

13      A.    It varied.  I picked up the phone calls, did

14  administrative work.

15      Q.    Did you work overtime when you were on modified

16  duty?

17      A.    You're not allowed.

18      Q.    Let's go back to the day on or about July 8, 2004,

19  when you went home that day, did you contact the union then?

20      A.    Yes.

21      Q.    How did you contact them?

22      A.    I called up.

23      Q.    Who did you call?

24      A.    I don't remember exactly.

25      Q.    Do you recall what you said?

DONES

1        A.     Well, I had explained to them what had happened to

2   me during the day.

3        Q.     What did the union say?

4        A.     I don't remember.

5        Q.     Did they tell you to do anything specific?

6        A.     No, not really.

7        Q.     Did you file a grievance concerning that day, in or

8   about July 8, 2004?

9        A.     I let the union know what happened, yes.

10       Q.     Did they file a grievance on your behalf?

11       A.     I don't know.  I know that a paper came out saying

12  if any FBI agent came to your house, don't speak to them.

13  But I don't know what they did afterwards.

14       Q.     You said a paper?  Where did you get this paper

15  from?

16       A.     It was a memo from the union.  I don't know if they

17  posted it or mailed it to everybody.  It was a letter stating

18  that if an FBI agent comes to your house, don't speak to

19  them.

20       Q.     Do you still have a copy of that memo?

21       A.     No.

22       Q.     Do you recall when the memo was written?

23       A.     I think it was the same week.  I don't remember

24  exactly.  I'm sure they keep copies of it.

25       Q.     Did the memo say why you shouldn't speak to the FBI

DONES

1    agent?

2        A.    I think it said that you're not supposed to speak

3    to an FBI agent, because if you lie to them, you could get in

4    trouble, so to avoid all those problems, don't even speak to

5    them.

6        Q.    Did the memo say anything about speaking with NYPD

7    concerning investigations?

8        A.    No, because it's common.  There is a patrol guide

9    revision saying that if you're a subject of an investigation,

10   they're supposed to go through certain procedures.

11       Q.    Do you know what the patrol guide says if you have

12   information concerning a subject of an investigation?

13       A.    If you have information of corruption?

14       Q.    Yes, or drug dealing?

15       A.    If you have any knowledge about police corruption,

16   you are supposed to report it to Internal Affairs.

17       Q.    Do you know whether there is a policy on what

18   happens if you don't report it to Internal Affairs?

19       A.    I don't know.  I don't exactly know.

20       Q.    Were you subsequently paid for that day in or

21   around July 8, 2004?

22       A.    No.

23       Q.    You were never paid?

24       A.    Like I told you, he wanted to use that as an

25   excuse.

DONES

1    Q.    Did you speak to any other officers or detectives

2    about what happened to you in July 2004, and we're talking

3    about the incident at your house and Yankee Stadium?

4    A.    Well, I spoke to people at the union, I let my

5    partner know what happened, a couple of people, yes.

6    Q.    Were you told by the defendants or the NYPD not to

7    talk about what happened that day?

8            MR. GREENWALD:  I object to the form.  Were

9            you told by defendants, I don't have a problem

10           with.  Were you told by NYPD, we need to identify

11           who told him.

12           MS. WALKER-DIALLO:  He can tell me.

13           MR. GREENWALD:  I object to the form.  Could

14           you rephrase the question?

15   Q.    Do you understand the question, sir?

16           MR. GREENWALD:  It's not a question if he

17           understands it.  I objected to it because you

18           lumped together the defendants and the NYPD, so

19           please break it down.

20   Q.    Were you told by the defendants not to talk about

21   what happened that day?

22   A.    No.

23   Q.    Did anyone from the NYPD tell you not to talk about

24   what happened that day?

25   A.    No.

DONES

1        Q.    Did any of the defendants tell that they wanted you

2    to become a confidential informant concerning the

3    investigation with Mr. Vasquez?

4        A.    No.

5        Q.    Were you later interviewed by Sergeant Teran after

6    that day, after July 2004?

7        A.    I think it was at the GO15, at the patrol guide

8    hearing, yes.

9        Q.    Were you represented by your union at the hearing?

10       A.    Union reps, yes.

11       Q.    Do you recall what you were charged with?

12       A.    I think they were saying I lied during an

13   investigation.

14       Q.    Prior to July 8, 2004, the day of the incident, did

15   you ever access computer records concerning the investigation

16   of Mr. Diaz?

17              MR. GREENWALD:  Before July 8, 2004.

18       A.    Have I ever accessed --

19              MR. GREENWALD:  The question was before

20              July 8, 2004, did you access computer records with

21              reference to Diaz.

22       A.    I don't recall.

23       Q.    What about after that day, do you recall accessing

24   computer records -- and let me just clarify, when I am

25   talking about computer records, I am talking about through

DONES

```
 1    the NYPD data system, not at home.

 2         A.    After that day, no.  After that day I knew he was a

 3    subject.  When they were in my house, I found out he was --

 4    you know, I knew they were investigating him, and I didn't

 5    want to have anything to do with him, and that he was the

 6    subject.

 7         Q.    What was the outcome of the GO15?

 8         A.    At the GO15 I was suspended.

 9         Q.    How long were you suspended for?

10         A.    I think it was 30 days or 29 days.

11         Q.    Do you recall when that was?

12         A.    The day of the GO15.

13         Q.    It was a one-day --

14               MR. GREENWALD:  Are you asking him when the

15               GO15 was, or when his suspension was from?

16               MS. WALKER-DIALLO:  When his suspension was

17               from.

18         A.    The day of the GO15.

19         Q.    Do you recall that day?

20         A.    Exactly, no.

21               MR. GREENWALD:  Do you have information at

22               home?

23               THE WITNESS:  I think so, yes, paperwork.

24               MR. GREENWALD:  Please leave a blank and he

25               will fill it in when he reviews the transcript.
```