DONES

1 _____

2 _____

3    Q.    What about the trial or the hearing?

4          MR. GREENWALD:  The trial room?

5          MS. WALKER-DIALLO:  Yes.

6    A.    The trial room I think was in February 2006.

7    Q.    What was the outcome of the trial room?

8    A.    I don't remember exactly.  I think it was they

9  found me guilty of using department computers, and I think

10 that might have been it.  I don't remember, but I can find

11 that out, too.

12         MR. GREENWALD:  Do you have information at

13         home?

14         THE WITNESS:  Yes.

15         MR. GREENWALD:  Leave a blank and fill in what

16         the findings were.

17 _____

18 _____

19   Q.    Did you testify at that trial room?

20   A.    Yes.

21   Q.    At the trial room were you represented by counsel?

22   A.    Yes.

23   Q.    Who was your counsel at the trial room?

24   A.    It was the DEA attorney, Phil Karysek.

25         MS. WALKER-DIALLO:  Please mark this as

DONES

1          Defendants' Exhibit A.

2               (Whereupon, the aforementioned document was

3               marked as Defendants' Exhibit A for identification

4               as of this date by the Reporter.)

5     Q.    I will show you what has been marked as Defendants'

6     Exhibit A.

7               MS. WALKER-DIALLO:  For the record, it is

8               document Bates-stamped 00226228, it was produced by

9               your attorney, it is a memo from Detective Dones to

10              Phil Karysek.

11              MR. GREENWALD:  Okay.

12    Q.    Did you have a chance to take a look at this

13    document?

14    A.    Briefly, yes.

15    Q.    Have you seen this document before?

16    A.    Yes.

17    Q.    I guess -- what is this document?

18    A.    It's my recollection of what had happened that day.

19    Q.    Mr. Karysek, was he at the DEA?

20    A.    He's the attorney.

21    Q.    Do you recall when you sent him this document?

22    A.    Not exactly, no.

23    Q.    Do you recall if it was in reference to the trial

24    room hearing?

25    A.    No.

DONES

1       Q.    Let me narrow this down.

2             Do you recall sending this at all around the time

3       that the incident happened, in July of 2004?

4       A.    This happened, yes, I remember sending him this.

5       This happened after they went to my house.

6       Q.    This happened, meaning the memo?

7             MR. GREENWALD:  By counsel, the memo starts on

8             July 8, 2004, and describes events that occurred.

9             So obviously it couldn't have been before.  It had

10            to be afterwards.

11            MS. WALKER-DIALLO:  I am trying to figure out

12            how long after.  He didn't say when.  I could be

13            three years after.

14            MR. GREENWALD:  But I object to the form of

15            the question.  Just ask him when the memo was

16            prepared.

17            MS. WALKER-DIALLO:  I did.  He said he didn't

18            recall.

19      A.    During that week.

20      Q.    During that week?

21      A.    Yes.

22      Q.    Thank you very much.

23            Did Mr. Karysek ask you to send this to him?

24      A.    I don't remember if it was him or the people from

25      the DEA, I don't remember.

DONES

1     Q.    You say he was your counsel at the trial hearing or

2    am I incorrect?

3                    MS. WALKER-DIALLO:  He said the lawyer.

4                    MR. GREENWALD:  He said he was a lawyer, but I

5            thought with the prosecutor's office.

6     A.    No, he was our DEA lawyer.

7                    MR. GREENWALD:  Was he representing you?

8                    THE WITNESS:  He was representing me.

9                    MS. WALKER-DIALLO:  I just want to ask one or

10           two more questions and take a quick break.  Let's

11           mark this as Defendant's Exhibit B.

12                    (Whereupon, the aforementioned document was

13           marked as Defendants' Exhibit B for identification

14           as of this date by the Reporter.)

15     Q.    Mr. Dones, I will show you what has been marked as

16    Defendants' Exhibit B.  It's a handwritten note.  I ask that

17    you just take a minute to look at it and let me know when

18    you're done.

19     A.    Okay.

20     Q.    Have you seen this document before?

21     A.    Yes.

22     Q.    Is this your handwriting?

23     A.    Yes.

24     Q.    Did you send this document to anyone?

25     A.    I don't remember if I sent or if I gave this to

DONES

1    Phil Karysek or if I gave him the typewritten one, I don't

2    remember, or if I gave him both.

3        Q.    Did you write Defendants' Exhibit B, and then was

4    Defendants' Exhibit B typed up to be Defendants' Exhibit A?

5                MR. GREENWALD:  By counsel, having looked at

6                it, there are differences.  I'm not talking about

7                material differences, but it's not a straight

8                transcript.  In other words, this is not -- the

9                typewritten version, which has been marked as

10               Defendants' Exhibit A, is not a direct rendition of

11               this.  It contains a lot of the same information, a

12               lot of the same stuff, but it's not a straight

13               transcription as in comparison to each other.

14       Q.    Why did you write Defendants' Exhibit B, this one,

15   the handwritten one?

16       A.    This was my -- I wrote it when I was home, the

17   incident, what had happened with the incident.

18       Q.    That same day?

19       A.    I think it was the same day or the day after, I

20   don't remember exactly.

21       Q.    Did you use Defendants' Exhibit B, which you say

22   you'd just written up, to type up Defendants' Exhibit A?

23       A.    I think so, yes.

24       Q.    So Defendants' Exhibit B is your recollection of

25   what happened that day, being July 8, 2004?

