PDO20105.TXT

1

1

2    NEW YORK CITY POLICE DEPARTMENT

3    DEPUTY COMMISSIONER OF TRIALS

4

5                One Police Plaza
              New York, New York
6
              Date:  February 1, 2005
7             Time:  10:25 o'clock a.m.

8
  RESPONDENT: DET. LISSANDER DONES
9
  CASE NO.:  80292/04
10
  REPORTER:  STEVEN KLEIN
11
  A P P E A R A N C E S:
12
  BEFORE:  COMMISSIONER ROBERT W. VINAL
13
  FOR THE DEPARTMENT: NATALIE BAPTISTE, ESQ.
14              Department Advocate's
              Office
15
  FOR THE RESPONDENT: KARASYK & MOSCHELLA, LLP
16              225 Broadway
              New York, New York 10007
17
              BY:  PHILIP KARASYK, ESQ.
18

Page 1

PDO2O1O5.TXT

19

20

21

22

23        TANKOOS REPORTING COMPANY, INC.
    305 Madison Avenue      142 Willis Avenue
24 Suite 449              P.O. BOX 347
    New York, N.Y. 10165    Mineola, N.Y.  11501
25  (212)349-9692          (516)741-5235


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ᴅ


                            2

1

2        (Time noted:  10:25 o'clock a.m.)

3        P.O. GAMRAT:  Calling Case No. 80292 of

4  2004, Detective Lissander Dones.

5        MR. KARASYK:  For the Detective, Philip

6  Karasyk.

7        MS. BAPTISTE:  Ms. Baptiste, of the

8  Department Advocate's office.

9        COMM. VINAL:  Good morning.

                        Page 2

*PDO2O1O5.TXT*

10          Will counsel approach for a moment.

11          (Bench conference held.)

12          COMM. VINAL:  We will take a short

13     recess.

14          (Recess had.)

15          COMM. VINAL:  Back on the record.

16          Before we proceed to opening statements,

17     Ms. Baptiste indicated that the Department is

18     seeking to amend Specifications 4 and 5 to change

19     the date indicated in each of those

20     specifications from November 28, 2004, to

21     November 28, 2003.

22          Is that correct?

23          MS. BAPTISTE:  Yes.

24          COMM. VINAL:  Apparently, there was a

25     clerical error.


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£*

3

*Page 3*

*PD020105.TXT*

1

2          *Any objection?*

3          *MR. KARASYK:  No.*

4          *COMM. VINAL:  Okay.*

5          *Specifications 4 and 5 are so amended.*

6          *We have a total of five specifications,*

7     *and I will further note that it was mentioned at*

8     *the bench conference that with regard to*

9     *Specification No. 3, a Bill of Particulars was*

10     *served by the Department on the Respondent, and*

11     *counsel can make reference, obviously to that*

12     *during the course of the trial.*

13          *If there are no further preliminaries,*

14     *let's move directly to opening statements.*

15          *Ms. Baptiste.*

16          *I'm pronouncing your name correctly?*

17          *MS. BAPTISTE:  Yes.*

18          *COMM. VINAL:  I wanted to make sure.*

19          *MS. BAPTISTE:  Good morning,*

20     *Commissioner, Mr. Karasyk.*

21          *You Honor, today the evidence will*

*Page 4*

*PDO20105.TXT*

22    demonstrate how Detective Dones, Lissander Dones,

23    compromised the integrity of an open Internal

24    Affairs investigation, and thereby threatened the

25    integrity of the Police Department.


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*D*


                              *4*

1

2            On or about and between November 26,

3    2003, and November 28, 2003, Detective Dones,

4    while at work, learned about a far-reaching

5    Internal Affairs investigation into a friend of

6    his, Detective Vasquez.

7            Detective Dones, a seasoned member of

8    the Internal Affairs Bureau, admits that he took

9    this information and discussed it with another

10    member of the service outside of the Internal

11    Affairs Bureau, who was also a friend of

12    Detective Vasquez, the subject of a far-reaching

                        *Page 5*

PD020105.TXT

13   criminal investigation.

14         The evidence will further show that

15   Detective Dones used a Department vehicle without

16   permission to go to work on November 28, 2003,

17   and going into the IAB computer system, using his

18   code to review information about the case

19   involving Detective Vasquez and other officers

20   who may have been involved in the case, even

21   though he was not assigned to that case.

22         The evidence will finally show that

23   during his GO-15 official interview, Detective

24   Dones made false statements regarding his

25   knowledge of having made prior statements during

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ם

5

1

2   the investigation.  Those statements referred to

3   are the ones made by Mr. Dones in July of 2004 to

Page 6

PD020105.TXT

4    Federal Agents, while an Internal Affairs

5    investigator was present.

6         The evidence will show that Detective

7    Dones' actions compromised the integrity of an

8    open investigation, and thereby compromised the

9    integrity of the Police Department.

10        And at the end of the presentation of my

11   case, I will ask you to find such.

12        Thank you.

13        COMM. VINAL:  Thank you.

14        Mr. Karasyk.

15        MR. KARASYK:  Commissioner, Detective

16   Dones is a twenty-year veteran with the New York

17   City Police Department.  He has a spotless

18   record.  His disciplinary record is absolutely

19   zero, with the exception of two CD's for minor

20   violations during his entire career.

21        The Department, I submit to you, will

22   not be able to prove by any direct evidence

23   whatsoever, either eyewitness or testimonial,

24   that Detective Dones in any way compromised this

Page 7

PD020105.TXT

25    investigation.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*o*


6

1

2         In fact, there is a paucity of such

3    evidence in their investigative file.

4         After you have heard all the evidence,

5    and had a chance to evaluate the facts, I am

6    certain that you will find him not guilty.

7         I will also add that you will hear from

8    the Department's own witnesses the manner in

9    which Detective Dones' rights, rights guaranteed

10    to him under GO-15, PG 206-13, were abused, how

11    evidence that the Department will seek to

12    introduce was obtained in direct violation of

13    Detective Dones' PG 206-13 rights, and the Court

14    will be called upon at the conclusion to preclude

15    such evidence.

PD020105.TXT

16          Without such evidence, the Department

17     will be unable to prove its case.

18          Thank you.

19          COMM. VINAL:  Thank you.

20          The Department has a witness to call?

21          MS. BAPTISTE:  Yes.

22          Your Honor, the Department's witnesses

23     just walked into the door.  I haven't had an

24     opportunity to talk with them at all.

25          COMM. VINAL:  That is supposed to happen


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0


                              7

1

2     before the trial.

3          It is ten after eleven.  I understand

4     the witnesses were late in arriving, but at this

5     point, I'm going to ask you to please call the

6     witness.

PD020105.TXT

7       MS. BAPTISTE:  All right.

8             The Department calls Detective Clohessy.

9             COMM. VINAL:  The witness you just

10   called, will he be testifying to any specific

11   specification, or all of them?

12           MS. BAPTISTE:  He will be testifying in

13   reference to Specification No. 4.  He will be

14   testifying in general about other matters, as

15   well.

16           COMM. VINAL:  Place your left hand on

17   the Bible, raise your right hand.

18           Do you swear the testimony you are about

19   to give will be the truth, the whole truth, and

20   nothing but the truth, so help you God?

21           THE WITNESS:  I do.

22           COMM. VINAL:  Have a seat.

23           P.O. GAMRAT:  For the record, please

24   state your name, your rank, your shield number

25   and your current command.

PDO2O1O5.TXT

8

1               Clohessy - Direct

2               THE WITNESS:  Detective Michael

3     Clohessy, Shield 1506, Internal Affairs, Group

4     51.

5               MS. BAPTISTE:  May I inquire, your

6     Honor?

7               COMM. VINAL:  Group 51, you said?

8               THE WITNESS:  Yes.

9               COMM. VINAL:  Your witness.

10              MS. BAPTISTE:  Thank you.

11 DIRECT EXAMINATION

12 BY MS. BAPTISTE:

13        Q    Good morning.

14        A    Good morning.

15        Q    Detective, how long have you been a

16 member of the New York City Police Department?

17        A    About eighteen-and-a-half years.

18        Q    And you are currently assigned to

Page 11

PD020105.TXT

19 Internal Affairs Bureau 51?

20      A    Yes.

21      Q    And how long have you been at Internal

22 Affairs Bureau 51?

23      A    About ten-and-a-half years.

24      Q    Please describe your duties and

25 responsibilities.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

▯


                              9

1                  Clohessy - Direct

2      A    I'm assigned to the Bronx team.  I

3 investigate people who impersonate Police Officers

4 when they commit crimes.

5      Q    Approximately how many investigations

6 have you been a part of over your ten-and-a-half year

7 time at Internal Affairs?  Just an approximate

8 number.

9      A    A few hundred, approximately forty-five

PDO2O1O5.TXT

10 per year.

11      Q      As a member of the Internal Affairs

12 Bureau – and you said you have done about hundreds

13 of investigations – what measures do you take to

14 make sure information about your case does not get

15 out to other members of the service?

16      A      Well, when a case is assigned to us,

17 it's usually assigned from the supervisor of each

18 team.

19      Q      Who is the supervisor of your team?

20      A      Sergeant Garland.

21      Q      Continue.

22      A      The case would pretty much either sit on

23 my desk, or would be in a file cabinet in the back.

24 Most often, it's sitting on my desk.

25      Q      As you are conducting an interview, are

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

0

10

PD020105.TXT

1                Clohessy - Direct

2 there certain steps that you take, or procedures that

3 you do, that are known to the Department, so other

4 members of the service don't find out about this

5 investigation?

6            MR. KARASYK: Objection, Commissioner,

7 it's leading.

8            It's also immaterial.

9            COMM. VINAL: I will allow a certain

10    amount of background as to the internal

11    procedures.

12            The question is, are you familiar with

13    IAB's security procedures, so that no one can

14    find out what is being investigated, who is being

15    investigated?

16      A    Yes, I am.

17      Q    Can you please explain it.

18      A    In the Impersonation Unit, it is kind of

19 unique for IAB, because we are not doing internal

20 cases. Most of our subjects that we are looking for

21 are criminals, they are not members of the service.

PDO2O1O5.TXT

22      So it is not unlikely for me to go into

23 different Detective squads, or other units outside

24 Internal Affairs, and speak with people.

25      Q    But that is because you deal with people


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*0*


11

1               Clohessy - Direct

2 outside of the service, outside of members of the

3 service?

4      A    Yes, that's correct.

5      Q    Who is your partner?

6      A    Currently?

7      Q    Yes.

8          Who was your partner?

9          COMM. VINAL:  Not currently.

10     A    It was –

11         COMM. VINAL:  Give a time frame.

12     Q    During the year of 2003.

PDO2O1O5.TXT

13     A    Detective Dones.

14     Q    And approximately how long was he your

15 partner?

16     A    Approximately a year, year-and-a-half.

17     Q    How long, in general, have you known

18 Detective Dones in any other capacity besides work?

19     A    When he came to the unit, about a

20 year-and-a-half.