DONES

1       A.    Yes.  Also, I think the back page is like 14, 15.

2    These were at the trial room, I think these were written

3    down.  I don't think these were connected with --

4       Q.    I see.

5                MR. GREENWALD:  By counsel, he's referring,

6                first of all --

7                MS. WALKER-DIALLO:  I will identify what the

8                documents are.  Defendants' Exhibit B is document

9                Bates stamped 00005 to 00016.

10       Q.    Plaintiff has just identified the last two pages or

11    three pages?

12       A.    0014.

13       Q.    To 0016?

14       A.    Correct.

15       Q.    It's not a part of the memo?

16       A.    Right, I don't think so.  I think this was at the

17    trial room, notes.

18       Q.    Notes you took at the trial room?

19       A.    Yes.

20                MS. WALKER-DIALLO:  Let's take a quick

21                five-minute break.

22                (Whereupon, a short recess was taken.)

23                MS. WALKER-DIALLO:  Back on the record.

24                Please mark the next document as Defendants'

25                Exhibit C.

DONES

1          (Whereupon, the aforementioned document was

2       marked as Defendants' Exhibit C for identification

3       as of this date by the Reporter.)

4          MR. GREENWALD:  Are you going to ask him

5       questions about the complaint?

6          MS. WALKER-DIALLO:  Yes, sir.

7          MR. GREENWALD:  He did not sign the complaint.

8       It's not a verified complaint.

9          MS. WALKER-DIALLO:  I know he did not sign the

10       complaint, and I know it is drafted by an attorney,

11       but the facts concerning the event is his claim.  I

12       will not ask him about any legal conclusions or

13       anything like that.

14          MR. GREENWALD:  I will deal with it on a

15       question-by-question basis.  Just so long as it's

16       clear on the record that the document was not

17       signed by my client.

18          MS. WALKER-DIALLO:  That's fine.

19     Q.    I will show you what's been marked as Defendants'

20   Exhibit C, and ask that you take a look at the document.

21   When you're done, just let me know.

22     A.    Okay.

23     Q.    Have you ever seen this document before?

24     A.    No.

25     Q.    I am not asking you about the substance of any

DONES

1    conversations with your attorney.  Did you meet with an

2    attorney by the name of George Fontana concerning this case?

3         A.    Yes, I think so, yes.

4         Q.    Did Sergeant Teran ever talk to you about the

5    decision to place you on modified duty?

6               MR. GREENWALD:  I think that's been asked and

7               answered.  Over my objection, you can answer again.

8         A.    I don't understand the question.

9         Q.    Who informed you that you were going to be placed

10   on modified duty?

11        A.    It was when Captain Scollan, during the phone call,

12   when he called me at group one.

13        Q.    Did Sergeant Teran ever say anything to you about

14   your placement on modified duty?

15        A.    No, the only thing that Sergeant Teran said was if

16   I don't do the phone call, I might lose my detail.

17        Q.    I think you talked about it before, but can you

18   just refresh my recollection, "lose detail," what does that

19   mean again?

20              MR. GREENWALD:  Again, and I see where this is

21              going because is this is the factual background, it

22              is exactly what he has testified to.

23              MS. WALKER-DIALLO:  I am not going anywhere.

24              MR. GREENWALD:  Over my objection as asked and

25              answered, I will let him answer it again, but

DONES

1          hopefully I won't have to do it again.

2                  THE WITNESS:  Repeat the question because I

3          lost it.

4                  MS. WALKER-DIALLO:  I did, too.  Please read

5          it back.

6                  (Whereupon, the referred-to question was read

7          back by the Reporter.)

8      Q.    Lose detail?

9      A.    I understood it to mean they would transfer me out

10    of group 51.

11    Q.    When you say transfer out of group 51, on to

12    modified duty, is that what you thought that meant?

13    A.    No, I thought they were just going -- group 51 is a

14    specialized unit, it's very -- what word should I use, it's

15    very -- a lot of people want to get into that unit, it's

16    very, you know.

17                MR. GREENWALD:  Elite.

18    A.    Elite unit.  I thought they would just get me out

19    of group 51 and send me somewhere else.

20    Q.    Did Lieutenant Mejia ever say anything to you about

21    your placement on modified duty?

22    A.    In which way?  I don't understand.

23    Q.    Did he ever talk to you about Scollan's decision to

24    place you on modified duty?

25    A.    No, I lost contact with these people after this

DONES

1    happened.  I never spoke to them again.

2        Q.    And I ask the same question for Morton, Defendant

3    Morton, did you ever have a conversation with Sergeant Julius

4    Morton about the decision to place you on modified duty?

5        A.    No, I don't recall that, no.

6        Q.    After July 8, 2004, the day of the incident, did

7    you ever speak to Sergeant Morton again?

8        A.    After the incident, no, I didn't speak to any of

9    these guys.

10        Q.    And just for clarification, "any of these guys"

11    means Sergeant Morton, Lieutenant Mejia, Frank Teran, and

12    Deputy Inspector Scollan; is that correct?

13        A.    Correct.

14        Q.    The day of the incident, July 8, 2004, do you

15    recall how many times you requested an attorney or a union

16    rep?

17        A.    To the best of my recollection, I told him when the

18    questioning, I told him I wanted an attorney.

19        Q.    That was at the house?

20        A.    That was in front of my building, yes.  And then

21    when Captain Scollan called me, I had told him, "Listen, you

22    guys held me here all day without legal representation and

23    without union representation," I told him then.

24        Q.    The first time in front of the building you said

25    you wanted an attorney?

DONES

1      A.    Yes.

2      Q.    Did you mention the union at that point?

3      A.    I mentioned both.  I said I wanted to go to the

4  48th precinct so I could speak to a delegate, so I could get

5  an attorney.