21     Q    Turning your attention to November 26,

22 2003, did you become aware of a call-out involving a

23 Detective Vasquez?

24     A    I was aware of a call-out, I wasn't

25 aware that Detective Vasquez was the subject of that

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

o

12

1               Clohessy - Direct

2 call out.

3     Q    Describe a call-out.

Page 16

PDO2O1O5.TXT

4      A    I was down in the 1st Precinct on an

5 unrelated call-out.

6      Q    Who were you there with?

7      A    I was there with Detective Dones, and I

8 believe Sergeant Schumacher.

9      Q    Okay.

10         Continue.

11     A    We were on another call-out, unrelated

12 to Detective Vasquez.

13         Somewhere in the night, I heard about

14 this other incident going on out in Queens.

15     Q    And that incident would be what?

16     A    That was with Detective Vasquez.

17     Q    And what specifically did you hear?

18     A    That there was a rip-off somewhere out

19 in Queens, and OCID –

20     Q    What does that stand for?

21     A    Organized Crime – I don't really know.

22        MR. KARASYK:  OCID?

23        THE WITNESS:  Yes.

24        MR. KARASYK:  Organized Crime

Page 17

*PDO2O105.TXT*

25    *Investigation Division.*


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523*

◻


13

1                    *Clohessy - Direct*

2            *THE WITNESS:  Thank you.*

3        Q    *Do you recall what you did after hearing*

4 *the call-out, or what happened next?*

5        A    *We were in 1st Precinct, and we were*

6 *involved in an investigation.  I'm not too sure if*

7 *there was an arrest there.*

8            *It basically took up our whole day.*

9        Q    *And that was at the 1st Precinct?*

10       A    *Yes.*

11       Q    *Detective Clohessy – am I saying that*

12 *right?*

13       A    *Yes.*

14       Q    *– does the Bronx team have a car*

15 *assigned to it?*

PDO2O1O5.TXT

16      A   Yes.

17      Q   Who is on that Bronx team, aside from

18 yourself?

19      A   Detective Dones.

20      Q   What is your car number?

21      A   169.

22      Q   And describe the car that is assigned to

23 you and Detective Dones.

24          COMM. VINAL:  And we are referring now

25   to November, 2003, Ms. Baptiste?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*o*


14

1               Clohessy - Direct

2          MS. BAPTISTE:  Yes.

3          COMM. VINAL:  Just so that the record is

4   clear.

5          MS. BAPTISTE:  Yes.

6          COMM. VINAL:  Back in November, 2003.

PDO20105.TXT

7    A    It's a black Chevy Impala.

8    Q    Who has the keys to the car?

9    A    Myself and Detective Dones.

10    Q    And who was the car technically assigned

11 to?

12    A    Me.

13    Q    Now, what was the purpose of assigning a

14 car to two investigators such as yourself?  What were

15 you supposed to use it for?

16    A    For investigations.

17    Q    Only?

18    A    Yes.

19    Q    Were you allowed to use the car for

20 personal errands at all?

21    A    No.

22    Q    And what were your responsibilities

23 regarding where the car was to be parked or stored?

24    A    The car is parked at the 48th Precinct.

25    Q    Now, how did you become aware of that?

*PD020105.TXT*

◻

15

1              Clohessy - Direct

2 How did you know that the car was supposed to be

3 stored at the 48th?

4        A    Well, since I have been in Internal

5 Affairs, in this group, for the last ten-and-a-half,

6 eleven years, I had a car assigned to me.  The car

7 was always parked at the 48th Precinct.

8              COMM. VINAL:  Is that where Bronx

9    Inspections is located?

10             THE WITNESS:  Yes.

11             COMM. VINAL:  Within that station house?

12             THE WITNESS:  Yes.

13       Q    Would you say it was common knowledge

14 that you knew the car was not supposed to be used for

15 personal errands?

16       A    That's correct.

17       Q    How did you come to know that?

18       A    I believe it's Department policy.

*Page 21*

PDO20105.TXT

19    Q    How did you come to know that the

20 vehicle assigned to you was only supposed to be used

21 for investigative purposes?

22    A    It has been the policy of the office to

23 leave that car at the 48th Precinct, and it is only

24 going to be used for official business.

25    Q    And that is common knowledge?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

☐


16

1                Clohessy - Direct

2    A    Yes, it is.

3    Q    Detective, is there an E-ZPass in the

4 car?

5    A    Yes, there is.

6    Q    Turning your attention to November 28,

7 2003, were you working on that day?

8    A    November 28th?

9    Q    Of 2003.

PDO2O1O5.TXT

10          COMM. VINAL:  You have already testified

11      that this is regarding – I believe that date was

12      previously mentioned – and you indicated that

13      you were at the 1st Precinct.

14              MS. BAPTISTE:  No, that was November

15      26th.

16              COMM. VINAL:  I thought I heard 28.

17              Okay.

18              That was November 26th?

19              MS. BAPTISTE:  Yes.

20              COMM. VINAL:  Okay.

21              Now we are going to November 28th, two

22      days later?

23              MS. BAPTISTE:  Yes.

24          A    What day was that?

25              MR. KARASYK:  Friday.


            [212] 349-9692 TANKOOS REPORTING COMPANY [516] 741-523⁵

ㅁ


                            17

PD020105.TXT

1                          Clohessy - Direct

2       A    Friday?

3       Q    Yes.

4       A    No, I was off that day.

5       Q    That was your RDO?

6       A    I don't know if it was my RDO, but I was

7 off that day.

8       Q    You know you weren't working?

9       A    Yes.

10      Q    Did you use the car that day?

11      A    No, I didn't.

12      Q    You are sure you did not use the car on

13 November 28, 2003, Car No. 169, you didn't use it

14 that day?

15      A    No.

16      Q    And who else had the keys to the car

17 besides yourself?

18      A    Detective Dones.

19      Q    Do you have a personal computer code?

20      A    Yes, I do.

21      Q    And is that personal computer code

                          Page 24

*PD020105.TXT*

22 *something separate and distinct from your tax code,*

23 *or is it your tax code?*

24     *A   Some codes are part of my tax number.*

25     *Q   Your computer code, that is a separate*

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

*18*

1               *Clohessy - Direct*

2 *number from your tax code?*

3     *A   It depends what you are trying to get*

4 *into.*

5       *In some applications, my tax code is*

6 *part of the computer code.*

7     *Q   When you say part of it, you would also*

8 *have to put in your tax code and your computer code,*

9 *to get access to what you want?*

10     *A   Yes.*

11     *Q   Just so we are clear, your computer code*

12 *is a separate number from your tax code?*

*Page 25*

PDO20105.TXT

13      A    To access the computer, I would have a

14 separate code, other than my tax, yes.

15      Q    Okay.

16          COMM. VINAL:  This computer code, is

17   this an IAB assigned code, or a code that all

18   members have?

19          THE WITNESS:  An IAB assigned code.

20      Q    Is that assigned specifically to you?

21      A    Yes, it is.

22          COMM. VINAL:  So I am clear, it is to

23   access IAB records, specifically, this computer

24   code that you are referring to?

25          THE WITNESS:  It can access IAB records,


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

ᴅ


                            19

1                Clohessy - Direct

2    or any Department records.

3      Q    Detective, how many people know your

PD020105.TXT

4 computer code?

5       A    The only one that would have access to

6 the code would be Detective Mounts.

7             COMM. VINAL:  Spell that name.

8             THE WITNESS:  M-o-u-n-t-s.

9       Q    Why would he have access to it?

10      A    He is the Land Manager for the office.

11      Q    Does Detective Dones have your computer

12 code number?

13      A    No.

14      Q    Have you ever given your computer code

15 number to anyone?

16      A    No.

17      Q    How many times have you logged onto the

18 computer using someone else's computer code?

19      A    I don't believe I have ever done that.

20      Q    Why have you not done that?

21      A    I have my own code.

22      Q    Detective, turning your attention back

23 to November 28, 2003.

24      A    Yes.

*PDO2O105.TXT*

25        Q    Did you access the computer, the IAB

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*o*

20

1                    Clohessy - Direct

2 computer, using your partner, Detective Dones', code?

3        A    No.

4        Q    Have you ever accessed the IAB computer

5 using your partner, Detective Dones', code?

6        A    No.

7        Q    Detective, have you ever looked up any

8 information in the IAB log involving that case which

9 you got the call-out about involving Detective

10 Vasquez?

11        A    No.

12        Q    Detective, how often is it that you look

13 up a case assigned to another Internal Affairs

14 Bureau?

15        A    Assigned to another group?

PDO2O1O5.TXT

16    Q   Yes.

17    A   Outside 51?

18    Q   Outside 51, yes.

19    A   Rarely, if ever.

20    Q   And is it commonplace that Detectives do

21 not give out their computer codes?

22        MR. KARASYK:  Objection, "commonplace."

23        COMM. VINAL:  We are talking about

24   procedures, as opposed to commonplace.

25    Q   Is it a known procedure or regulation


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

◻


21

1             Clohessy - Cross

2 not to give out your computer code to other members

3 of your department?

4    A   Yes, it is.

5        MS. BAPTISTE:  No further questions.

6        COMM. VINAL:  Cross-examination?

Page 29

PDO2O1O5.TXT

7 CROSS-EXAMINATION

8 BY MR. KARASYK:

9      Q    Good morning, Detective.

10      A    Good morning.

11      Q    My name is Philip Karasyk, and I

12 represent Detective Dones.

13          Detective, Ms. Baptiste asked you

14 whether it is commonplace for one Detective to give

15 out his computer code to another Detective, and you

16 answered "no," correct?

17      A    That's correct.

18      Q    Does it occur during your workday that

19 you could be working on a computer under your code,

20 and another Detective can come up to you and ask you

21 to run a certain log for him, because he hasn't had

22 the opportunity to log in himself?  Has that ever

23 happened?

24      A    Yes, it does.

25      Q    And it is true, is it not, that when

*PD020105.TXT*

*22*

1              *Clohessy - Cross*

2 there are Detectives working on the computer under

3 their code, there are times when another Detective

4 who has not logged in will ask that Detective who has

5 logged in to run certain information for him on an

6 investigation that that Detective is working on,

7 correct?

8      A    That's correct.

9      Q    And it is also true that when you are

10 the Detective who is operating the computer, and you

11 run that log, that may not be a case that you are

12 working on yourself; isn't that true?

13      A    That's correct.

14      Q    So there are times when you can be

15 working on a case, you can be working on the

16 computer, and you can be asked to run logs on cases

17 that you, yourself, are not working on, correct?

18      A    Correct.

*Page 31*

PDO20105.TXT

19    Q    Is it also true, Detective, based on

20 your experience, that in your command there are times

21 when members of the service fail to log off the

22 computer system, and just leave the computer system

23 engaged in IA-Pro for example?

24    A    Yes.

25    Q    When they fail to log off, anybody with

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

23

1                Clohessy - Cross

2 knowledge or how to operate IA-Pro can come over and

3 access logs under that Detective's ID; isn't that

4 true?

5    A    Yes.

6    Q    That can happen even when that Detective

7 whose ID number is being used is not even there; is

8 that correct?