6      Q.    And the next time you said you told Scollan, where

7  were you at that point, was that at Yankee Stadium or at

8  group one?

9      A.    That was at group one, when he had called on the

10  cell phone.

11      Q.    You told him you wanted an attorney and your union

12  delegate again?

13      A.    No, I had told him he had held me there all day and

14  I didn't get a meal, I didn't speak to any union,

15  representative, and I didn't speak to an attorney, that he

16  held me there without legal representation.  I informed him

17  that.

18      Q.    What did he say, if anything?

19      A.    No, he just said, don't worry, I'm going to get

20  paid for the day.

21      Q.    After July 8, 2004, did you ever complain to

22  someone within NYPD about what happened that day?

23              MR. GREENWALD:  Within NYPD?

24      A.    You mean with the union?

25      Q.    No, with the NYPD.

DONES

1          MR. GREENWALD:  Did you file any kind of

2      complaint, formal complaint, or make an oral

3      complaint with anybody at NYPD about what happened

4      on July 8, 2004?

5          THE WITNESS:  No, I spoke to the union about

6      it, I didn't speak to anybody from the NYPD.  They

7      are supposed to represent me, so I figured we bring

8      grievances to them and they fight for us.

9      Q.    To your knowledge, did they file a grievance

10 concerning the July 8th incident?

11      A.    I don't know.

12      Q.    The GO15, was that in relation to what happened on

13 July 8, 2004?  Let me clarify that.

14          Was the subject of the GO15 about what happened on

15 July 8, 2004?

16      A.    I don't know if it was exactly because of what

17 happened that day.  I think it was based on the whole overall

18 investigation.

19      Q.    The overall investigation being into Mr. Vasquez,

20 or what do you mean by the overall investigation?

21      A.    My understanding is when there is an investigation

22 going on, they have to question everybody that they think is

23 involved in the investigation, so generally I think it was

24 because of the whole investigation.  I don't know exactly

25 what, you know, what role I played in it.

DONES

1        Q.    That's fair.

2              Were you ever out of work for health reasons while

3        you were employed with the NYPD, like out on sick leave,

4        medical leave?

5                   MR. GREENWALD:  I object.  What's the purpose

6                   of that?  We're not claiming a physical injury in

7                   this case.  I mean, by the bringing of a lawsuit,

8                   it does not call into question everything in his

9                   life.  Is there some basis for that question?

10                  MS. WALKER-DIALLO:  In paragraph 35 of the

11                  complaint there is an allegation that he suffered

12                  humiliation, as well as emotional pain and

13                  suffering.

14                  MR. GREENWALD:  Right.  Okay.  And?

15       Q.    Were you ever out of work as a result of any

16       emotional pain or suffering?

17                  MR. GREENWALD:  As a result of this incident?

18                  MS. WALKER-DIALLO:  Yes, if I can get out the

19                  question.  I am trying my best and you're like --

20                  MR. GREENWALD:  The question was improper.

21                  MS. WALKER-DIALLO:  It wasn't improper.

22                  MR. GREENWALD:  Yes, it was.

23                  MS. WALKER-DIALLO:  You want specifics, I am

24                  giving you specifics.

25                  MR. GREENWALD:  First of all, the question

DONES

1    changed.  First you asked him about health reasons,

2    then you morphed it into something else.

3        MS. WALKER-DIALLO:  I didn't morph it into

4    anything.  You want specifics, I'm going to give

5    you specifics.  I said health reasons.  You

6    objected.  I am giving you specifics.  I am

7    directing you to paragraph 35 of the complaint,

8    which says, and I will read it into the record:

9    "As a direct and proximate consequence of

10   defendants' unlawful, discriminatory, and harassing

11   conduct, plaintiff has suffered loss of benefits

12   and privileges of his employment with the NYPD;

13   damage professionally, economically; suffered

14   humiliation; as well as emotional pain and

15   suffering."

16       MR. GREENWALD:  And I asked you, after you

17   asked the question, whether or not it was relating

18   to this incident, which you had not related any of

19   your questions to.  So now --

20       MS. WALKER-DIALLO:  I just related it to the

21   question.

22       MR. GREENWALD:  Fine.  So now the question is,

23   did you miss any time from work as a result of this

24   incident.

25       MS. WALKER-DIALLO:  Let me ask the questions.

DONES

```
 1              I'm the one asking the questions.  If your client

 2              doesn't understand the question, he can say, ma'am,

 3              I don't understand what you're saying.  It's

 4              simple.  We don't need to get into arguments over

 5              this.  I asked a broad question.  You said

 6              specifics, I pointed you to specifics.  It's clear.

 7         Q.   The question is, were you ever out of work as a

 8    direct or proximate consequence of what happened to you on

 9    July 8, 2004?  Specifically, there's emotional pain and

10    suffering.  Were you out of work as a result of emotional

11    pain and suffering you said you suffered as a result of

12    July 8, 2004?

13         A.   Was I ever out of work because of this incident?

14         Q.   This is alleging that you suffered pain and

15    suffering as a result of July 8, 2004, and what happened

16    afterwards.  My question is, did you take any days off from

17    work as a result of this emotional pain and suffering?

18         A.   Can I confer with him for something?

19         Q.   There is a question pending.

20              MR. GREENWALD:  That's fine.  Come confer with

21              me.

22              MS. WALKER-DIALLO:  No, it's not fine.  You

23              can't do that.

24              MR. GREENWALD:  You have your objection on the

25              record.  Come talk with me.  The question is
```

DONES

1          inappropriate.