9    A    Yes.

Page 32

PD020105.TXT

10      Q    As a matter of fact, based on your

11 experience, that is not an uncommon event for

12 Detectives to forget to log out at IA-Pro?

13      A    Sometimes it happens, yes.

14      Q    You were not working on the 28th?

15      A    Right.

16      Q    You don't know what transpired in the

17 command that day?

18      A    No.

19      Q    You don't know who was there, who wasn't

20 there?

21      A    Yes.

22      Q    Now, can you just for a moment describe

23 the command, the physical layout of the command, for

24 us.  Is it one room where everybody works?  How is

25 it?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

口

24

PDO2O1O5.TXT

1                    Clohessy - Cross

2       A    It's basically two rooms where the

3  Detectives sit.

4              When you first walk in the office, to

5  the left-hand side there are three desks, assigned to

6  three Detectives, and four computers along the wall.

7              Then the main Detective office, there

8  are eleven desks where Detectives are assigned, and

9  three computer terminals.

10      Q    And where was Detective Dones' desk, in

11  which of those rooms?

12      A    His desk was in the back and side,

13  against the window.

14      Q    In the second room?

15      A    In the main Detective room.

16      Q    In the main Detective room?

17      A    Yes.

18      Q    Now, would it be possible for someone to

19  come into that main Detective room and fail to see

20  Detective Dones, if he was sitting at his desk at the

21  computer?  Is it wide open space?

PDO20105.TXT

22      A   Yes, it is opened up.

23      Q   So if someone was sitting at their desk

24 and working, would the person who was working at that

25 desk be visible to anyone walking into that room?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

D


25

1                   Clohessy - Cross

2       A   Yes.

3       Q   They would not be obstructed, hidden by

4 anything?

5       A   No.

6       Q   Okay.

7           Now, you testified that the only other

8 person that has the codes for everybody, the computer

9 codes for everybody in the office, is Detective

10 Mounts; is that correct?

11      A   That's correct.

12      Q   Okay.

Page 35

PDO20105.TXT

13          And do you know whether or not Detective

14 Mounts was working on November 28th?

15      A   No, I don't.

16      Q   Okay.

17          But with those codes, anyone who has

18 that code can go in under another person's name and

19 access the IA-Pro; is that correct?

20      A   It depends on which code it is.

21          I believe it's the main access code –

22 actually, I'm not sure which code he has.  He has one

23 code.

24          I'm not sure if it's the main access

25 code to get into the computer, and then you can log


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

0


                              26

1           Clohessy - Cross

2 onto whatever application you want to get into

3 thereafter.

Page 36

*PDO2O1O5.TXT*

```
 4    Q    Okay.

 5         You are not sure?

 6    A    No.

 7    Q    But you know that Mounts has codes?

 8    A    He has the code.

 9    Q    The code?

10    A    Yes.

11         There are different codes, one to get

12 into the computer, to start the computer, and then,

13 if you want to get into MIS, or the CARS Pro, there

14 are different access numbers.

15         I think he has the first code to get you

16 into the second step in the computer.

17    Q    Okay.

18         Without that code –

19    A    IA-Pro would be one of them.

20    Q    He can get into IA-Pro with the code

21 that he has?

22    A    I believe it's the IA-Pro code that he

23 has.  I'm not a hundred percent.

24    Q    It is the IA-Pro that he has?
```

*Page 37*

*PDO2O1O5.TXT*

25      A   Yes.


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

*0*


27

1                    *Clohessy - Cross*

2       Q    With respect to your automobile that you

3 had, you said there was an E-ZPass attached to the

4 car, correct?

5       A    Yes.

6       Q    And that E-ZPass that is attached to the

7 car, I assume is attached with Velcro strips to the

8 windshield?

9       A    Yes.

10      Q    That E-ZPass can be pulled off and

11 detached from the automobile, correct?

12      A    Yes.

13      Q    If that E-ZPass is pulled off and

14 detached, it can be used by any other automobile,

15 correct?

*Page 38*

PDO2O1O5.TXT

16      A    Correct.

17      Q    Okay.

18           You also testified that you and

19 Detective Dones are the only two people that had keys

20 to the automobile, correct?

21      A    That's correct.

22      Q    Does the boss have a copy of the key?

23      A    At that time?

24      Q    Yes.

25      A    I don't believe so, no.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523Ē

o

28

1            Clohessy - Cross

2       Q    Did a Sergeant have a copy of the key?

3       A    I don't believe so.

4       Q    Did anyone else have a copy of the key?

5       A    The only one at that time was –

6 actually, it was prior to the incident of November

PDO20105.TXT

7 28th – was Detective Minaya.  He used to be in the

8 Bronx team.

9          When he left the Bronx team to go into

10 the Manhattan team, he personally gave me that key.

11      Q   He gave you that key?

12      A   Yes.

13      Q   But you don't know whether or not he

14 made a copy of that key, do you?

15      A   No.

16      Q   All he did was give you back the key?

17      A   That's correct.

18      Q   Okay.

19          Whether or not he made a second copy,

20 you have no way of knowing?

21      A   No.

22          COMM. VINAL:  The key to the Chevy

23   Impala, black Chevy Impala?

24          THE WITNESS:  Yes.

25      Q   Did you say he went to the Bronx team?

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*PD020105.TXT*

29

1              Clohessy - Cross

2      A   He was originally in the Bronx team, and

3 then I forget the time, the date, he left the Bronx

4 team and went into the Manhattan team.

5      Q   Okay.

6          Now, let me direct your attention to

7 November 26, '03.

8      A   Yes.

9      Q   You were in a call-out, and you were in

10 the 1st Precinct, correct?

11     A   Yes.

12     Q   And that call-out had nothing to do with

13 the Vasquez matter, correct?

14     A   That's correct.

15     Q   And in the 1st Precinct, you were

16 involved in a different matter, a different

17 investigation, correct?

18     A   That's correct.

*PD020105.TXT*

19     Q     And you were there with Detective Dones,

20 correct?

21     A     Yes.

22     Q     And who else were you there with?

23     A     I believe it was Sergeant Schumacher.

24     Q     Sergeant Schumacher?

25     A     Yes.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

▫


30

1                    Clohessy - Cross

2     Q     Any other members of your team?

3     A     There might have been someone from –

4 Detective Minaya might have been there, also.

5     Q     In addition to you all, were there other

6 members of the 1st Precinct around, as well?

7     A     Yes.

8     Q     And where were you physically in the 1st

9 Precinct?

*Page 42*

PDO20105.TXT

10      A    In the Detective Squad.

11      Q    In the squad?

12      A    Yes, that's correct.

13      Q    And the squad in the 1st Precinct is a

14 large, open area, correct?

15      A    Yes, it is.

16      Q    And at that time when you were there,

17 there were other squad Detectives in the immediate

18 vicinity, correct?

19      A    Yes, there were.

20      Q    And it is also fair to say that those

21 Detectives in that immediate vicinity were able to,

22 if they were so inclined, to hear what you all were

23 talking about, correct?

24      A    That's correct.

25      Q    You weren't sitting there and

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

0

31

Page 43

PDO20105.TXT

1                    Clohessy - Cross

2 whispering?

3       A    I don't believe so.

4       Q    You were speaking in a regular,

5 conversational voice?

6       A    Yes.

7       Q    During that time there came a point when

8 you learned about this Rachko-Vasquez caper?

9       A    Yes.

10      Q    You learned about that at that time,

11 correct?

12      A    Yes.

13      Q    You learned that there was something

14 going on?

15      A    Yes.

16      Q    Okay.

17           And the discussion about that was had

18 out in the open, in regular, conversational voices,

19 correct?

20      A    Yes.

21      Q    There was no attempt to hide that, that

*PDO20105.TXT*

*22 this Rachko/Vasquez matter was ongoing, was there?*

*23      A    I don't believe the names came up at*

*24 that time.*

*25      Q    Okay.*

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523ξ*

*σ*

*32*

*1                Clohessy - Cross*

*2      A    I remember there was conversation that*

*3 there was something going on out in Queens, and*

*4 people from our office were responding to it.*

*5      Q    Right.*

*6          It involved potentially members of the*

*7 service?*

*8      A    That's correct.*

*9      Q    Involved in a drug rip-off?*

*10      A    Yes, that's correct.*

*11      Q    Okay.*

*12          COMM. VINAL:  The question that came*

PDO2O1O5.TXT

13   out, so the record is clear, that came out in

14   conversation, a drug rip-off?

15          THE WITNESS:  Yes, that there was some

16   sort of rip-off out in Queens.

17          There were no names that I recall

18   mentioned at that point.

19      Q    But that members of the service might

20 potentially be involved in a drug rip-off in Queens,

21 correct?

22      A    No.

23          There was some sort of impersonation

24 going out in Queens, that members from my office

25 responded out there.

          (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

ₒ

                              33

1          Clohessy - Cross

2      Q    And your office is the Police

3 Impersonation Unit?

Page 46

*PD020105.TXT*

4       A    Yes.

5       Q    So at some point that evening out in

6 that squad room, there was information out there that

7 there were either members of the service or there

8 were police impersonators involved in ripping off a

9 drug dealer in Queens?

10      A    Yes.

11      Q    And that information was openly

12 discussed in front of the entire squad, correct?

13      A    Yes.

14      Q    It is true, isn't it, that you were not

15 told by the Sergeant that you should not discuss it,

16 keep it confidential, were you?

17      A    No.

18      Q    How long were you in the 1st Precinct

19 Squad?

20      A    I believe we spent a good part of the

21 tour, if not the whole tour, there.

22      Q    Okay.

23           And do you ever remember discussing

24 anything more about this matter with Detective Dones?

*Page 47*

PD020105.TXT

25    A    That day?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ᵒ


                                    34

1                    Clohessy - Cross

2    Q    That day.

3    A    I really don't remember discussing it

4 too much, because I believe we were assisting in

5 processing an arrest.  That basically took up the

6 bulk of our time.

7    Q    Okay.

8         Were there times when you were not with

9 Detective Dones when you were in the 1st Precinct,

10 when you were in another area of the 1st Precinct?

11    A    I'm sure there were, yes.

12    Q    Okay.

13         The Sergeant you were with, again, was

14 who?

15    A    Schumacher.

                    Page 48

*PDO20105.TXT*

16    Q   Schumacher?

17    A   Yes.

18    Q   Were there times when you were not with

19 Schumacher, Schumacher was with Dones?

20    A   I'm sure there were, yes.

21    Q   With respect to your duties, your work

22 in the command, does there ever come a time when,

23 pursuant to your duties, you scroll through the logs,

24 the IA-Pro logs, to get an idea of what is going on

25 with respect to police impersonations in other

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*35*

1        Clohessy - Cross

2 commands?

3    A   At times, yes.

4    Q   You go through these logs oftentimes

5 when you have no particular case, which causes you to

6 go to that particular log, do you?

*Page 49*

PDO20105.TXT

7    A    At times, yes.

8    Q    And you do that to educate yourself

9 about the overall picture out there in IAB world,

10 correct?

11    A    No, not really.

12    Q    Okay.

13        Why do you go through the logs?

14    A    Basically, to see what's going on

15 concerning the police impersonations.