2                  MS. WALKER-DIALLO:  It's not an inappropriate

3          question.

4                  MR. GREENWALD:  Which time, the fourth time

5          you got it out?

6                  MS. WALKER-DIALLO:  If you would let me get

7          the question out.

8                  (Whereupon, a short recess was taken.)

9                  MR. GREENWALD:  My client points out to me

10         that the referenced paragraph does not say anything

11         about time out of work.  That's why he was

12         confused.

13                 MS. WALKER-DIALLO:  First of all, if your

14         client is confused, he can say we don't know what

15         you're talking about.

16                 MR. GREENWALD:  That's why I'm here,

17         counselor.  That's why I'm here.

18                 MS. WALKER-DIALLO:  No, you're not here to sit

19         here and tell me how to ask the question.  If you

20         want to talk to me and say, well, maybe,

21         Ms. Walker-Diallo, what you're asking is -- you're

22         being condescending and you're being rude and I

23         don't appreciate it.  You want me to be specific or

24         ask questions so that your client can understand, I

25         don't have a problem with doing that, but I'm not

DONES

1        going to sit here and take this type of treatment,

2        I'm not.

3                MR. GREENWALD:  What type of treatment?  What

4        are you talking about?

5    Q.    I specifically asked, were you ever out of work,

6    and if you don't understand the question, please say that and

7    I will try my best to rephrase it.

8            After this incident, which is July 8, 2004, up

9    until the time you went out on retirement in 2006, did you

10   ever take off from work as a result of any emotional pain and

11   suffering that you suffered from the event of July 8, 2004?

12   Do you understand the question, sir?

13   A.    Yes.  You're asking me did I lose -- did I take

14   days off from work after this incident happened.

15   Q.    Not related to anything else, related to this case.

16   A.    No.

17   Q.    Thank you.

18                MS. WALKER-DIALLO:  I just want to note for

19        the record, and I spoke to Ms. Cronan about this,

20        that we haven't received responses to our

21        interrogatories and document request.

22   Q.    Aside from the named defendants, and I believe it

23   was a Sergeant Crowley and Agent Hosey that showed up at your

24   house on July 8, 2004, is there any other person that has any

25   knowledge and information concerning what happened that day?

DONES

1          MR. GREENWALD:  I object to the form of that

2          question.  First of all, that encompasses

3          attorneys.

4      Q.   I don't want to know what you spoke about with your

5  attorney.

6          Let's put it this way:  Were there any witnesses to

7  what happened to you on July 8, 2004, in front of your

8  apartment?

9      A.   Witnesses?  Not that I know of.

10      Q.   Let's move on to Yankee Stadium.  Were there any

11  witnesses that you know of that saw what happened to you at

12  Yankee Stadium?

13      A.   No, not that I know of.

14      Q.   Let's move on to group one.  Are there any

15  witnesses, to your knowledge, aside from the defendants that

16  were there, that saw what happened to you that day at group

17  one?

18      A.   Well, I guess whoever was working at group one that

19  day knew what was going on.

20      Q.   Do you know, were they officers?

21      A.   I couldn't tell you if they were detectives,

22  sergeants, I couldn't tell you.

23      Q.   Do you know the names of anyone who was working

24  that day that may have seen something, what happened to you?

25      A.   No, but all you have to do is look at the log.

DONES

1          MS. WALKER-DIALLO:  Could you mark this next

2     document as Defendants' Exhibit D.

3          (Whereupon, the aforementioned document was

4     marked as Defendants' Exhibit D for identification

5     as of this date by the Reporter.)

6     Q.    Detective Dones, I will show you what has been

7     marked as Defendants' Exhibit D.  I ask that you take a look

8     at the document and let me know when you're done.

9     A.    Okay.

10    Q.    It's a one-page document Bates-stamped 00221.  It

11    appears to be a log.  The date is Thursday July 8, 2004.

12    Have you ever seen this document before?

13    A.    No, this is the first time I've see it.  I mean,

14    I've seen paperwork, but I don't know if I've seen this

15    before.

16    Q.    Are you currently receiving retirement benefits

17    from the NYPD?

18    A.    Pension, yes.

19    Q.    Is that your only source of income?

20    A.    Yes.

21    Q.    Have you gone to see any medical doctors as a

22    result of the events of July 8, 2004?

23    A.    No.

24    Q.    Going back to paragraph 35 of the complaint where

25    we read into the record, I am just going to reference where,

DONES

1    as a result of defendants' actions, you suffered -- you were

2    damaged professionally and economically.  Can you tell me how

3    you were damaged economically?

4              MR. GREENWALD:  Well, I have a problem with

5              that.  That's a subject of expert testimony and

6              when you marked the complaint, you indicated you

7              were going to deal with just facts and not legal

8              conclusions.  Damages is a legal conclusion.

9              MS. WALKER-DIALLO:  I do not think that is a

10             legal conclusion.

11             MR. GREENWALD:  It most certainly is.  The

12             very word "damages" has legal import.  At the time

13             of the trial, we're intending to present an

14             economist to talk about that, and you basically

15             violated what you said you were going to do with

16             the complaint.

17             MS. WALKER-DIALLO:  I am not violating

18             anything.

19             MR. GREENWALD:  That's a self-serving

20             statement.

21             MS. WALKER-DIALLO:  It is not a self-serving

22             statement.

23             MR. GREENWALD:  Sure it is.

24             MS. WALKER-DIALLO:  If you want to be

25             argumentative, you can do that.  Let's move on.