16        Those logs are categorized in different

17 types.  It could be a misconduct or a force type

18 complaint, or a corruption type of complaint.

19        Those type of logs don't interest me.

20 It is the information type logs that interest me.

21    Q    My point is, there are oftentimes in the

22 legitimate pursuit of your duties that you will call

23 up logs on IA-Pro when you might not have any

24 specific investigation concerning those logs; isn't

25 that true?

*PDO20105.TXT*

*36*

1                    *Clohessy - Cross*

2        A    I would say I don't go through those

3 logs just for curiosity.

4                If it doesn't concern me, I'm not going

5 to pull up the logs, to see what's going on in the

6 Department.

7        Q    Okay.

8                What about to familiarize yourself as to

9 what is going on?

10       A    If it's categorized as an information,

11 intelligence type log, possible I would go look, and

12 see what's going on.

13       Q    Even though you may not have a specific

14 case on the subject matter of that log, correct?

15       A    That's correct, yes.

16       Q    Okay.

17                Now, you testified that sometimes your

18 cases sit on your desk, sit out on your desk,

*Page 51*

*PDO20105.TXT*

19 correct?

20      A    That's correct.

21      Q    When they sit out on your desk, they are

22 available to anyone who wants to come over and look

23 at them?

24      A    Yes.

25      Q    Did you ever happen to notice whether or


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*0*



37

1               Clohessy - Cross

2 not Detective Dones had kept his codes on a piece of

3 paper on his bulletin board on his desk; did you ever

4 have to observe that?

5      A    No.

6      Q    Okay.

7           Do you know where Detective Dones kept

8 his codes?

9      A    No.

Page 52

*PD020105.TXT*

10    Q    How long have you worked with Detective

11 Dones?

12    A    It was about a year-and-a-half.

13    Q    A year-and-a-half?

14    A    Yes.

15    Q    During that entire time working with him

16 for the year-and-a-half, have you ever had a question

17 about his integrity?

18    A    No.

19    Q    Have you ever found him to violate

20 departmental policy regarding confidential

21 information?  Have you ever seen him do that?

22    A    No.

23        MR. KARASYK:  I have no further

24    questions.

25        Thank you, Detective.


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

ɒ

38

*Page 53*

*PD020105.TXT*

1        *Clohessy - Redirect*

2        COMM. VINAL:  Redirect?

3        MS. BAPTISTE:  Yes.

4        Thank you.

5 REDIRECT EXAMINATION

6 BY MS. BAPTISTE:

7        Q    Back in November of 2003, specifically

8 on November 26, 2003, at that time, did you know your

9 partner's schedule as far as what days he worked and

10 what days he didn't?

11       A    Whatever I was scheduled to work, he was

12 scheduled to work.

13       Q    Okay.

14            So were you scheduled to work on the

15 28th?

16       A    I don't know if it was my actual day off

17 or if I took off.

18            I believe it might have been my regular

19 day off.

20       Q    So therefore, on the 28th, it would have

21 been Dones' regular day off, as well?

*Page 54*

PDO20105.TXT

22    A    That's correct.

23    Q    Now, you indicated on November 26th that

24 you and Detective Dones were at the 1st Precinct, and

25 then you were processing an arrest; is that right?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ロ


39

1              Clohessy - Redirect

2    A    I believe we were assisting in the

3 processing of an arrest.

4    Q    And approximately what time did you

5 leave from processing that arrest?

6    A    The exact time, I don't recall, but I

7 remember we were there the bulk of the tour.

8         We were working the late one, three to

9 eleven.

10    Q    And then, after you finished your tour,

11 you went home?

12    A    We went back to the office.

PDO2O1O5.TXT

13        COMM. VINAL:  3:00 p.m. to 11:00 p.m.?

14        THE WITNESS:  Yes.

15        COMM. VINAL:  November 26th?

16        THE WITNESS:  Yes.

17    Q    And you testified about officers

18 sometimes logging onto the computer and somewhat

19 forgetting that they logged on.

20        Is it commonplace that someone would log

21 on and forget it, and no one would turn it off for

22 about two days?

23        Could someone's IAB log, or the

24 computer, be open for days and weeks, and no one

25 would turn it off, or were you just referring to a

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523&

&

40

1        Clohessy - Redirect

2 specific period of time, like hours?

3    A    Some applications that you go into, if

Page 56

*PD020105.TXT*

4 you don't stay on it consistently, I'm talking about

5 a few minutes –

6        Q    It would kick out?

7        A    Kick you out.

8             I don't believe IA-Pro does that.

9             I'm not the computer expert, but I don't

10 believe IA-Pro does that.

11            Is it possible for that to happen?

12 Absolutely.

13       Q    Have you ever seen anything like that

14 happen, where someone just logged on for days and

15 days?

16       A    I have seen those computers stay on,

17 people walk away from it.  It happens all the time.

18       Q    Now, you indicated that you heard about

19 a call-out, about someone possibly impersonating a

20 Police Officer; is that right?

21       A    Yes.

22       Q    Did you ever receive or hear any

23 specific information that this was an actual member

24 of the service who was involved in this incident?

*Page 57*

PDO2O1O5.TXT

25          COMM. VINAL:  Strictly on November 26th?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


41

1               Clohessy - Redirect

2          MS. BAPTISTE:  Yes.

3          COMM. VINAL:  We are talking about when

4    you were at the 1st Precinct on an unrelated

5    matter.

6          THE WITNESS:  No.

7          COMM. VINAL:  Did you hear anything

8    about an actual MOS being the subject of a

9    rip-off?

10          THE WITNESS:  No.

11      Q    You only heard about an impersonation,

12 someone impersonating?

13      A    Right.

14      Q    And there were no names mentioned in

15 relation to that impersonation case, right?



PDO2O1O5.TXT

16      A   At that time and date, no, as far as I

17 was concerned.

18      Q   As far as you were concerned?

19      A   As far as I was concerned, I didn't hear

20 any names at that point.

21      Q   Okay.

22          You also indicated at times you scroll

23 through the logs, to see what is going on involving a

24 police impersonation case; is that correct?

25      A   That's correct.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⋮

◻


42

1           Clohessy - Redirect

2      Q   And you also indicated, when asked, that

3 you don't scroll through cases that you see marked

4 "corruption," they don't interest you?

5      A   Yes.

6      Q   Why is that?

*PDO2O1O5.TXT*

7       A   *Because the logs that are assigned to*

8 *the Impersonation Unit are categorized as*

9 *investigation, and there are other logs that are*

10 *categorized as I and I's, as information type logs*

11 *that don't get assigned to anybody.*

12          *Those are the ones that more interest*

13 *me.*

14          *The corruption cases, I wouldn't have*

15 *any involvement in the corruption cases, so they*

16 *don't interest me.*

17       Q   *You wouldn't have any reason, or anyone*

18 *on the impersonation team wouldn't have any reason –*

19          *MR. KARASYK:  Objection to "anyone."*

20          *COMM. VINAL:  In terms of any reason, I*

21 *will allow it to the extent of what are the*

22 *normal practices and procedures, whether there is*

23 *a reason.  I will allow that.*

24          *Any member of your team could go into*

25 *"I" logs, corruption logs?*

*PDO2O105.TXT*

*43*

1              *Clohessy - Redirect*

2              *That's the question.*

3              *THE WITNESS:  I have access to those*

4        *logs.*

5              *COMM. VINAL:  The question is, is there*

6      *any reason for a member of your team, the*

7      *impersonation team, to go into that type of log?*

8              *THE WITNESS:  No.  Not really, no.*

9        *Q    And you indicated you do not go through*

10    *those logs for curiosity?*

11        *A    No.*

12        *Q    Because they don't concern you?*

13        *A    That's correct.*

14        *Q    Now, you indicated that sometimes there*

15    *are cases on your desk, that you might leave your*

16    *case on your desk.*

17              *The way your office is set up, would*

18    *another member from a different IAB group be allowed*

PDO2O1O5.TXT

19 to just come to your desk, even though he is not in

20 Group 51, would another IAB member be allowed to come

21 and start rummaging around your desk?

22      A    There are two other Internal Affairs

23 groups in our building.

24      Q    What are those groups?

25      A    53 and 56.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

 ₀


                                    44

1                   Clohessy - Recross

2      Q    All right.

3      A    Not very often do those other members of

4 the service come into our office.

5             Likewise, I don't go into their office.

6      Q    Would you have to notify someone before

7 you just went pulling out files from their file

8 cabinet or their desk?

9      A    Yes, you would.

*PD020105.TXT*

10    Q    So it would be somewhat unusual for

11 someone from another IAB group to come into your

12 desk, pull files off, rummaging through, without

13 someone knowing or saying something, that would ring

14 a bell or something?

15    A    That's correct.

16    Q    Thank you.

17         MS. BAPTISTE:  No further questions.

18 RECROSS EXAMINATION

19 BY MR. KARASYK:

20    Q    Detective, someone in your team can do

21 that, walk over to your desk and flip open your file?

22    A    Yes.

23    Q    That wouldn't raise any great alarm,

24 would it?

25    A    No.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*D*


45

Page 63

PDO2O1O5.TXT
1                    Clohessy - Recross

2        Q    Isn't it also true, Detective, that

3 there are some impersonation cases that involve

4 members of the service that do get classified as C

5 cases?

6        A    Repeat that?

7        Q    Yes.

8             Aren't there cases involving members of

9 the service when the member of the service is

10 actually accused of using his badge to commit a

11 crime, and you investigate those types of crimes?

12       A    No.

13       Q    And when you have cases where there is

14 an allegation of a member of the service, or someone

15 supposedly being a member of the service, committing

16 a crime, you would investigate that; wouldn't you?

17       A    No.

18             In the Impersonation Unit, we do

19 impersonators.  We don't get involved with members of

20 the service at all.

21             In the ten-and-a-half years I have been

Page 64

PDO2O1O5.TXT

22 in that office, I believe there might be two cases

23 where we discovered that there was an actual law

24 enforcement officer involved.

25          So if the log comes in, and it gets


[212] 349-9692 TANKOOS REPORTING COMPANY [516] 741-523£

0


46

1              Clohessy - Recross

2 assessed down on Hudson Street, for the most part,

3 the cases that we are going to get are going to be

4 impersonators, not members of the service.

5     Q    Okay.

6          Let me ask you this question.

7          Is there any prohibition that you are

8 aware of that would prevent you from logging onto

9 IA-Pro and accessing a C case?

10     A    None.

11          MR. KARASYK:  Thank you.

12          No further questions.

Page 65

*PDO2O1O5.TXT*

13          I'm sorry, I have another question.

14          Q    On the night of November 26th, after

15 your tour was over, what did you and Dones do?

16          A    I went –

17          Q    Did you take the car back?

18          A    I believe we went back to the office,

19 and then, at some point in time, it is our – the way

20 it works is we would drive back to the 48th Precinct,

21 and get in our own personal cars, and go home.

22          Q    Do you recall whether you did that on

23 that night?