DONES

1          Just for the record, the purpose of asking these
2          questions is also if this case ever tries to
3          settle, but whatever.
4               MR. GREENWALD:  Like you're going to settle it
5          if he answers that question.
6               MS. WALKER-DIALLO:  Nobody said that any
7          settlement or even trial depends on the answer to
8          the question.
9               MR. GREENWALD:  You just implied it on the
10          record.
11               MS. WALKER-DIALLO:  I said I asked the
12          question.  I didn't say if he doesn't answer the
13          question, there goes the settlement.  Let's move
14          on.
15     Q.    It also says you suffered humiliation as well as
16     emotional pain and suffering.  Can you tell me about the
17     emotional pain and suffering that you say that you suffered
18     as a result of defendants' actions?
19     A.    Well, humiliation because I was in an elite unit.
20     I had never been in trouble with the NYPD.  I did everything
21     that I was told to do with the NYPD.  As a matter of fact,
22     when other undercovers didn't want to do a certain type of
23     job, I was called upon to do it, and I did it willingly.
24          When this incident happened, I got suspended for
25     30 days.  My mother, my family, they all thought that I took

DONES

1   30 days vacation, because this was no embarrassing to me that

2   none of them even knew that I was suspended.  You know, it's

3   very humiliating when you've got to speak to people that

4   think that you're involved in some kind of criminal activity

5   when you weren't.  And I was never even mentioned in any

6   criminal activity that I know of.

7           Until this day I'm still embarrassed.  You know, I

8   don't even tell people that I'm a retried cop or anything,

9   usually -- unless I know the people, because this was very

10  embarrassing to me.  I had a spotless record, I got great

11  evaluations, for me to be put through all this stuff, to be

12  harassed.  Because like I said, they violated my civil and my

13  union rights here.  A person who had a high school diploma,

14  high school education, grew up in the South Bronx knew this,

15  compared to sergeants and lieutenants who have bachelors or

16  associates degrees or masters degrees, and they didn't know

17  that they were violating my rules, my rights.

18      Q.   Did you go speak to a therapist about how you were

19  feeling after this event?

20      A.   Ma'am, believe it or not, I'm Latino, we don't

21  believe in going to hospitals unless we're practically dying.

22  You know, I can't go spend GHI money or some health insurance

23  money on something that -- unless I'm dying.  You know, look,

24  I'm shaking now.  It's an emotional problem that we go

25  through, but we settle it ourselves, because like I said,

1    this is embarrassing.  I don't even want to talk to anybody

2    about this incident.

3        Q.    After this incident happened, did anyone, did any

4    officer or detective ever say anything to you about the

5    events?

6            Let me clarify.  Did anyone ever -- I'm talking

7    about any NYPD officer or detective -- ever say anything to

8    you negatively about what happened on July 8, 2004?

9        A.    Negatively in which way?

10       Q.    You said you were embarrassed about what happened.

11   I am trying to get to whether anyone said anything to you on

12   the job that would have made you feel embarrassed?

13       A.    Well, embarrassed in a way, like I said, going

14   through this incident, a man with a spotless record.  Second

15   of all, the people who worked with me in group 51, they all

16   turned their back on me.  I mean, how embarrassing is that?

17   I mean, you can't even count on people that worked with you,

18   that needed you for certain things, but then when this

19   incident happened, you were like, you know, a black sheep.

20       Q.    Did they know the real reason as to why you were on

21   modified duty?  The reason I said "real reason," you

22   testified previously that Deputy Inspector Scollan said it

23   would be a domestic incident, if I'm understanding correctly,

24   in the records as to why you were on modified duty?

25           MR. GREENWALD:  I object to the form of the

DONES

1              question, because it calls for the operation of

2              others' minds.  You can ask him whether they said

3              anything to him, but you can't ask him what they

4              thought.

5        Q.    Did you tell these officers at group 51 what

6    happened to you on July 8, 2004?

7        A.    I spoke to some people, yes.

8        Q.    Are these the same people that you believe treated

9    you differently?

10       A.    Yes.

11       Q.    Do you know whether any of the defendants informed

12   your coworkers about what happened on July 8, 2004?

13       A.    I don't know.  I don't know if they let anybody

14   know, but I'm sure they spoke to the lieutenant, because he

15   usually has to know why one of his workers is being modified.

16       Q.    Did your lieutenant ever say anything to you about

17   the incident on July 8, 2004?

18       A.    No.

19       Q.    Were you required to obtain authorization to look

20   at computer records concerning this investigation, and the

21   investigation into Vasquez?

22              MR. GREENWALD:  You previously asked him

23              whether he did that, and he said no.

24              MS. WALKER-DIALLO:  I don't think my question

25              was whether he did it.

DONES

1       Q.    I am asking, would you have to, the procedure, if

2  you know it, have to obtain authorization?  Let's say you

3  wanted to look at the file, would you have to obtain

4  authorization before you can look at the file?

5              MR. GREENWALD:  Over objection, I will allow

6              him to answer.

7       A.    My knowledge of the investigations is, each group

8  conducts their own investigation.  I am not privy to that

9  group's investigations.  I can't go into a computer and look

10 at their records because when it's something -- when it's a

11 high-profile case, they could put encrypted messages into the

12 computer so you really -- and our group wasn't privy to the

13 information or the investigation from group 41.

14             MR. GREENWALD:  Is there a code to access the

15             file?

16             THE WITNESS:  Like I said, we can't really go

17             into their files.  Unless it's common knowledge

18             that there is a log-out, we can see the log because

19             it's common knowledge, it's out there in the

20             computer, but we can't really look at their

21             investigations.

22             MR. GREENWALD:  You're not allowed to or

23             you're not able to.