24          A    We got into our own cars and went home.

25          Q    At the 48th Precinct?


          [212] 349-9692 TANKOOS REPORTING COMPANY [516] 741-523[

*ø*



                              47

1                Clohessy - Recross

2      A    Yes.

3      Q    You left the Department car at the 48th

PDO2O1O5.TXT

4 Precinct?

5      A     Yes.

6      Q     The 48th Precinct is in the Bronx?

7      A     In the Bronx.

8           MR. KARASYK:   Thank you.

9           COMM. VINAL:   You say your tour ended at

10    11:OO p.m., and you went back to the station

11    house?

12          THE WITNESS:   I don't know exactly what

13    time we got off that night, but I know that at

14    the end of the day, whatever time that was, we

15    left the car at the 48th Precinct and went home.

16          COMM. VINAL:   Any further questions, Ms.

17    Baptiste?

18          MS. BAPTISTE:   No further questions.

19          COMM. VINAL:   If there are no further

20    questions, you can step down.

21          You are excused.

22          (Witness excused.)

23          COMM. VINAL:   We will take a

24    three-minute break and proceed to the next

*PDO2O1O5.TXT*

25    *witness.*

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

*o*

*48*

1

2        *(Recess had.)*

3        *COMM. VINAL:  Does the Department have*

4    *another witness the call?*

5        *MS. BAPTISTE:  Yes.  At this time the*

6    *Department calls Sergeant Gregory Garland.*

7        *COMM. VINAL:  Please step up.*

8        *If you would face me, and place your*

9    *left hand on the Bible, and raise your right*

10   *hand.*

11       *Do you swear the testimony you are about*

12   *to give will be the truth, the whole truth, and*

13   *nothing but the truth, so help you God?*

14       *THE WITNESS:  I do.*

15       *COMM. VINAL:  Have a seat.*

*Page 68*

PD020105.TXT

16          P.O. GAMRAT:  For the record, please

17    state your name, your rank, your shield number

18    and your current command.

19          THE WITNESS:  Sergeant Gregory Garland,

20    Shield 4885, assigned to IAB Group 51.

21          COMM. VINAL:  You need to spell your

22    first name and last name.

23          THE WITNESS:  G-r-e-g-o-r-y,

24    G-a-r-l-a-n-d.

25          COMM. VINAL:  Your witness

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0

49

1              Garland - Direct

2 DIRECT EXAMINATION

3 BY MS. BAPTISTE:

4      Q    Sergeant Garland, how long have you been

5 a member of the New York City Police Department?

6      A    Twenty-one years.

*PD020105.TXT*

7     Q    And where are you currently assigned?

8     A    I'm assigned to Internal Affairs Group

9 51.

10     Q    How long have you been assigned to

11 Internal Affairs Group 51?

12     A    Over four years.

13     Q    And what is your position there?

14     A    I'm a Sergeant.

15     Q    Please describe your duties and

16 responsibilities.

17     A    A Sergeant assigned to the Bronx team.

18 We handle all police impersonation robberies that

19 occur within the city.

20     Q    Are you also in charge of assigning cars

21 to specific members of your team?

22     A    Yes.  We have – besides a car assigned

23 to me, we have cars assigned to the Bronx team.

24     Q    And who was assigned to Car No. 169?

25     A    Officially, it is assigned to Detective

PD020105.TXT

$\square$

50

1                 Garland - Direct

2 Clohessy, of the Bronx team.

3        Q    And who were the people who had keys to

4 the car?

5        A    During my time there, people who had

6 keys to the car were Detective Clohessy, Detective

7 Minaya and Detective Dones.

8        Q    That would be November, 2003?

9        A    2003.  It would be Clohessy and Dones in

10 2003.

11            I'm not sure if Minaya still had keys to

12 the car, but one time he did.  He has since

13 transferred to the Manhattan team.

14        Q    Is there a Department policy as far as

15 copying keys to a vehicle?

16        A    I don't know if there is a policy.

17        Q    Are the Detectives allowed to use the

18 car for personal errands?

Page 71

PDO20105.TXT

19      A   No.

20      Q   When a car is assigned to a Detective or

21 a team, what are they supposed to use that car for?

22      A   That car is supposed to be used for

23 police business.

24      Q   Only?

25      A   Only.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0


                            51

1               Garland - Direct

2      Q   So therefore, checking out something an

3 officer or investigator might have been interested

4 in, but it wasn't police business, he is not supposed

5 to use that vehicle?

6      A   It's supposed to be used for official

7 police business only.

8      Q   And where was the car supposed to be

9 stored?

PDO2O1O5.TXT

10      A    The car was supposed to be stored at the

11 48th Precinct.

12      Q    Were officers allowed to store the

13 vehicle at their home at all?

14      A    No.

15      Q    So, to the best of your knowledge, on

16 November 26, 2003, after Detective Clohessy's tour

17 was over, to the best of your knowledge, the car was

18 being stored at the 48th Precinct?

19      A    Right.

20      Q    And it would be, again, back in use when

21 he came off his RDO, when his next day of work would

22 be?

23      A    Yes.

24      Q    So if his RDO was on the 28th, there

25 would be no reason for the car to have been used, or

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

*PDO2O1O5.TXT*

1                    *Garland - Direct*

2 moved from the 48th Precinct?

3        A    Correct.

4        Q    Sergeant Garland, do you have a personal

5 computer code?

6        A    For the Department computer?

7        Q    Yes.

8        A    Yes.

9        Q    And that personal computer code is a

10 separate code from your tax code, correct?

11        A    Correct.

12        Q    And how many people know your computer

13 code?

14        A    Just myself.

15        Q    Why is that?

16        A    Because it's assigned to me.

17        Q    Were you taught somewhere not to give

18 out your computer code?

19        A    Yes.

20        Q    You were aware it was a procedure not to

21 give out your computer code?

*Page 74*

*PD020105.TXT*

```
22      A   Yes.

23          COMM. VINAL:  Did you say "put out"?

24          MS. BAPTISTE:  Give out your computer

25   code.
```

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523*

◻

*53*

```
1                Garland - Direct

2       Q   So in your time at Internal Affairs,

3 approximately how many people have you let use your

4 computer code to log onto your computer?

5       A   No one.

6       Q   Is it commonplace, in your experience,

7 in your four years where you would be on the

8 computer, and someone might ask you to look up

9 something under your code for them?

10      A   Yes.

11      Q    Is it commonplace that you have ever

12 used someone else's code?  Have you ever used someone
```

*Page 75*

*PD020105.TXT*

*13 else's code to look into a computer?*

*14    A   No.*

*15    Q    Why not?*

*16    A   I have my own code.*

*17    Q    Is it Department procedure that you are*

*18 aware of that after someone logs into the computer,*

*19 they are instructed, or is it Department policy that*

*20 they should log off immediately afterward, after they*

*21 finish their use of the computer?*

*22    A   That's Department procedure, yes.*

*23    Q    Okay.*

*24        And Sergeant, is there an E-ZPass in Car*

*25 No. 69?*

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523E*

*□*

*54*

*1        Garland - Direct*

*2    A   Yes.*

*3    Q    Is it commonplace, in your four years,*

*Page 76*

*PDO2O105.TXT*

4 that an E-ZPass from one car would be switched to

5 another car?

6     A   No, every car has their own E-ZPass.

7     Q   Each car keeps their own E-ZPass?

8     A   Yes.

9     Q   Is there any switching of E-ZPasses

10 between cars?

11    A   Not that I'm aware of.

12    Q   So there is a specific E-ZPass assigned

13 to each specific car?

14    A   Correct.

15    Q   Sergeant, were you working on November

16 28, 2003?

17    A   What day of the week was that?

18    Q   That would be a Friday.

19    A   No, I was off.  It's my regular day off.

20    Q   And you don't have access to anyone

21 else's computer code, correct?

22    A   No.

23    Q   Sergeant, how often have you looked up a

24 case not involving your group in the IA-Pro log?

*PDO2O1O5.TXT*

25     A   How often?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*o*


55

1                    Garland - Direct

2     Q   Yes.

3     A   I look at logs just about every day.

4     Q   Do you look at logs that may involve

5 investigations outside of your department?

6     A   Yes.

7          COMM. VINAL:  Outside of Group 51?

8          MS. BAPTISTE:  Yes.

9     A   Yes.

10    Q   Why do you do that?

11    A   Well, for a few different reasons.

12 Curiosity.  Sometimes, although the heading of the

13 log will say something, sometimes inside the log is

14 something else.

15         I look at a lot of logs every day, not

PDO2O1O5.TXT

16 every day, but when I do log on, I look at the logs.

17    Q    So if it's a case labeled "corruption,"

18 would you look at that case log?

19    A    Yes.

20    Q    Have you ever looked up information

21 involving Detective Vasquez?

22    A    Yes.

23    Q    On what date did you look up any

24 information involving Detective Vasquez?

25    A    I don't remember the exact date.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

ロ


56

1              Garland - Direct

2    Q    But you know you were not working on

3 November 28th; is that correct?

4    A    Correct, I wasn't working that day.

5    Q    When you looked at that case involving

6 Vasquez, did you —

*PDO2O1O5.TXT*

7         COMM. VINAL:  The log, correct?

8         THE WITNESS:  Yes.

9         COMM. VINAL:  Is that what you are

10    accessing, a log?

11        THE WITNESS:  Yes.

12        COMM. VINAL:  Just for the record.

13        THE WITNESS:  Yes.

14    Q    Did you also look up Vasquez and Rachko?

15    A    Whatever was in the log, I read.

16    Q    When you did those things, whose

17 computer code did you use?

18    A    I used my own code.

19    Q    Was there ever a time when you asked

20 Detective Dones to use his code to look up that

21 information?

22    A    No.

23    Q    Was there a time that Detective Dones

24 was on the computer and you, while he was on the

25 computer, used the computer to look up that

PD020105.TXT

ø

57

1                        Garland - Cross

2 information?

3        A    No.

4        Q    Thank you.

5            MS. BAPTISTE:  No further questions.

6            COMM. VINAL:  Cross-examination.

7 CROSS-EXAMINATION

8 BY MR. KARASYK:

9        Q    Sergeant, good morning.

10       A    Good morning.

11       Q    Sergeant, you said in November of '03

12 the only three people that had keys to the car were

13 Dones, Minaya and Clohessy, correct?

14       A    Yes.

15       Q    Okay.

16            And in November, November 26, '03, you

17 were in the 1st Precinct that night?

18       A    Yes.

PDO2O1O5.TXT

19    Q    And Minaya was with you that night?

20    A    Yes.

21    Q    And Dones?

22    A    Yes.

23    Q    And Clohessy?

24    A    Yes.

25    Q    Okay.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*D*


58

1                Garland - Cross

2            And it is true, Sergeant, is it not,

3 that there came a time, while you were there that

4 night, when you learned about this Queens drug

5 rip-off by Vasquez and Rachko, correct?

6    A    Yes.

7    Q    And you learned about that while you

8 were in the 1st Precinct, correct?

9    A    I don't know if I was in the 1st

Page 82

*PD020105.TXT*

10 Precinct at that time.

11          Sometime that night I learned about it,

12 yes.