24             THE WITNESS:  You're not able to.

25      Q.    Is it your testimony that the investigation

DONES

1    into Mr. Diaz, to your knowledge, that was by group 51; is

2    that correct or am I totally wrong?

3        A.    It's group 41.

4        Q.    To your knowledge, you didn't have the ability to

5    access group 41's investigation?

6        A.    To my knowledge, yes.

7        Q.    Mr. Dones, we are now coming to the conclusion of

8    today's deposition.  I have some final questions for you.

9    Did you understand all of the questions that I asked?

10       A.    Basically, yes.

11       Q.    Did you answer all of the questions truthfully?

12       A.    Yes.

13       Q.    Do you want to change any of your answers?

14       A.    Not that I can remember, no.

15              MS. WALKER-DIALLO:  Thank you for your time.

16              (Whereupon, at 3:15 P.M., the Examination of

17       this witness was concluded.)

18

19

20    _____
                LISSANDER DONES

21

22    Subscribed and sworn to before me

23    this ____ day of _____, 2008.

24    _____
                NOTARY PUBLIC

25

Ricardo S. Castro
Notary Public, State of New York
No. 01CA5041272
Qualified in Bronx Country
Comm Exp.

DONES

1                    E X H I B I T S

2      DEFENDANTS' EXHIBITS:

3

4      EXHIBIT         EXHIBIT                        PAGE

5      LETTER          DESCRIPTION

6

7          A           Memo from Detective Dones to

8                      Phil Karysek                    62

9          B           Handwritten memo               64

10         C           Complaint                      67

11         D           NYPD Log                       79

12

13

14                    I N D E X

15

16     EXAMINATION BY                                 PAGE

17     MS. WALKER-DIALLO                              3

18

19

20

21          INFORMATION AND/OR DOCUMENTS REQUESTED

22     INFORMATION AND/OR DOCUMENTS                   PAGE

23     Fill in Date of GO15 Hearing                   61

24     Fill in Findings of Trial Room                 61

25

DONES

# C E R T I F I C A T E

STATE OF NEW YORK        )
                         : SS.:
COUNTY OF NEW YORK       )

I, GOLDY GOLD, a Notary Public for and within

the State of New York, do hereby certify:

That the witness whose examination is

hereinbefore set forth was duly sworn and that such

examination is a true record of the testimony given by that

witness.

I further certify that I am not related to any

of the parties to this action by blood or by marriage and

that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand

this 3rd day of March, 2008.

GOLDY GOLD

Diamond Reporting, Inc.

# ERRATA SHEET

**Plaintiff(s):** _____

_____

_____

**Defendant(s):** _____

_____

_____

| Page | Line No. | Error | Correction |
|------|----------|-------|------------|
| 14 | 22 | Aug. 2006 | Sept. 2006 |
| 25 | 22 | Thanksgiving, 2004 | Thanksgiving 2003 |
| 51 | 22 | AT Group 1 | at Group 51 |
| 52 | 8 | Group 52 | Group 51 |

**DATE:**

**NAME OF WITNESS:**

**SIGNATURE:**

Subscribed and sworn to before me this 1? day of March, 2008.

Ricardo S. Castro
Notary Public, State of New York
No. 01CA6041272
Qualified in Bronx Country
Comm Exp. 02/02/21

_____
NOTARY PUBLIC



**Look-See Concordance Report**

- - -

UNIQUE WORDS: **1,314**
TOTAL OCCURRENCES: **5,026**
NOISE WORDS: **384**
TOTAL WORDS IN FILE: **16,159**

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES ON

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS ON

## – DATES –

**August of 2006** [1]
*14:22*
**February, 2006** [1]
*61:6*
**February 20, 2008** [1]
*1:11*
**January** [1]
*18:20*
**January, 2005** [1]
*16:2*
**January 7, 1962** [1]
*8:16*
**January 21, 1985** [1]
*14:24*
**January 21st** [1]
*15:1*
**July** [2]
*15:15, 16*
**July, 2004** [4]
*30:2; 31:4; 58:2; 59:6*
**July 8, 2004** [30]
*30:25; 34:20; 52:14; 55:18;*
*56:8; 57:21; 59:14, 17, 20;*
*63:8; 65:25; 70:6, 14; 71:21;*
*72:4, 13, 15; 75:9, 12, 15;*
*77:8, 11, 24; 78:7; 79:11, 22;*
*83:8; 84:6, 12, 17*
**July 8th** [1]
*72:10*
**July of 2004** [4]
*28:2, 4; 51:17; 63:3*
**March, 2008** [1]
*88:17*

## – 0 –

**00005** [1]
*66:9*
**00016** [1]
*66:9*
**0014** [1]
*66:12*
**0016** [1]
*66:13*
**00221** [1]
*79:10*
**00226228** [1]
*62:8*

**07** [1]
*1:4*
**073085** [1]
*3:20*

## – 1 –

**1,050** [1]
*10:21*
**100** [2]
*1:16; 2:9*
**10007** [2]
*1:17; 2:9*
**10453** [2]
*3:9; 10:15*
**11042** [1]
*2:4*
**12** [2]
*48:23; 49:8*
**12:52** [1]
*1:12*
**12th** [2]
*20:7, 8*
**14** [1]
*66:1*
**15** [2]
*22:9; 66:1*
**1859** [2]
*3:9; 10:15*
**1962** [1]
*8:16*
**1980** [1]
*13:9*
**1983** [1]
*2:4*
**1985** [2]
*14:24; 18:10*
**1986** [1]
*13:2*
**1991** [2]
*17:22, 23*