13          Q    Okay.

14          And you learned that members of the

15 service were involved, correct?

16          A    Correct.

17          Q    And that information was discussed among

18 the members of your team, correct?

19          A    Yes.

20          Q    And there was no attempt to hide that

21 information, was there?

22          A    No.

23          Q    There was no attempt to indicate that

24 that was confidential information, was there?

25          A    No.


          (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ᴏ

PDO2O105.TXT

1                    Garland - Cross

2        Q    As a matter of fact, at some point
3 during that night, you understood that Rachko and
4 Vasquez had been arrested; isn't that true?

5        A    I don't know if I knew Vasquez was
6 arrested.  I knew Rachko had been arrested.

7        Q    You knew Vasquez had been with him,
8 right?

9        A    I'm sorry?

10       Q    You knew that Vasquez was also part of
11 that investigation?

12       A    Yes.

13       Q    That matter was freely and openly
14 discussed with the members of your team in the 1st
15 Precinct?

16       A    Yes.

17       Q    It was discussed in the squad room,
18 correct?

19       A    It was discussed that night.  I don't
20 know if it was exactly in the squad room.

21       Q    It was openly discussed?

Page 84

PD020105.TXT

22    A    Yes.

23    Q    Nothing confidential, hidden, about it?

24    A    No.

25    Q    Did there ever come a time when you

60

1              Garland - Cross

2 discussed that information with Detective Dones, when

3 he indicated to you that he knew Vasquez?

4    A    Yes.

5    Q    Okay.

6              Tell the Court what transpired, what

7 Detective Dones said to you, and how he said it to

8 you, how it came out that he said it to you.

9    A    Well, we mentioned the guy's name,

10 Vasquez, and I think Detective Dones said Julio.

11              I said, "I think that's his name."  He

12 said, "I know him.  I used to work with him."  He

Page 85

PD020105.TXT

13 said, I think, "He broke me in."

14    Q    He came out and said that to you

15 spontaneously?

16    A    Yes.

17    Q    You didn't ask him?

18    A    No.

19    Q    He volunteered?

20    A    Yes.

21    Q    Was there any attempt on his part to

22 hide his association with Vasquez?

23    A    No.

24    Q    Now, during the course of that evening

25 when you discussed this matter, you learned that it

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

ø

61

1                Garland - Cross

2 was a police impersonation case, correct?

3    A    Yes.

Page 86

*PDO20105.TXT*

4    Q    Your command, Group 51, does police

5 impersonation cases, correct?

6    A    Yes.

7    Q    Okay.

8         How long have you known Detective Dones?

9    A    I've known him as long as he has been in

10 Group 51.

11    Q    And could you tell us your opinion of

12 him as a Police Officer.

13    A    I have a good opinion of him.

14    Q    Have you evaluated him?

15    A    Yes, I have.

16    Q    Do you remember what your last

17 evaluation was of him?

18    A    I gave him a good evaluation.

19    Q    4, 4.5?

20    A    If that's what it was.

21         A minimum of 4.

22    Q    Okay.

23         Have you ever had any integrity issues

24 with Detective Dones?

*Page 87*

*PDO20105.TXT*

25      *A   No.*


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

σ


62

1                    *Garland - Cross*

2       *Q   Now, you also testified that the*

3 *automobile 169 had an E-ZPass, correct?*

4       *A   Yes.*

5       *Q   And it is true, is it not, that that*

6 *E-ZPass is located on the windshield of that*

7 *automobile?*

8       *A   Yes.*

9       *Q   It is attached to the windshield of that*

10 *automobile by Velcro strips?*

11      *A   Yes.*

12      *Q   And it is true, is it not, that it could*

13 *be taken off of the windshield, correct?*

14      *A   Sure.*

15      *Q   It could be taken off, and if it is*

*Page 88*

*PDO2O1O5.TXT*

16 *taken off, anyone in any other automobile can use*

17 *that E-ZPass?*

18      *A     Yes.*

19      *Q     Merely because it was used at a specific*

20 *time, there is no guarantee that the automobile that*

21 *was used with it was 169; isn't that true?*

22      *A     I guess you could say that's correct.*

23      *Q     Okay.*

24             *Now, you said that you access IA-Pro and*

25 *look at logs every day, correct?*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

*◻*


*63*

1                *Garland - Cross*

2      *A     Yes.*

3      *Q     Almost every day?*

4      *A     Yes.*

5      *Q     You do that to acquaint yourself with*

6 *what is going on in IAB world?*

*PD020105.TXT*

7      A    Yes.

8      Q    That is information you want to know, as

9 an investigator?

10     A    Yes.

11     Q    You look at all logs that are available

12 to you?

13     A    I have access to all logs.

14     Q    It would be nothing for you to look at a

15 C log, as well as a misconduct log, would it?

16     A    Yes.

17     Q    Okay.

18          Let me ask you this.

19          With respect to the accessing of the

20 logs, do you know whether or not the IA-Pro program

21 is one that has to be logged out of in order to log

22 off of it; or does it automatically kick you out

23 after a certain period of time?

24     A    I don't know if it kicks you out after a

25 certain amount of time.  I don't believe it does.

*PDO20105.TXT*

□

64

1                    Garland - Cross

2        Q    Okay.

3            If you log onto IA-Pro, and then forget

4 to log off, IA-Pro would be accessible on that

5 machine for as long as that machine is operating,

6 until someone logs it off, correct?

7        A    Yes, that's correct.  As far as I know,

8 that's correct.

9        Q    Okay.

10           Sergeant, isn't it true that there are

11 times when, for whatever reason, members of the

12 group, Group 51, forget to log off of IA-Pro, and

13 IA-Pro stays on their machine?

14       A    Yes.

15       Q    And when that occurs, anyone in Group 51

16 can walk over to a particular machine where IA-Pro is

17 up and access logs through IA-Pro, correct?

18       A    Yes.

PDO20105.TXT

19    Q    And when they access IA-Pro through that

20 particular machine, when you run a printout of that

21 particular log, it would show that it was accessed

22 under a particular Detective's ID, even if that

23 Detective was not actually the one who was accessing

24 the log; isn't that true?

25    A    You lost me.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

◻


                              65

1                    Garland - Cross

2    Q    A convoluted question?

3    A    Yes.

4    Q    I want you to assume that a Detective

5 has logged onto IA-Pro and has failed to log off.

6    A    Yes.

7    Q    He has left the command.

8    A    Okay.

9    Q    He has left his computer on, and IA-Pro

*PD020105.TXT*

10 is still up.

11      A    Okay.

12      Q    Isn't it a fact, if another Detective

13 were to walk over to that computer, and access a log,

14 he would have no problem doing that?

15      A    Correct.

16      Q    Isn't it also true, under those

17 circumstances, if a printout was run of who accessed

18 that log, it would show the ID of the Detective who

19 failed to log out?

20      A    Yes.

21      Q    And there would be no way of knowing

22 that it was another Detective who actually did that

23 access; isn't that true?

24      A    Correct.

25      Q    All you would have is the ID who logged

*PDO2O1O5.TXT*

1          *Garland - Cross*

2 on originally and forgot to log off?

3        A    Yes.

4        Q    You did not work on November 28th,

5 correct?

6        A    That was a Friday?

7        Q    Yes.

8        A    Yes, I was off.

9        Q    Okay.

10          MR. KARASYK:  I have no further

11    questions.

12          Thank you very much.

13          COMM. VINAL:  Any Redirect?

14          MS. BAPTISTE:  No further questions.

15          COMM. VINAL:  There being no further

16    questions, you can step down.

17          You are excused.

18          (Witness excused.)

19          COMM. VINAL:  The Department has another

20    witness to call?

21          MS. BAPTISTE:  The Department calls

PDO20105.TXT

22    Detective Mounts.

23        COMM. VINAL:  Place your left hand on

24    the Bible, raise your right hand.

25        Do you swear that the testimony you are

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□

67

1        Mounts - Direct

2    about to give will be the truth, the whole truth,

3    and nothing but the truth, so help you God?

4        THE WITNESS:  I do.

5        COMM. VINAL:  Please have a seat.

6        P.O. GAMRAT:  For the record, please

7    state your name, spell your first and last name,

8    your rank and your shield number, and your

9    current command.

10        THE WITNESS:  Donald P. Mounts,

11    D-o-n-a-l-d, M-o-u-n-t-s, Detective, Shield 114,

12    Internal Affairs Bureau, Group 51.

PD020105.TXT

13          COMM. VINAL:  Your witness.

14          MS. BAPTISTE:  Thank you.

15 DIRECT EXAMINATION

16 BY MS. BAPTISTE:

17      Q    Detective, how long have you been a

18 member of the New York City Police Department?

19      A    Nineteen years.

20      Q    And you are currently assigned to IAB

21 Group 51?

22      A    Yes.

23      Q    How long have you been assigned to that

24 unit?

25      A    Since March of 2001.


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ᴅ


                        68

1                    Mounts - Direct

2      Q    Please describe your duties and

3 responsibilities at Internal Affairs Bureau 51.

                    Page 96

*PDO2O1O5.TXT*

4       A    I'm assigned to investigate basically a

5 lot of different types of cases.

6             My main responsibility is the

7 investigation of solicitation, unlawful solicitation,

8 by police-affiliated organizations.

9             However, I do do specialized cases, such

10 as people who make and produce NYPD shields, false

11 shields, identification cards.

12            I'm also on the Committee of Police

13 Affiliated Organizations, run by the First Deputy

14 Commissioner, and I'm also the Land Manager for the

15 group, as far as the computer access, computer codes.

16      Q    What does it mean when it says you are

17 the Land Manager; what does that mean?

18      A    I have an all access code for all the

19 computers in the office.

20            My code allows me to do things behind

21 the scene on those computers.  I can install

22 software, uninstall software.  I can update the

23 computers with the correct things that they should

24 have in them.

*Page 97*

*PD020105.TXT*
25          *Plus I handle any real problems we have*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

σ


*69*

1                    *Mounts - Direct*

2 *with Group 7, which is the computer section of IAB.*

3          *I attend managers meetings, Land*

4 *Managers meetings, on every other Thursday morning.*

5 *They update us on all the new software coming out.*

6          *Q    Now, are you also in charge of*

7 *maintaining the computer codes of everyone else in*

8 *the Department, or do you just have access to them?*

9          *A    I do not have access to everyone else in*

10 *the Department.*

11          *I only have access to the computer codes*

12 *that were issued to Group 51, when IA-Pro, which is*

13 *the system we use to get on the computer system, came*

14 *on line.*

15          *That was in mid-2001, I believe, is when*

*PDO20105.TXT*

16 they came on line.

17          I was issued a list of computer codes

18 for everyone assigned to Group 51 at that time.

19          Q    So, specifically referring to November,

20 2003, the code numbers you would have had would have

21 been for those from 2001?

22          A    It would contain the computer codes of

23 everyone who was assigned to Group 51 on the day I

24 was given the list.

25          Q    So if there was someone who came to your

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

◻

                                70

1                    Mounts - Direct

2 group afterward, you would not have their computer

3 code?