## – 2 –

**20** [2]
*1:11; 15:2*
**2003** [2]
*27:25; 29:15*
**2004** [41]
*25:23; 27:23, 25; 28:2, 4;*
*30:2, 25; 31:4; 34:20; 51:17;*
*52:14; 55:18; 56:8; 57:21;*
*58:2; 59:6, 14, 17, 20; 63:3,*
*8; 65:25; 70:6, 14; 71:21;*
*72:4, 13, 15; 75:9, 12, 15;*
*77:8, 11, 24; 78:7; 79:11, 22;*
*83:8; 84:6, 12, 17*
**2005** [6]
*15:1, 5, 7; 16:2, 3, 6*
**2006** [3]
*14:22; 61:6; 77:9*
**2007-104884** [1]
*2:10*
**2008** [3]
*1:11; 86:23; 88:17*
**21** [1]
*14:24*
**21st** [1]
*15:1*
**22** [1]
*52:17*
**24** [4]
*5:24; 6:5, 8, 12*
**25** [1]
*44:10*
**26** [1]
*47:18*
**28** [6]
*49:5, 6, 7, 9, 10*
**29** [1]
*60:10*
**29th** [1]
*12:10*

## – 3 –

**3** [1]
*87:17*
**30** [4]
*44:10; 60:10; 81:25; 82:1*
**3085** [1]
*1:4*
**34** [1]
*21:5*
**35** [3]
*73:10; 74:7; 79:24*
**38** [3]
*52:16, 17, 20*
**3:15** [1]
*86:16*
**3rd** [1]
*88:17*

## – 4 –

**41** [2]
*85:13; 86:3*
**41's** [1]
*86:5*
**46** [1]
*18:18*
**47** [1]
*18:19*
**48** [4]
*31:6; 38:4, 8; 43:18*
**48th** [1]
*71:4*

## – 5 –

**50** [3]
*18:18, 20; 24:19*
**51** [13]
*52:25; 53:4, 18, 20; 55:8, 9;*
*69:10, 11, 13, 19; 83:15;*
*84:5; 86:1*
**52** [3]
*18:19; 21:23; 52:8*
**5:00** [2]
*48:14; 52:6*

## – 6 –

**61** [2]
*87:23, 24*
**62** [1]
*87:8*
**64** [1]
*87:9*
**67** [1]
*87:10*

## – 7 –

**7** [1]

**8:16**
**79** [1]
*87:11*
**7th** [1]
*31:2*

## – 8 –

**8** [30]
*30:25; 34:20; 52:14; 55:18;*
*56:8; 57:21; 59:14, 17, 20;*
*63:8; 65:25; 70:6, 14; 71:21;*
*72:4, 13, 15; 75:9, 12, 15;*
*77:8, 11, 24; 78:7; 79:11, 22;*
*83:8; 84:6, 12, 17*
**86** [4]
*10:17; 18:20, 21; 39:12*
**89** [1]
*23:4*
**8:00** [1]
*48:14*
**8th** [2]
*31:2; 72:10*

## – 9 –

**9** [2]
*18:18; 22:1*
**91** [5]
*19:1, 2, 4, 13; 23:3*
**911** [1]
*21:7*
**95** [7]
*19:12, 13; 20:4; 21:21, 23;*
*22:3; 24:2*
**96** [1]
*21:23*
**9:00** [1]
*48:14*

## – A –

**ability** [2]
*6:13; 86:4*
**able** [4]
*6:20; 48:15; 85:23, 24*
**academy** [1]
*18:17*
**accept** [1]
*12:16*
**access** [5]
*8:25; 59:15, 20; 85:14; 86:5*
**accessed** [1]
*59:18*
**accessing** [1]
*59:23*
**account** [2]
*11:16, 20*
**accurately** [1]
*5:13*
**achieved** [1]
*13:6*
**action** [1]
*88:14*
**actions** [2]
*80:1; 81:18*
**active** [1]
*18:1*
**activity** [2]
*82:4, 6*
**address** [1]
*10:14*

**administer** [1]
  21:3
**administrative** [2]
  51:25; 55:14
**Affairs** [5]
  20:5, 10; 21:13; 57:16, 18
**.fect** [1]
  6:13
**aforementioned** [4]
  62:2; 64:12; 67:1; 79:3
**African** [2]
  54:3, 4
**afternoon** [6]
  3:10, 11; 12:21; 48:15; 52:5, 6
**afterwards** [4]
  52:7; 56:13; 63:10; 75:16
**Agent** [10]
  30:22; 31:11; 34:15; 36:23; 37:5, 21; 38:16; 40:2; 47:10; 77:23
**agent** [18]
  31:9, 18; 32:7, 13, 16; 33:2, 6, 15, 17; 34:11; 35:13; 36:8; 39:23; 41:5; 56:12, 18; 57:1, 3
**agree** [1]
  4:2
**agreed** [1]
  39:7
**al** [1]
  3:20
**alcoholic** [1]
  6:7
**Alex** [1]
  8:12
**.fred** [1]
  13:11
**allegation** [2]
  21:4; 73:11
**allegations** [3]
  4:8; 20:19; 26:6
**allege** [1]
  28:4
**alleged** [1]
  28:8
**allegedly** [1]
  27:13
**alleging** [1]
  75:14
**allow** [3]
  16:1; 25:18; 85:5
**allowed** [2]
  55:17; 85:22
**alone** [1]
  31:13
**American** [2]
  54:3, 4
**amount** [1]
  25:7
**ample** [1]
  50:12
**answer** [15]
  5:6, 12, 13; 6:20; 11:4, 24; 12:17; 25:19; 27:11; 68:7, 25; 81:7, 12; 85:6; 86:11
**.swered** [4]
  42:2, 3; 68:7, 25
**answers** [2]
  81:5; 86:13
**anybody** [7]