4          A    No, I would not.

5          Q    And you indicated that you have an

6 actual list of computer codes?

*PDO20105.TXT*

7    *A    Yes.*

8         *MS. BAPTISTE:  I'm going to show you*

9    *what I would ask be marked as Department's*

10   *Exhibit 1 for identification.*

11        *COMM. VINAL:  Deem it marked*

12   *Department's Exhibit 1 for identification.*

13        *[Document marked Department's Exhibit 1*

14   *for identification.]*

15        *COMM. VINAL:  Show it to the witness.*

16   *Q    Do you recognize what I'm showing you?*

17   *A    Yes.*

18   *Q    What do you recognize it to be?*

19   *A    This is a copy of the list of computer*

20 *codes I was given when IA-Pro came on line in 2001,*

21 *with the actual codes being redacted on it.*

22   *Q    Is that a fair and accurate duplication*

23 *of the list that you are in possession of?*

24   *A    Yes, it is.*

25        *MS. BAPTISTE:  At this time, I would ask*

PDO20105.TXT

71

1                    Mounts - Direct

2       that Department's Exhibit No. 1 –

3              COMM. VINAL:  I'm a little confused.

4       You said the actual codes are deleted?

5              THE WITNESS:  Yes.

6              COMM. VINAL:  The actual code numbers?

7              THE WITNESS:  Yes.

8              COMM. VINAL:  On the document?

9              THE WITNESS:  Yes.

10             COMM. VINAL:  On the document you are in

11      possession of?

12             THE WITNESS:  The copy of the original

13      document.

14             COMM. VINAL:  The one you are holding?

15             THE WITNESS:  Yes.

16      Q    Why were the code numbers deleted?

17      A    For security purposes.  Those codes are

18 secure codes, and they allow access into the system.

Page 101

*PD020105.TXT*

19    *COMM. VINAL:  I'm just asking for more*

20    *foundation in terms of the relevance of the*

21    *charges.*

22        *Are you looking to match up a specific*

23    *code?*

24        *I heard no reference to the Respondent*

25    *in regard to the list.*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523*

*o*


72

1        *Mounts - Direct*

2        *MS. BAPTISTE:  I'll clarify it.*

3        *COMM. VINAL:  All right.*

4    *Q    Is Detective Dones' name on that list?*

5    *A    No, it is not.*

6    *Q    Did you have Detective Dones' code?*

7    *A    No, I did not.*

8    *Q    Is that a complete list of the codes you*

9 *had in your possession?*

*Page 102*

PDO20105.TXT

10      A   Yes, it is.

11      Q   And Detective Dones' name is not on that

12 list?

13      A   No, it is not.

14      Q   So therefore, in November of 2003, did

15 you have Detective Dones' computer code?

16      A   No, I did not.

17          MS. BAPTISTE:  At this time, I would ask

18    that –

19          COMM. VINAL:  Before we go further, is

20    it in dispute?

21          You are offering this as a negative,

22    that the Respondent's code was not on the list

23    possessed by the witness?

24          MS. BAPTISTE:  Yes.

25          The point would be no one else had

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

73

*PDO2O1O5.TXT*

1          *Mounts - Direct*

2     access to this code.  The only other person who

3     had access to the code would be Detective Mounts,

4     and even he didn't have the code.

5          The only one who had the code would be

6     Detective Dones.  His partner didn't have it, and

7     the only other person in charge of having that

8     information didn't even have it.

9          COMM. VINAL:  Mr. Karasyk, is it in

10     dispute, that the Respondent is not on this list

11     of codes?

12          MR. KARASYK:  No, Commissioner, it is

13     not.

14          COMM. VINAL:  Apparently, Mr. Karasyk is

15     willing to stipulate to this.

16          You have seen it?

17          MR. KARASYK:  I have seen it.

18          Detective Mounts testified that he did

19     not have his code.

20          COMM. VINAL:  This is a list that you

21     prepared yourself?

*Page 104*

*PDO2O1O5.TXT*
22          THE WITNESS:  No.

23              COMM. VINAL:  It was prepared for you?

24          THE WITNESS:  Prepared for me.

25              COMM. VINAL:  Okay.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

▫


74

1                   Mounts - Direct

2              And it contains the names of all the

3     members of the group, Group 51, as of November,

4     2003?

5          THE WITNESS:  No, sir, it does not.

6              COMM. VINAL:  Okay.

7              It contains the names of the members who

8     you assigned codes to?

9          THE WITNESS:  No.

10              COMM. VINAL:  Okay.

11              Tell me what the list says.

12          THE WITNESS:  It contains members who

*PDO2O1O5.TXT*

13    were assigned to Group 51 in 2001.

14            Some of those members are the same that

15    are there now, some have since left.

16            There are no additions other than what

17    was on the original list of people who later came

18    into the unit.

19            COMM. VINAL:  It is your testimony that

20    the list you have there, prepared for you, is a

21    list of the codes of those who were in Group 51

22    in 2001, when you joined the unit, correct?

23            THE WITNESS:  That's correct.

24            COMM. VINAL:  You said that was March of

25    2001?


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⅗

◻


                    75

1            Mounts - Direct

2            THE WITNESS:  Yes.

3            COMM. VINAL:  That is when you had this

*PD020105.TXT*

4     list prepared?

5          THE WITNESS:  Yes.

6          COMM. VINAL:  The members who joined

7     Group 51 after that time, you don't have their

8     code numbers on your list?

9          THE WITNESS:  That's correct.

10         COMM. VINAL:  Okay.

11         Apparently, Mr. Karasyk is willing to

12    stipulate to that.

13         What am I missing?

14         MR. KARASYK:  I'm willing to say that

15    the document speaks for itself.  His name is not

16    on there.

17         I haven't cross-examined him yet.

18         COMM. VINAL:  The larger issue here is

19    whether this witness was aware of the

20    Respondent's code.

21         MS. BAPTISTE:  Yes.

22         COMM. VINAL:  I didn't hear that as a

23    foundation question.

24         Were you aware of Detective Dones' code

*Page 107*

*PDO2O1O5.TXT*

25    number to access the IA-Pro computer system?


    (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


                        76

1                    Mounts - Direct

2            THE WITNESS:  I know he has a code.

3            COMM. VINAL:  Are you aware of what the

4    number was?

5            THE WITNESS:  No.

6            COMM. VINAL:  You have never been aware

7    of that?

8            THE WITNESS:  No.

9            COMM. VINAL:  It is not on your list

10    there, the list that was prepared in 2001?

11            THE WITNESS:  Right.

12            COMM. VINAL:  It was never updated?

13            THE WITNESS:  Never updated at any time.

14            COMM. VINAL:  There is a larger issue,

15    whether this witness – he is talking about a

                    *Page 108*

*PD020105.TXT*

16    *list that has been handed to him that was*

17    *prepared in 2001.*

18            *He indicated, as new members joined*

19    *Group 51, the list was not updated with their*

20    *code numbers on it.*

21            *THE WITNESS:  That's correct, sir.*

22            *COMM. VINAL:  And that is why Detective*

23    *Dones' name is not on your list, he joined the*

24    *unit after 2001?*

25            *THE WITNESS:  He was assigned a code*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

*D*


*77*

1            *Mounts - Direct*

2    *while he was in another group, and therefore, I*

3    *wouldn't have that code on my list.*

4            *COMM. VINAL:  When he joined Group 51,*

5    *your group, that list was not updated to include*

6    *his security access?*

*Page 109*

*PD020105.TXT*

7          *THE WITNESS:  That's correct.*

8              *COMM. VINAL:  And your testimony is, you*

9    *have never asked the Respondent, either, for his*

10    *access code, correct?*

11              *THE WITNESS:  Not to my knowledge, no,*

12    *sir.*

13              *COMM. VINAL:  I hesitate to take paper*

14    *into evidence, unless it proves a certain point.*

15              *This was used to refresh the witness'*

16    *recollection when he joined Group 51 in 2001.*

17              *You had this list prepared, members who*

18    *were already there?*

19              *THE WITNESS:  It was given to me by the*

20    *computer section, yes.*

21              *COMM. VINAL:  That contained the access*

22    *codes, but it does not contain Detective Dones'*

23    *access code?*

24              *THE WITNESS:  Yes.*

25              *COMM. VINAL:  So stipulated.*

PD020105.TXT

*

78

```
1                    Mounts - Direct

2            I don't need the document.

3            He is stipulating that Detective Dones

4    was not in Group 51 in 2001.

5            He came to your group later?

6            THE WITNESS:  Yes.

7            COMM. VINAL:  And this list relates to

8    2001 only.

9            That is the witness' testimony.

10            What he is testifying to is that

11    Detective Dones' name is not on that list.

12            The reason is he wasn't a member of

13    Group 51 in 2001, correct?

14            THE WITNESS:  Correct.

15        Q    Have you ever had Detective Dones'

16 computer number?

17        A    No.

18        Q    Have you ever at any point asked
```

*PD020105.TXT*

19 *Detective Dones to log onto his computer, for you to*

20 *look up information?*

21      *A   No, I have not.*

22      *Q   Detective Mounts, on November 26th of*

23 *2003, did you become aware of an incident involving*

24 *Detective Vasquez?*

25      *A   Yes, I did.*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£*

*0*


*79*

1                    *Mounts - Direct*

2      *Q   Okay.*

3            *What were the circumstances that made*

4 *you aware of that?*

5      *A   I was working on that day in Group 51,*

6 *and we received information of an impersonation*

7 *robbery case that became a call-out to our group.*

8            *I was assigned by the Commanding Officer*

9 *to begin doing computer checks in regards to that*

*Page 112*

PDO2O1O5.TXT

10 call-out.

11          Other members of the group were sent out

12 on the call-out from my command, and I remained

13 there.

14      Q    What other members?

15      A    Detective Yacopino and Detective Miles.

16          COMM. VINAL:  We need a spelling for

17   Yacopino.

18          THE WITNESS:  Y-a-c-o-p-i-n-o, Anthony

19   is his first name.

20          Detective Edward Miles, M-i-l-e-s.

21          They were sent out.

22          I don't remember whether Detective Dones

23   was working that night, but it's a possibility

24   that he was, and he was already out on something

25   else.


          (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*PDO2O1O5.TXT*

1              *Mounts - Direct*

2              COMM. VINAL:  I don't believe that was

3      part of the question.

4              Listen carefully to the question.

5              Next question.

6        Q    Detective Mounts –

7              COMM. VINAL:  Were you called out; did

8      you go out to Queens?

9              THE WITNESS:  I did not go out to

10     Queens.

11             COMM. VINAL:  Yacopino and Miles?

12             THE WITNESS:  They were sent out on the

13     call-out.

14             COMM. VINAL:  Go ahead.

15       Q    Based upon the call-out, it was about an

16  impersonation, not a member of the service?

17       A    Originally, yes.

18       Q    You came to learn later that it involved

19  a member of the service?

20       A    Yes.

21       Q    When did you learn that?

*Page 114*

*PDO20105.TXT*

22    A    I believe the suspicion came in within

23 an hour or two after the original case came in, that

24 there may be a member of the service involved.