  42:2; 43:16; 45:4; 72:3, 6; 83:1; 84:13
**anywhere** [6]
  46:18, 24; 47:1; 55:3, 5; 68:23
**apartment** [12]
  19:8; 31:5, 19; 32:17; 36:10; 38:14; 39:4, 21, 22, 25; 40:12; 72:8; 78:8
**appear** [1]
  8:6
**appears** [2]
  8:2; 79:11
**appreciate** [1]
  76:23
**Approximately** [2]
  10:20; 22:16
**approximately** [8]
  7:22; 11:17; 19:16; 22:4; 24:2; 40:13; 44:7, 10
**argumentative** [1]
  80:25
**arguments** [1]
  75:4
**arrest** [1]
  47:12
**Aside** [3]
  7:10; 21:11; 77:22
**aside** [1]
  78:15
**asking** [22]
  4:7, 18; 9:12; 11:15, 17; 29:13; 33:23; 34:9, 16; 35:24; 36:1, 3, 13; 37:19; 43:5; 60:14; 67:25; 75:1; 76:21; 77:13; 81:1; 85:1
**assert** [1]
  9:1
**asserting** [1]
  10:3
**assigned** [1]
  18:19
**assignment** [3]
  15:8; 49:14; 53:8
**Assistance** [1]
  14:9
**assistant** [1]
  3:13
**associate** [1]
  32:23
**associates** [1]
  82:16
**Association** [2]
  17:19, 21
**assume** [1]
  4:22
**Athletic** [1]
  20:9
**attorney** [16]
  5:1; 7:10, 14; 61:24; 62:9, 20; 67:10; 68:1, 2; 70:15, 18, 25; 71:5, 11, 15; 78:5
**Attorneys** [2]
  2:3, 8
**attorneys** [1]
  78:3
**August** [1]
  14:22
**authorization** [3]
  84:19; 85:2, 4
**Avenue** [1]

  2:4
**avoid** [1]
  57:4
**aware** [1]
  25:21
**AWOL** [1]
  43:21

## – B –

**bachelors** [1]
  82:15
**background** [2]
  4:10; 68:21
**badge** [1]
  55:2, 3, 4
**badges** [1]
  55:5
**bank** [1]
  11:19
**baseball** [1]
  39:16
**based** [1]
  72:17
**Basically** [1]
  19:7; 86:10
**basically** [1]
  80:14
**basis** [1]
  67:15; 73:9
**bat** [3]
  39:14, 16
**Bates** [1]
  66:9
**Bates-stamped** [2]
  62:8; 79:10
**bathroom** [8]
  47:24, 25; 48:2, 5, 6, 7, 8; 54:12
**behalf** [1]
  56:10
**behind** [3]
  41:5, 10, 13
**believe** [9]
  6:12; 35:10; 49:22, 25; 77:22; 82:20, 21; 84:8
**benefits** [4]
  14:3, 6; 74:11; 79:16
**Besides** [1]
  6:22
**besides** [2]
  7:8; 40:1
**beverages** [1]
  6:7
**birth** [3]
  8:2, 15, 16
**bit** [1]
  50:1
**black** [3]
  54:1, 8; 83:19
**blank** [4]
  15:19, 21; 60:24; 61:15
**block** [1]
  39:11
**blood** [1]
  88:14
**body** [1]
  47:2
**book** [1]
  17:14
**books** [1]

  45:24
**born** [1]
  8:16
**bought** [1]
  21:1
**break** [9]
  5:4, 7; 6:25; 29:5; 37:9, 13; 58:19; 64:10; 66:21
**Briefly** [1]
  62:14
**bringing** [1]
  73:7
**broad** [1]
  75:5
**Bronx** [7]
  3:9; 10:15; 13:11; 22:1; 31:6; 54:20; 82:14
**Brooklyn** [1]
  33:22
**building** [8]
  20:8, 9; 44:5, 17; 47:18, 25; 70:20, 24
**buildings** [1]
  54:25
**Bureau** [2]
  20:5; 21:14
**buy** [1]
  23:12
**buy-and-busts** [1]
  21:12
**buying** [1]
  21:17
**BYCZEK** [1]
  2:3

## – C –

**call** [29]
  21:7; 27:8; 29:10; 41:8, 20; 42:7, 11, 16, 17, 19, 20; 43:13, 17, 18, 19; 44:23, 25; 47:8; 48:20, 21; 49:2, 21, 23; 51:8; 53:2; 55:23; 68:11, 16; 73:8
**call-out** [4]
  27:2, 3, 9, 13
**calls** [3]
  48:17; 55:13; 84:1
**capacity** [7]
  1:6, 7, 8; 7:3
**CAPTAIN** [1]
  1:6
**Captain** [8]
  29:14; 33:4; 38:8; 41:4; 48:16, 22; 68:11; 70:21
**car** [34]
  31:6, 7, 11, 12, 13; 33:7; 36:21; 38:25; 39:7, 9, 10, 14, 17, 18; 40:7, 10, 15, 17, 18, 21; 41:3, 10, 11, 19; 43:1, 2, 4, 7, 9; 44:11, 14, 15; 46:1; 47:5
**card** [7]
  17:13; 54:19, 21, 22, 24; 55:1, 2
**CARDOZO** [1]
  2:7
**care** [1]
  6:1
**CAROLYN** [1]
  2:10