25    Q    Turning your attention specifically –


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523*

*D*


81

1                   *Mounts - Direct*

2              *MS. BAPTISTE:  Let me go back.*

3    Q    You said about an hour or so later,

4 information may have come out that involved a member

5 of the service?

6    A    I believe a former member of the

7 service, the information came out about approximately

8 an hour later, that he was involved.

9    Q    Information about a former Detective

10 Rachko?

11    A    Yes, that's correct.

12    Q    Was there any information out there that

PD020105.TXT

13 you heard involving Detective Vasquez?

14     A    I believe before I left that evening to

15 go home, at some point, that name did come up.  It

16 did come up in the investigation that was given to me

17 by my supervisor.

18     Q    What tour were you working that day?

19     A    I was working from 9:45 a.m. until six

20 p.m.

21         That was my scheduled tour of the day.

22     Q    So at some point before you left that

23 evening, you –

24     A    I actually worked later that evening, I

25 think until 1:00 in the morning.


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523:

◻


                        82

1                 Mounts - Direct

2             COMM. VINAL:  Can you estimate what time

3     it was, if you can, that you learned the name

                    Page 116

*PDO2O1O5.TXT*

4   "Vasquez" was involved in the Queens call-out?

5         THE WITNESS: It could have been as late

6   as eleven or twelve that evening.  I'm not sure

7   exactly what time.

8         I believe I was made aware that there

9   was a member of the service involved, but I don't

10   know the exact time.

11      Q   In your years working in the Internal

12 Affairs Bureau, what, if any, procedures are there to

13 ensure that information regarding an investigation

14 does not leak out to other members of the service?

15         MR. KARASYK:  Commissioner, I'm going to

16   object.  This is irrelevant.

17         We already had voluminous testimony on

18   it.

19         COMM. VINAL:  I will allow questions of

20   the witness regarding various types of logs that

21   have been testified to by other witnesses.

22         Let's make it more specific.

23         I will allow you to ask any questions

24   regarding what members are allowed to access, not

*Page 117*

*PD020105.TXT*

25    *access.*

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

*83*

1                *Mounts - Direct*

2            *By "members," you mean individuals*

3    *assigned to Group 51?*

4        *Q    Are members assigned to Group 51 allowed*

5 *to generally peruse the internal investigation files*

6 *of any other Internal Affairs Bureaus?*

7            *COMM. VINAL:  Bureaus?*

8            *MS. BAPTISTE:  A different group.*

9            *COMM. VINAL:  A different group.*

10            *MS. BAPTISTE:  A different Internal*

11    *Affairs group.*

12        *A    Specifically, we investigate*

13 *impersonations, therefore, all the members are*

14 *admonished to peruse files that are on the computer*

15 *in regards to our cases.*

*Page 118*

*PD020105.TXT*

*16          There are certain instances where other*

*17 groups are assigned cases that we have things to do*

*18 with, and therefore, we would actually access those*

*19 logs, to read them.*

*20          That is only reading them on the screen,*

*21 when you actually look at them.*

*22          Different members within the unit have*

*23 different responsibilities when it comes to that.*

*24          Basically, the Sergeants must peruse the*

*25 logs, to find out what happened overnight, to see if*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

*0*


*84*

*1               Mounts - Direct*

*2 it concerns anything within our group that we haven't*

*3 been notified of.*

*4          The Lieutenant very rarely goes onto the*

*5 system to do it.*

*6          And then, as the person who assigns*

*PDO2O1O5.TXT*

7 cases within the office, I peruse every file on the

8 IA-Pro system, to see if there are any cases that

9 have anything to do with us that we have not been

10 notified of.

11         COMM. VINAL:  Let me ask you this.

12         Is there a written IAB procedure that is

13     given to Detectives working in Group 51 regarding

14     what they can and should access, what they should

15     not access, with regard to logs of other groups,

16     et cetera?

17         THE WITNESS:  No, sir, there is nothing

18     written.

19     Q    Are the Detectives given any kind of

20 oral warning that they should or should not go into

21 the investigative file of another Internal Affairs

22 group?

23         MR. KARASYK:  Objection.

24         COMM. VINAL:  I will allow it regarding

25     training.

*PDO2O1O5.TXT*

ø

85

1                    *Mounts - Direct*

2            Are you familiar with any training that

3    is conducted to the members of internal 51, or

4    when they join Group 51?

5            THE WITNESS:  Yes, I am.

6            COMM. VINAL:  What training do they

7    receive regarding accessing computer logs?

8            THE WITNESS:  When you attend –

9            COMM. VINAL:  Not how to do it, what

10    they are allowed to access.

11            THE WITNESS:  When you attend the

12    Internal Affairs investigation course, part of

13    that three-week course is – I'm sorry, two-week

14    course – is on computers and the use of IA-Pro.

15            When I attended that course myself, the

16    instructor specifically told us, you only are

17    allowed to access the logs that concern your

18    group.  You do not go through the system and go

*PD020105.TXT*

19     *through everybody else's stuff, unless there is a*

20     *particular check mark on the machine which*

21     *doesn't allow you access.*

22            *If you wish to practice going into logs,*

23     *you can check mark, and place that check mark on*

24     *the machine, and it does not allow you access to*

25     *the whole system, only to a training part of it.*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523*

*□*


*86*

1                 *Mounts - Direct*

2            *Then you can go into those logs and look*

3     *at them.*

4            *But he told us specifically, once you*

5     *are in the active system, you are not allowed to*

6     *access any logs that do not concern your group.*

7     *Q     And that was your training?*

8     *A     That's my training.*

9     *Q     Okay.*

*PD020105.TXT*

10          When was that?

11     A     In 2001, I went through the IIC School.

12     Q     Turning your attention to November 28,

13 2003.

14     A     Yes.

15     Q     That would be a Friday.  Were you

16 working that day?

17     A     Yes, I was.

18     Q     Did you have an opportunity on that day

19 to access the computers?

20     A     Yes, I did.

21     Q     What were you doing with the computers?

22     A     Normally, my duty as far as perusing the

23 logs, and assigning cases from those logs.

24     Q     Did you have an occasion to look up a

25 case involving Julio Vasquez?


       (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

σ

PDO2O1O5.TXT

1                    Mounts - Direct

2        A    If it was on the first screen that you

3 come on, and had anything to do with an

4 impersonation, yes.

5            I did not specifically –

6            COMM. VINAL:  The question is your

7 present recollection.

8            On November 28th, did you access a log

9 that had Julio Vasquez's name in it?

10            That is the question.

11            Do you have a present recollection of

12 having done that?

13            THE WITNESS:  No, I do not.

14            COMM. VINAL:  Is there anything that

15 would refresh your recollection?

16            THE WITNESS:  No, there isn't anything

17 that I know of.

18        Q    But your only use for the computer that

19 day would have been looking in the logs, to assign

20 cases?

21        A    That's correct.

*PDO2O1O5.TXT*

22      Q   *Just so that I'm clear, can you explain*

23 *how a computer system is set up.*

24          *Is there a general first page, and then*

25 *you can go further in depth into it?*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

*0*


*88*

1                *Mounts - Direct*

2      A   *Yes, ma'am.*

3      Q   *Okay.*

4          *COMM. VINAL:  Like an index, the first*

5    *page, index to the logs?*

6          *THE WITNESS:  Yes, there is an index*

7    *that lists the log number, and a very short,*

8    *one-line description of the type of case it is,*

9    *such as an impersonation, a referred case, a*

10    *corruption case.*

11          *As that screen comes up, you can look at*

12    *the screen and go through the impersonation*

*Page 125*

*PD020105.TXT*

13    *cases.*

14         *COMM. VINAL:  This is IA-Pro?*

15         *THE WITNESS:  Yes.*

16         *COMM. VINAL:  The very first page is an*

17    *index?*

18         *THE WITNESS:  Yes.*

19         *COMM. VINAL:  A little summary, a one*

20    *line summary, regarding the log number and what*

21    *it relates to?*

22         *THE WITNESS:  Yes.*

23         *COMM. VINAL:  Next question.*

24    *Q    And that log can be printed out; is that*

25 *correct?*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

*89*

1              *Mounts - Direct*

2    *A    It can be printed, but it can also be*

3 *viewed on the screen.*

*Page 126*

*PDO20105.TXT*

4       *MS. BAPTISTE:  I will show you what I*

5    *ask to be marked as Department's Exhibit No. 1.*

6          *COMM. VINAL:  This is Department's 2 for*

7    *identification.*

8          *How many pages is this document?*

9          *It appears to be multi-pages.*

10       *MS. BAPTISTE:  Eight.*

11          *COMM. VINAL:  It will be marked as*

12    *Department's Exhibit 2 for identification.*

13          *(Document marked Department's Exhibit 2*

14    *for identification.)*

15          *COMM. VINAL:  Do you recognize that*

16    *document?*

17          *(Witness reviewing document.)*

18       *MR. KARASYK:  May I have a minute?  I'm*

19    *trying to find it.*

20          *COMM. VINAL:  Yes.*

21          *(Pause.)*

22          *COMM. VINAL:  Do you recognize what that*

23    *is?*

24          *THE WITNESS:  I've never seen it before*

*Page 127*

*PDO2O1O5.TXT*
25    *in my life.  I have never seen a document like*


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

ˈ

90

1                    *Mounts - Direct*

2    *this before.*

3            *COMM. VINAL:  Ms. Baptiste, next*

4    *question.*

5        *Q    Would that be a printout of how an*

6 *IA-Pro index would look like?*

7            *MR. KARASYK:  Objection.  He said he had*

8    *never seen it in his life, how would he know?*

9            *COMM. VINAL:  Does it look like to you*

10    *that it could be an index from the IA-Pro?*

11            *Is that correct?*

12            *MS. BAPTISTE:  Yes.*

13            *COMM. VINAL:  Be very specific.*

14    *Provide as much information as possible.*

15            *Does it look like it to you?*

*PD020105.TXT*

16            THE WITNESS:  No, this is not an index

17    of IA-Pro.

18            This is not what I would see when I pull

19    up the screen.

20        Q    Do you know what this is?

21        A    I know what it is, by looking at it I

22 can surmise what it is.

23        Q    What is it?

24        A    A usage log of Investigator Dones' usage

25 of the IA-Pro system.


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*a*


                        91

1                Mounts - Direct

2            I have never seen it before.

3        Q    You have never seen a usage log before?

4        A    No, I have not.

5        Q    All right.

6            COMM. VINAL:  Not specifically his, have

                    *Page 129*

PDO2O1O5.TXT

7    you ever seen any usage log?

8            THE WITNESS:  I'm not privileged to that

9    information.  It's only through the Computer

10    System Group 7.

11            I have never seen that before, anything

12    like that.

13        Q    At any time, if you needed any

14 information, you would use your own code?

15        A    Yes.

16        Q    Have you ever used anyone else's?

17        A    No, ma'am.

18        Q    Turning your attention to November 28th

19 of 2003, you indicated that you were working that

20 day?

21        A    Yes, I was.

22        Q    Do you remember approximately what time

23 you left that day?

24        A    Left?

25        Q    Yes.