PDO2O1O5.TXT

92

1            Mounts - Cross

2            What was your tour that day?

3      A    My tour for the day was O545 in the

4 morning by 14OO, which is 2:OO in the afternoon.

5      Q    And do you recall, do you remember

6 staying any later than 2:OO in the afternoon?

7      A    I was out the door at 2:OO.  It was the

8 day after Thanksgiving.  I specifically remember

9 that.

10           MS. BAPTISTE:  No further questions.

11           COMM. VINAL:  Cross-examination?

12 CROSS-EXAMINATION

13 BY MR. KARASYK:

14      Q    Detective, you were in the command from

15 the start of your tour until the end of your tour,

16 correct?

17      A    I'm not sure.  I may have left.  I may

18 have gone to Manhattan, to drop off paperwork on a

Page 131

PDO20105.TXT

19 couple of cases that I was working.  I don't remember

20 whether I was or was not.

21      Q    When do you recall coming back?

22      A    I'm not sure whether I came back to the

23 command at the end of my tour.

24          I know I was out of the command by tour,

25 or I signed off, or I called in to sign off at 2:00.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

□


93

1              Mounts - Cross

2      Q    You are not sure if you came back to the

3 command on the 28th?

4      A    I'm not sure whether I came back or not.

5          I know I was working a case in

6 Manhattan.  I dropped off stuff on Fifth Avenue

7 sometime during that day.

8      Q    Let me show you this document, and I ask

9 you if you can identify it.

PD020105.TXT

10          COMM. VINAL:  This is just being used to

11    refresh his recollection?

12          MR. KARASYK:  Yes.

13          COMM. VINAL:  Okay.

14          MR. KARASYK:  Yes.

15    Q   Look at that copy, and see if it

16 refreshes your recollection as to where you signed

17 out from.

18          (Witness reviewing document.)

19    A   It appears that I signed out from the

20 command.  I might have come out before 1400.

21    Q   Having viewed that document, does it

22 refresh your recollection that you signed out from

23 the command at approximately 1400 hours?

24    A   I believe so, yes.

25    Q   Okay.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

D

94

Page 133

PDO2O1O5.TXT

1           Mounts - Cross

2           And it is fair to say that during the

3 entire time you were at the command, you never saw

4 Detective Dones at the command, did you?

5       A   I did not see him at the command at all.

6       Q   It is clear in your mind that for your

7 tour, during the time you were at the command, that

8 Detective Dones was — you never saw him at the

9 command, correct?

10      A   I never saw him that day at all.

11          COMM. VINAL:  That day, so the record is

12 clear, being November 28, 2OO3?

13          THE WITNESS:  November 28, 2003, I never

14 saw Detective Dones at all.

15      Q   And if Detective Dones had been there,

16 and had been working at his desk, you would have seen

17 him, wouldn't you?

18      A   Yes.

19      Q   And if he had been — by the way, do you

20 know what Dones' RDO's were that day, on that day?

21      A   I should, because I prepare the roll

Page 134

PDO20105.TXT

22 call, but I don't – I think he was off that day.  I

23 think it was an RDO, or excused for the day.

24      Q    Is it fair to say, if you had seen him

25 in the command on his day off, that is something that

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0

95

1                 Mounts - Cross

2 you would have remembered, it would have piqued your

3 interest?

4      A    Yes, if he came in on my day off, it

5 would have piqued my interest.  I would have made an

6 adjustment to the roll call.

7      Q    When you signed out at 1400, you were at

8 the command, correct?

9      A    I believe so, sir.  I believe I was at

10 the command, yes.  I just can't remember whether I

11 called in from the outside.

12            It looks like my signature.  I believe I

Page 135

PDO2O1O5.TXT

13 was there at 1400.

14    Q    At 1400, when you signed out at the

15 command, you didn't see Detective Dones, did you?

16    A    No.

17    Q    You didn't see him working at his

18 computer, did you?

19    A    No, I did not.

20    Q    Okay.

21        Now, Detective, isn't it a fact that in

22 Group 51 there had been a number of incidents where

23 members have left the command without signing off,

24 signing out, signing off their computer?

25    A    That's correct, sir.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


96

1        Mounts - Cross

2    Q    And meaning that when they hadn't signed

3 off their computer, their computer is accessible to

Page 136

PD020105.TXT

4 anyone who comes by to obtain logs, if the computer

5 has been logged into IA-Pro, for example?

6      A    If it's logged on, and logged on a

7 second time, into IA-Pro, yes.

8      Q    Okay.

9           And IA-Pro, to the best of your

10 knowledge, does not automatically kick you out, does

11 it?

12      A    No.

13      Q    It stays on for as long as it can be on,

14 until someone actually logs off?

15      A    That's correct, sir.

16      Q    And it is also true, Detective, if

17 someone were to use a log-on computer, not their own,

18 there would be no way of knowing who the person was

19 who used that computer; isn't that true?

20      A    That's correct.

21      Q    Detective, you attended IIC school in

22 2001, correct?

23      A    Yes.

24      Q    Okay.

PDO2O105.TXT

25          Detective Dones did not attend with you,


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


97

1                    Mounts - Cross

2 did he?

3       A   I don't believe so, no.

4           No, he wasn't in my class.

5       Q   You don't have any direct knowledge of

6 what Detective Dones was taught when he went to the

7 IIC school?

8       A   No.

9       Q   You have no idea what he was taught

10 about accessing logs, or prohibitions about accessing

11 logs, do you?

12      A   No.

13      Q   It is entirely possible what you were

14 taught about accessing logs could have been

15 completely different than what he was taught; isn't

Page 138

PDO2O1O5.TXT

16 that true?

17        A    Yes.

18        Q    And you also testified that you are not

19 aware of any Internal Affairs or Patrol Guide

20 guidelines dictating or mandating what logs can be

21 accessed by IAB personnel, and what logs cannot be

22 accessed by IAB personnel?

23        A    Nothing written, no, sir.

24        Q    Nothing written.

25            Okay.


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ø


                            98

1                Mounts - Cross

2                And I believe your testimony was that

3 you normally would not access other logs, other C

4 logs, unless your command had some connection with

5 the event that the log was about, correct?

6        A    Me, myself, personally.

                    Page 139

PDO2O1O5.TXT

7    Q   That is your own personal guide?

8    A   Correct.  That's what my bosses told me

9 that I have to do.

10    Q   Okay.

11        But it is true that in this particular

12 case concerning Vasquez, your command did have a

13 connection with that case, didn't it?

14    A   Yes, it did.

15    Q   And, in fact, you accessed C logs

16 regarding that case, because your command was

17 involved with the investigation; isn't that correct?

18    A   Yes, I did.

19    Q   You are aware that Detective Dones was

20 with the Sergeant when this situation broke on

21 November 26th, weren't you?

22    A   I believe he was out of the command with

23 the Sergeant, yes.

24    Q   Okay.

25        Were you ever told by anyone in the

*PDO20105.TXT*

*99*

1                    *Mounts - Cross*

2 command that the information about Vasquez was

3 confidential, that Vasquez's arrest was confidential?

4      A    At some point, I was told not to access

5 logs in regards to that case, it had been moved to

6 Group 41.

7      Q    Okay.

8           When was that?

9      A    I cannot remember, sir.

10     Q    Was it within the first three or four

11 days of the case breaking?

12     A    It would have been within the first

13 week.

14     Q    Within the first week?

15     A    Sometime within the first week.  I can't

16 tell you exactly when the case went over.

17     Q    And you don't know –

18           COMM. VINAL:  By "first week," you mean

*Page 141*

PDO20105.TXT

19    the first week after November 26th?

20         THE WITNESS:  I believe the incident

21    happened on the 26th.

22         From the 26th to the end of the month,

23    sometime during that period of time we were

24    relieved of any possibility, and my supervisor

25    told me Group 41 has the case, we no longer need

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

o

100

1              Mounts - Cross

2    to access anything in regard to it.

3         Q    Was it the week following Thanksgiving?

4         A    Well, it would have to have been, for

5    me, personally, the week following Thanksgiving,

6    because my supervisor wasn't working on Thanksgiving,

7    or the day after.

8         Q    The earliest you found out about this

9    was the week following Thanksgiving, which is the

Page 142

PDO2O1O5.TXT

10 week of November 30th?

11    A   Yes.

12        MR. KARASYK:  One second, Commissioner,

13    please.

14        (Pause.)

15    Q   Detective, isn't it a fact that this

16 habit of members of Group 51 leaving their computers

17 signed on became so extensive that you actually put a

18 note up, to remind them, members of the service, to

19 sign out of their computers?

20    A   Yes.

21    Q   It got to that level that you decided to

22 put up a note, to remind them to do it, yes or no?

23    A   Yes.

24        MR. KARASYK:  Thank you.

25        No further questions.


     (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

□

PD020105.TXT

1         Mounts - Redirect

2         COMM. VINAL:  You did that yourself, put

3    this note up?

4         THE WITNESS:  Yes, I did.

5         COMM. VINAL:  Where did you put it?

6         THE WITNESS:  I think I told everybody

7    to remember to sign off the computers, and I put

8    a note on the bulletin board, which is located

9    over the two computers behind my desk that most

10    people use.

11         COMM. VINAL:  Redirect.

12 REDIRECT EXAMINATION

13 BY MS. BAPTISTE:

14    Q    When did you put that note up?

15    A    When?

16    Q    What year.

17    A    It had to be sometime in 2002, early

18 2003, when I first took over being the Land Manager

19 for the group, that I became aware that people hadn't

20 been signing off, and I had to remind them to sign

21 off.

Page 144

PDO2O1O5.TXT

22    Q    Did you ever make any kind of directive,

23 or give any instruction, about using the computer

24 when it is logged on under someone else's name?

25    A    Yes.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*O*


102

1                    Mounts - Redirect

2    Q    What directive?

3    A    I told someone, when you are logged onto

4 that computer, everything is done is under your code

5 name.

6            If you are logged on, you are

7 responsible for whatever happens under your code

8 name.

9            Please log off of the computer.

10           I directed people to log off, don't

11 forget to log off today.

12           I would log people off before I left, on

Page 145

PDO20105.TXT

13 purpose, to make sure that those computers, when I

14 left the office, were shut down, at least the ones

15 that I used, the ones behind my desk.

16      Q   So you indicated that you were working

17 on the 26th?

18      A   Yes.

19      Q   If a computer was left on, with

20 someone's log number, based on your common practice

21 of having worked there, you would have logged them

22 off?

23      A   I would log the two computers that are

24 directly behind me in my office.  Those are the ones

25 that I'm basically responsible for, the ones that I

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

o

103

1                Mounts - Redirect

2 work on.  They would have been logged off before I

3 left the office.

Page 146

PD020105.TXT

4    Q    And whose computers are those?

5    A    They are open to anyone in the group.

6         They are actually on a desk behind me,

7 in my area, and anyone can use them.

8         I particularly use those computers to do

9 my work.

10    Q    Do you check to make sure, for example,

11 the computer at Detective Dones' desk, does anyone

12 check to make sure that the people are logged off of

13 those computers?

14    A    No, ma'am.

15    Q    On November 28, 2003, you indicated that

16 you were working and did not see Detective Dones?

17    A    I didn't see him that day.

18    Q    Were you looking for him?

19    A    I was not scheduled to work.

20         I wouldn't have been looking for him,

21 no.

22    Q    Is it possible that sometimes a

23 Detective, or has it ever occurred –

24         MR. KARASYK:  Objection, is it possible,

*PDO2O1O5.TXT*

25      *has it ever occurred, Commissioner.*


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

*0*


104

1              *Mounts - Redirect*

2              *We are talking about this specific date.*

3      *He was very clear, on this specific date, he*

4      *didn't see him.*

5              *MS. BAPTISTE:  Counsel was allowed –*

6              *COMM. VINAL:  I didn't hear the full*

7      *question.*

8              *I will allow you to complete the*

9      *question.*

10             *Go ahead.*

11        *Q    In your time and experience, has there*

12 *ever been a time where an investigator or a Detective*

13 *assigned to your group may come in and leave without*

14 *you noticing them.*

15             *COMM. VINAL:  How would he know that, if*

*Page 148*

PD020105.TXT

16    he didn't notice them?

17        I don't know if he can answer the

18    question.

19        I will allow you to reword it.

20    Q    Has there ever been an opportunity where

21 you may look at the log and recognize that someone

22 was there, and you maybe haven't seen them that day,

23 or at that time?

24    A    Yes.

25    Q    So people could slip in and out, and you

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

□

105

1            Mounts - Redirect

2 wouldn't necessarily see them?

3    A    It's possible, yes.

4    Q    Now, you indicated that on November 26,

5 2003, when you first found out about the incident,

6 you said the information you heard about wasn't

Page 149

PDO20105.TXT

7 confidential at that point?

8       A    At that point, it was part of an

9 investigation that we were conducting, and I was

10 instructed by the Commanding Officer to pull every

11 log concerning that individual.  I did so.

12       Q    When did you pull every log concerning

13 that individual?

14       A    That evening, the evening of the

15 investigation.

16       Q    You did it under your code number?

17       A    Yes.

18       Q    You said you later learned that the

19 investigation became confidential?

20       A    Later on, I remember being told that it

21 was moved to Group 41.  We had nothing to do with it,

22 it was their responsibility, I had nothing to do

23 with it, I should not pull up any logs with regard to

24 it.

25       Q    Even before being told that the case was

PDO2O1O5.TXT

◻

106

1                    Mounts - Redirect

2 confidential, would it be common practice to discuss

3 an Internal Affairs investigation with an outside

4 member of your group?

5        A    No.  No, it would not be because –

6        Q    Why?

7        A    Everybody in our group is part of our

8 group.

9             If it's an investigation that concerns

10 our group, we share the information among each other.

11            I printed those logs –

12            COMM. VINAL:  You indicated within the

13    group.  As I understood, the question was would

14    you share it outside the group.  Was that part of

15    the question?

16            MS. BAPTISTE:  Yes.

17            COMM. VINAL:  The question related to

18    sharing information outside of Group 51?

Page 151

PDO2O1O5.TXT

19      THE WITNESS:  Outside of Group 51?

20      COMM. VINAL:  Yes.

21    A   Only if there was another group working

22 with us.

23        I believe at that time Group 25 was

24 working with us in regard to it, and maybe Group 41

25 just entered.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ᴅ


107

1        Mounts - Recross

2        We would share that information with

3 them, but we would not share it with any other group.

4    Q   And what about sharing that information

5 with general members of the service, not in IAB, just

6 general members of the service?

7    A   Never.

8    Q   Never?

9    A   Never.

Page 152

PDO2O1O5.TXT

10      MS. BAPTISTE:  No further questions.

11      COMM. VINAL:  Who is Group 25?

12      THE WITNESS:  They were originally

13  involved, then Group 41 came in.

14      COMM. VINAL:  Cross-examination?

15 RECROSS-EXAMINATION

16 BY MR. KARASYK:

17      Q   During time of your tour at Group 52,

18 you did not see Detective Dones present in the

19 command, on November 28th; isn't that true?

20      A   You said Group 52.  You mean Group 51.

21      Q   Group 51.

22      A   I never saw Detective Dones while I was

23 in the command that day, I never saw him at all that

24 day.

25      Q   Okay.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

口

108

Page 153

PD020105.TXT

1          Mounts - Recross

2          And to the best of your recollection,

3 you signed out from the command at 1400 hours?

4     A   I believe so, yes, to my recollection.

5     Q   We can say you were in the command at

6 1400 hours, can't we?

7     A   I believe I was.  I don't have an

8 independent recollection, other than my signature.

9     Q   It is your signature, and it says 1400

10 hours?

11    A   Yes.

12    Q   At 1400 hours, when you were in the

13 command, you did not see Detective Dones?

14    A   No, I did not.

15    Q   And if he had been there at his desk,

16 you would have seen him, wouldn't you?

17    A   Yes, I would have.

18        MR. KARASYK:  No further questions.

19        COMM. VINAL:  Anything further?

20        MS. BAPTISTE:  Nothing, your Honor.

21        COMM. VINAL:  If there are no further

Page 154

PDO2O1O5.TXT

22    questions, you can step down.

23        You are excused.

24        (Witness excused.)

25        COMM. VINAL:  It is five minutes after

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0

109

1

2    one.  We will take a luncheon recess at this

3    time.

4        I ask everyone to be back in the Trial

5    Room at ten minutes after 2:00.

6        Thank you.

7        (Luncheon recess had.)

8        COMM. VINAL:  Ms. Baptiste, do you have

9    a witness to call?

10       MR. KARASYK:  May we approach for a

11    second?

12       COMM. VINAL:  Yes.

Page 155

PDO20105.TXT

13        (Bench conference held.)

14            COMM. VINAL:  The witness you are about

15    to call, Ms. Baptiste, is who?

16            MS. BAPTISTE:  The witness is Sergeant

17    Francis Teran.  He is in IAB.

18            COMM. VINAL:  Prior to the commencement

19    of testimony, Mr. Karasyk asked for a bench

20    conference in which he wanted to make a motion

21    regarding Sergeant Teran's testimony.

22            I will allow him to do so at this time.

23            MR. KARASYK:  I would like to move that

24    Sergeant Teran be prohibited from testifying,

25    precluded from testifying by this Court, based


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


110

1

2    upon the fact that, as a member of the New York

3    City Police Department, and in a supervisory

PDO20105.TXT

4      capacity, he conducted an interview of Detective

5      Dones on July 8, 2004, without benefit of

6      providing Detective Dones with any other

7      protections of GO-15.

8              Specifically, it is our belief that

9      Sergeant Teran – and it is unrefuted by any of

10     the documents that we have – specifically it is

11     our belief that Sergeant Teran, prior to

12     questioning Detective Dones in an official

13     investigation, was fully aware that Detective

14     Dones was the subject of the investigation, and

15     that this was a serious violation that was being

16     investigated.

17             Nonetheless, Sergeant Teran undertook to

18     interview Detective Dones without benefit of the

19     safeguards provided under Patrol Guide Section

20     206-13, interrogation of members of the service.

21             Specifically, Sergeant Teran did not, as

22     the Patrol Guide section calls for, permit him to

23     obtain counsel, did not permit him to consult

24     with counsel, prior to questioning him.

PDO2O105.TXT
25          *Sergeant Teran specifically did not give*

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

*o*

*111*

1

2    *Detective Dones any information concerning the*

3    *allegations, the nature of the allegations.*

4    *He specifically did not acquaint*

5    *Detective Dones with the Department's policy*

6    *regarding making of false statements, as he is*

7    *required to do, and he did not permit a*

8    *representative of Detective Dones' union,*

9    *specifically, the Detectives Endowment*

10    *Association, to be present at any time, let alone*

11    *all times during the questioning.*

12    *Further, and in direct violation of*

13    *206-13, Sergeant Teran failed to ensure that the*

14    *interrogation was recorded either mechanically,*

15    *or by a Department stenographer.*

*Page 158*

PD020105.TXT

16    Counsel for the Police Department has

17    produced not a single shred of documentation

18    concerning this interview, except for a worksheet

19    done by Sergeant Teran, which states – and I'm

20    quoting from Sergeant Francis Teran – it gives

21    the log number, gives the accompanying

22    investigators Captain Scollan, Lieutenant Mejia,

23    Sergeant Morton, and SA, Special Agent, I assume,

24    is Ken Hosey.

25        Now, four of those people –


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

□

112

1

2        COMM. VINAL:  Spell "Hosey."

3        MR. KARASYK:  H-o-s-e-y.

4        Four of the people on his worksheet that

5    accompanied him during the interview of Detective

6    Dones were members of the New York City Police

Page 159

PDO2O1O5.TXT

7    Department, and superior officers.

8         Indeed, in his brief narrative of the

9    interview, Sergeant Teran says, "On the above

10    date, the undersigned" – Sergeant Teran – "with

11    the above aforementioned investigators,

12    interviewed Detective Lissander Dones.

13         "A summary of this interview will be an

14    attachment to the case by SA Hosey, FBI.  Case to

15    remain active."

16         It is clear from the Sergeant's own

17    worksheet, let alone at least two sections in the

18    GO-15 of Detective Dones, in which Sergeant Teran

19    was the interviewer, and in which he states,

20    referring to the July 8th, interview, "When I

21    interviewed you, when I questioned you," that

22    this was an interrogation of a member of the

23    service, who was the subject of an investigation,

24    where there was a serious allegation, and

25    Sergeant Teran wholly and completely failed to

*PDO2O1O5.TXT*

113

1

2    provide Detective Dones with any of the

3    protections of 206-13.

4            I would submit to you, based upon that

5    basic failure of a basic right, a fundamental,

6    basic right that all Police Officers enjoy within

7    the New York City Police Department, any

8    testimony that Sergeant Teran gives concerning

9    that interview, and any evidence which he gleaned

10    from that interview which is to be used against

11    Detective Dones in this hearing be precluded,

12    because he wholly failed to afford him the basic

13    fundamental protection that the Police Department

14    affords its officers, 206-13.

15            He didn't give him any right to consult

16    counsel, he did not give him a right to have a

17    union representative present, he didn't

18    stenographically record it, as required.

Page 161

PD020105.TXT

19          Any evidence that he offers from this

20     witness stand is tainted, faintly tainted, by

21     that failure to provide Detective Dones with his

22     basic 206-13 rights.

23          And I ask that he be precluded from

24     testifying based upon that.

25          COMM. VINAL:  Ms. Baptiste, I will hear


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523E

0


114

1

2     you on the motion.

3          MS. BAPTISTE:  Commissioner, as the

4     Department has stated before, it is the

5     Department's position that on that date of July

6     9, 2004 –

7          COMM. VINAL:  Isn't it July 8, 2004?

8          MS. BAPTISTE:  The document actually

9     says investigation on July 9, 2004.  That is what

Page 162

PDO2O105.TXT

10    it actually says.

11         COMM. VINAL: Okay.

12         MR. KARASYK:  We are just confused by

13    dates.  I believe it's July 8th, based on his

14    worksheet.  The 9th has been used, as well.

15         I don't think there is any argument that

16    it occurred.  Whether it was on the 8th or the

17    9th, we will find out.

18         COMM. VINAL:  Go ahead.

19         MS. BAPTISTE:  This interview that was

20    conducted was organized, was orchestrated, and

21    was primarily conducted by Federal Agents, that

22    being the FBI.

23         This was not a violation of the

24    Respondent's GO-15 rights, or a violation of

25    206-13 –

115

PD020105.TXT

1

2          COMM. VINAL:  The GO-15 is simply an old

3    term for PG 206-13?

4          MS. BAPTISTE:  Yes.

5          COMM. VINAL:  It is not two separate

6    proceedings.

7             We are talking about a single procedure

8    that is outlined in the Patrol Guide under Patrol

9    Guide Section 206-13, the interrogation of

10    members of the service.

11          MS. BAPTISTE:  Yes.

12          COMM. VINAL:  Go ahead.

13          MS. BAPTISTE:  What 206-13 makes clear

14    is during an official interview of a member of

15    the service, they have specific rights.

16             Nowhere is it alleged – and it is quite

17    clear that the interview that took place in July

18    of 2004, was not anything that would be qualified

19    as an official Department interview.

20             The Department investigators from

21    Internal Affairs are not precluded from

Page 164

PD020105.TXT

22    accompanying Federal Agents when they question

23    members of the service.

24         There is nothing in the Patrol Guide,

25    there is nothing in the Department policy, that

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*

116

1

2    precludes an investigator from tagging along,

3    from accompanying during an interview

4    orchestrated by the Federal Government, that

5    being the FBI.

6         At no point were the Respondent's basic

7    rights violated under 206-13.

8         The fact that investigators were present

9    does not automatically lead to the conclusion

10    that it was an official interview.  In fact, it's

11    the opposite.

12         This investigation and this interview on

PDO2O1O5.TXT

13  that particular day was led and headed by the

14  Federal Government, which is why they did the

15  summary, which is why they dictated the

16  procedures how it was memorialized, how it was

17  recorded.

18          It is their procedure not to record it.

19          That was done mainly because they were

20  the ones in charge.

21          This was not something that was set up

22  by Internal Affairs Investigations, where they

23  call the shots, make the decisions on how things

24  should be done.

25          Since they were just followers, tagged

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

117

1

2  along, they fell in line with what the Federal

3  Agents did.

Page 166

PD020105.TXT

4    Therefore, the basic premise, the first

5    line of PG 206-13, the very basic premise that

6    this applies when there is an official interview,

7    nothing else needs to be looked at, because this

8    was not an official interview conducted by the

9    Internal Affairs Investigation Unit, or any

10    bureau.

11        Therefore, Commissioner, any other

12    standards, or any other things listed underneath

13    that, are irrelevant, because the main point that

14    this was not an official interview negates

15    everything else.

16        It is the Department's position that

17    this was not an investigation that was headed or

18    led by the Internal Affairs investigators, and

19    therefore, the Respondent's rights under Patrol

20    Guide Section 206-13 were not violated.

21        MR. KARASYK:  Just to respond?

22        COMM. VINAL:  Please.

23        MR. KARASYK:  It is quite apparent from

24    the draft of the FBI report itself that the

Page 167

PD020105.TXT

25    questions that were asked concerned access to the

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523\

☐

118

1

2    NYPD computer system.

3        There is no indication, even from their

4    own worksheet, the FBI worksheet, that there were

5    any questions related to a wider federal

6    investigation.

7        All the questions centered around access

8    to the NYPD system regarding Vasquez, and when

9    that access was obtained, and what was said from

10   Detective Dones with regard to Detective Vasquez.

11       There is nothing here about questions

12   about the federal investigation.

13       In addition, the PG 206-13 says the

14   purpose is to protect the rights of members of

15   the service in an official Department

PDO2O1O5.TXT

16     investigation.

17          The IAB group that investigated this

18     clearly had an investigation, they were clearly

19     doing an investigation, they were investigating

20     access to NYPD computers, and there can be no

21     doubt that this was an official investigation.

22          In addition, the second paragraph

23     procedure says, prior to questioning a member of

24     the service, who is the subject, or a witness, of

25     an official investigation, which this was,

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

0

119

1

2     interrogating officer shall, as I enumerate,

3     permit counsel, have it recorded, all those

4     things.

5          There is a worksheet, there is an NYPD

6     worksheet about the investigation.   There is an

Page 169

*PD020105.TXT*

7     old saying that you can't hang a sign on a cow

8     that says "horse" and make it a horse.

9           This was clearly, clearly, an NYPD

10    investigation, Commissioner.

11          There were four members of the NYPD

12    present, there were bosses present.  He was

13    questioned, he was the subject.  It was an NYPD

14    allegation, and there is no doubt whatsoever that

15    he was due to be afforded the right of PG 206-13.

16          And while I agree with counsel that IAB

17    can tag along, it is one thing for them to tag

18    along and not say anything, participate; it is

19    quite another thing for them to join in the

20    interrogation, as Sergeant Teran has testified,

21    stated in the GO-15 of Detective Dones that he

22    did, and it is an entirely other thing, once

23    again, for them to come in and use the

24    information gleaned from that investigation in a

25    Department trial, on Department charges, to try

PD020105.TXT

□

120

1

2    to prove this officer guilty by testimony which

3    they were not privy to, unless it was obtained

4    under the GO-15.

5          I don't think there is any question that

6    it was an official investigation.  Their own

7    documents prove that if it was an official

8    Department investigation, where he was the

9    subject under 206-13, by the very wording of it,

10    he is entitled to the protections of 206-13.

11          He has to be precluded from testifying

12    for violating that prohibition.

13          COMM. VINAL:  All right.

14          MS. BAPTISTE:  May I respond?

15          COMM. VINAL:  Yes.

16          MS. BAPTISTE:  Just to correct one of

17    the statements made by defense counsel, the

18    summary encompasses more than just questions

Page 171

PDO20105.TXT

19    regarding the computer use, it also encompasses

20    the Detective's admission that he disclosed

21    information to a Louis NievesDiaz.

22        There were not only questions about the

23    computer usage, there were also questions about

24    his involvement, his sharing of information.

25        In fact, the computer usage does play

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□

121

1

2    into the Federal Government investigation into

3    the criminal case, because at that point, they

4    were investigating who knew what, and how much

5    information had been disseminated, and who may

6    have been possibly involved.

7        At that point, they were still gathering

8    evidence.

9        Specifically, because an Internal

Page 172

PD020105.TXT

10    Affairs investigator is there, does not make it

11    an official Department interview.

12         The Patrol Guide refers to an official

13    interview.  They mean one conducted by the

14    Department itself.

15         The mere fact that an investigator

16    happens to be present, and may even ask one

17    question during a federal bureau criminal

18    investigation does not all of a sudden turn it

19    into an official Department investigation.

20         The Patrol Guide refers to an official

21    Department investigation, not any investigation

22    that the Federal Government may have involving a

23    member of the service.  Does that automatically

24    mean that they are afforded the same rights as

25    they are under the Patrol Guide Section 206-13?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

D

122

Page 173

*PD020105.TXT*

1

2          To do that would set a dangerous

3    precedent that the Federal Government must be

4    tied to the Patrol Guide, and that is just not

5    the case.

6          The fact is, the Patrol Guide refers to

7    one thing specifically, the fact that

8    investigators may tag along.  It is run by the

9    Federal Government, they organize it, they

10   orchestrate it, they are the primary questioners.

11         The fact that someone from our office is

12   present from Internal Affairs all of a sudden

13   does not turn it into an official interview,

14   therefore, affording him the rights under 206-13.

15         Again, Commissioner –

16         COMM. VINAL:  You don't have to do it

17   again, I listened to you the first time.

18         MS. BAPTISTE:  The federal investigation

19   was based on a crime committed by Vasquez.  There

20   was some information, they were trying to

21   determine how far that tree stretched out into

*Page 174*

PDO20105.TXT

22  the criminal activity.

23       COMM. VINAL: I hear you.

24       Both counsel, in the course of their

25  argument, have alluded to information in terms of


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0


123

1

2  why the interview was conducted, who set it up,

3  what it related to, and specific factual

4  information regarding the information that,

5  clearly, we don't have in the record at this

6  point.

7       Counsel are referring to documents that

8  are referring back to the July, 2004, interview.

9       The issue presented is quite clear as

10  made by Mr. Karasyk, and that is, did the

11  interview of the Respondent, in July of 2004,

12  whether on the July 8th or July 9th – perhaps we

Page 175

PDO20105.TXT

13    will get it clarified — constituted an interview

14    which was required to be conducted consistent

15    with the provisions of Patrol Guide 206-13.

16          Obviously, in making a determination as

17    to whether those provisions should have applied

18    to this interview, the circumstances under which

19    the interview was conducted, set up, arranged,

20    the manner in which the interview is conducted,

21    the involvement, noninvolvement, of members of

22    this service as interrogators during the

23    interview, are all very relevant.

24          I'm going to preclude — excuse me, I'm

25    going to, at this point, not grant the

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□

124

1

2    Respondent's motion to preclude Sergeant Teran's

3    testimony regarding the interview, I will allow

Page 176

PD020105.TXT

4    testimony regarding all aspects of the interview,

5    and that will give us a thorough record.

6        However, although I am denying the

7    motion to preclude, Respondent's counsel's

8    arguments regarding his position that 206-13

9    procedures should have been followed during this

10   interview, and were not, remains, and will be

11   considered as part of the overall decision.

12       Obviously, in that sense, we will have a

13   thorough record to present to the Police

14   Commissioner as to how the interview was

15   conducted, since he makes all the determinations.

16       As far as the evidentiary determination

17   as to what a witness can testify to, I'm going to

18   allow him to testify as to all aspects of the

19   July, 2004, interview that he and other members

20   of the service apparently attended with regard to

21   Special Agent Hosey, H-o-s-e-y.

22       Is that correct?

23       MS. BAPTISTE: Yes.

24       COMM. VINAL: Of the FBI.

Page 177

*PDO2O105.TXT*

25    *With that ruling, let's have the witness*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

□


125

1                    *Teran - Direct*

2    come back into the room, please and take the

3    stand.

4            Please step up, if you would, please

5    step up and face me.

6            Place your left hand on the Bible, raise

7    your right hand.

8            Do you swear the testimony you are about

9    to give will be the truth, the whole truth, and

10    nothing but the truth, so help you God?

11            THE WITNESS:  I do.

12            COMM. VINAL:  Have a seat.

13            P.O. GAMRAT:  For the record just state

14    your name, spell it, your rank, your shield

15    number and your current command.

*Page 178*

PDO20105.TXT

16          THE WITNESS:  Sergeant Francis Teran,

17      T-e-r-a-n, Internal Affairs Bureau, Group 41,

18      Shield No. 3454.

19          COMM. VINAL:  What group presently?

20          THE WITNESS:  Group 41.

21          COMM. VINAL:  Your witness.

22 DIRECT EXAMINATION

23 BY MS. BAPTISTE:

24      Q    Sergeant, how long have you been a

25 member of the New York City Police Department?


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

□



                        126

1               Teran - Direct

2      A    It will be fourteen years in April of

3 2005.

4      Q    And how long have you been with the

5 Internal Affairs Bureau?

6      A    Since September 29th of 2003.

                Page 179

PDO2O1O5.TXT

7      Q   And have you always been assigned to the

8 same command while in Internal Affairs?

9      A   Yes.

10      Q   Please describe your duties and

11 responsibilities at Internal Affairs Group 41.

12      A   At Internal Affairs Group 41, I conduct

13 internal investigations of members assigned to the

14 Organized Crime Control Bureau of any misconduct or

15 allegations thereof.

16      Q   Approximately how many investigations

17 have you been a part of?

18      A   Over a hundred.

19      Q   Over a hundred?

20      A   Yes.  That is including narcotics

21 investigations, Internal Affairs.

22      Q   You also did narcotics investigations

23 out of Internal Affairs?

24      A   No, I worked out of narcotics.

25      Q   During your time at Internal Affairs,

*PDO20105.TXT*

ɒ

127

1                 Teran - Direct

2 approximately how many investigations have you been

3 part of?

4        A    About fifty.

5        Q    Now, what aspects of an investigation

6 done in Internal Affairs is different from the way an

7 investigation would be handled in a different

8 department, in another department outside of Internal

9 Affairs?

10               COMM. VINAL: I'm not sure I understand

11      that question.

12               I am not interested in comparisons

13      between non-IAB investigations and regular

14      investigations.

15               We have a number of issues you are aware

16      of. I would like to move to the case you are

17      trying here.

18               Let's focus on this case.

*Page 181*

PD020105.TXT

19    Q   In your particular Internal Affairs

20 Group 41, what specific precautions are taken, so

21 that information about your cases, your

22 investigations, does not get leaked out?

23          MR. KARASYK:  Objection.

24          Irrelevant, Commissioner, what happens,

25    in 41.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


128

1              Teran - Direct

2          COMM. VINAL:  I just don't know where

3    you are going.

4          We have a number of issues here, as you

5    are fully aware of.

6          I would like to focus on the charges,

7    this witness' relevant testimony regarding those

8    charges.

9          Go ahead.

Page 182

PDO20105.TXT

10          MS. BAPTISTE:  Can he answer the

11   question?

12          COMM. VINAL:  He investigated this

13   matter.

14          MS. BAPTISTE:  Yes.

15          COMM. VINAL:  Can we get to the

16   investigation?

17          That was a general matter question.  I

18   would like to focus on the investigation.

19     Q    Specifically, in Group 41, when a case

20 came up, an investigation came up involving Detective

21 Dones, what special precautions were taken?

22     A    The investigation was kept to a select

23 few in the group, those that were involved in the

24 case.  They were the only ones who knew about the

25 investigation pertaining to Detective Dones.


       (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

n


                              129

                       Page 183

PD020105.TXT

1           Teran - Direct

2      Q    And why was that?

3      A    Because he was a member of the Internal

4 Affairs Bureau, of a different group.

5           There were members in Group 41 that had

6 worked with Detective Dones in the past in IAB.

7      Q    So you became involved in the

8 investigation of Detective Dones around what time?

9      A    The investigation started in November of

10 2003, in which —

11      Q    Was it specifically related to Dones?

12      A    Repeat the question.

13           COMM. VINAL:  What happened in November,

14     2003?

15           THE WITNESS:  In November, 2003, there

16     was — ex-Detective Julio Vasquez, along with

17     Detective Rachko, were involved in a rip of a

18     drug courier.

19           COMM. VINAL:  Did you learn this on that

20     day?

21           THE WITNESS:  Yes.

Page 184

PDO2O1O5.TXT
22          COMM. VINAL:  Okay.

23          THE WITNESS:  On that day.

24          Subsequently into the investigation,

25     conducting numerous phone record checks, we


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ᴏ


                        130
1                  Teran - Direct

2     became aware that Detective Dones was in contact

3     with one of the subjects of this investigation.

4          COMM. VINAL:  You can ask the witness

5     what investigative steps he took, starting on

6     November 26th, in terms of the entire

7     investigation.

8          Please proceed.

9          Move it along, please.

10     Q    What investigative steps did you take

11 concerning the investigation into how you became

12 involved in investigating Detective Dones?

                    Page 185

PDO2O1O5.TXT

13    A    Phone records were requested, they were

14 checked.  They were compared to the MOS database.

15         Numerous interviews were conducted of

16 members of the service.

17         That's how –

18         COMM. VINAL:  That is generally.

19         I don't know how his investigation was

20 conducted, what is relevant to the Department's

21 case as to what he did.

22         I can't take a summary in terms of his

23 conclusion as to what happened.

24         Go ahead, please.

25    Q    What did you do in your investigation?


        (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


                            131

1              Teran - Direct

2    What things did you do –

3         COMM. VINAL:  Not in general.

                    Page 186

PD020105.TXT

4          On November 26, 2003, did you go out to

5     Queens?

6          THE WITNESS:  No.

7          COMM. VINAL:  Okay.

8          What did you do on that date, when you

9     first became involved in this?

10         THE WITNESS:  We responded to the Office

11    of the Chief of IAB, at which time we were

12    informed that Detective Julio Vasquez was

13    involved in a rip.

14    Q    What does "rip" mean?

15    A    It's when a Police Officer apprehends a

16 person, or arrests a person who is carrying a

17 narcotic or money.

18    Q    At that point, on November 26th, was

19 Detective Julio Vasquez under arrest?

20    A    At that time, no, he was not.

21         He was arrested the following day; which

22 would be November 27, 2003.

23    Q    Describe what you did next, after

24 becoming involved on November 26th.

Page 187

PDO20105.TXT

25      A    Once we were advised what had, we had


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

*


132

1                    Teran - Direct

2 gone out to Detective Julio Vasquez's residence, we

3 spoke with him, and we removed him to his command, at

4 which time we retrieved his weapons, his personal

5 property, and then he was removed to the Queens DA's

6 office, for debriefing.

7      Q    And based on your interview with

8 Detective Vasquez, did that in some way direct you to

9 Detective Dones?

10      A    Yes, it did.

11            In December of 2003, there were

12 numerous – there was a proffer conducted, a proffer

13 agreement with the United States District Attorney's

14 office, Eastern District, in which information was

15 relayed to us that Julio Vasquez was involved with

Page 188

PDO2O1O5.TXT

16 another Detective, a member of the service, in

17 conducting rips.

18      Q    Specifically, how did that information

19 lead you to Detective Dones?

20           COMM. VINAL:  The question was regarding

21 Detective Dones.

22      Q    How did that information lead you to

23 Detective Dones?

24      A    The information that was provided to us

25 in the proffer –


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

ロ


133

1              Teran - Direct

2           COMM. VINAL:  Vasquez's attorney

3 proffered this?

4           THE WITNESS:  Yes, along with the United

5 States District Attorney's Office.

6           COMM. VINAL:  They don't know.  The

Page 189

PDO20105.TXT

7    question is where is the information coming from.

8        I need to know the sources of

9    information.

10        THE WITNESS:  Through Detective Julio

11    Vasquez.

12        COMM. VINAL:  He told –

13        THE WITNESS:  He told us that he was

14    involved in a rip –

15        COMM. VINAL:  Again, were you present at

16    an interview with Vasquez sitting in the room,

17    and you heard these words come out of his mouth?

18        THE WITNESS:  Yes.

19        COMM. VINAL:  And this was on?

20        THE WITNESS:  December 12, 2003.

21        COMM. VINAL:  Okay.

22        What did you hear Vasquez say?

23        THE WITNESS:  That one of his first rips

24    that he was involved in involved a Detective

25    Louis NievesDiaz, who is a former member of the

*PDO20105.TXT*

134

1           *Teran - Direct*

2     New York City Police Department.

3           With that, we investigated Detective

4     Louis NievesDiaz, we interviewed him, we obtained

5     phone records of Detective Louis NievesDiaz, at

6     which time there were phone calls made to

7     Detective Dones, and Detective Dones calling

8     NievesDiaz.

9           COMM. VINAL:  We can start with you got

10    phone records.

11          THE WITNESS:  Okay.

12          COMM. VINAL:  And you indicated that

13    there was something in the phone records that

14    related to Detective Dones.

15          THE WITNESS:  Yes.

16          COMM. VINAL:  Are the phone records

17    relevant here?

18          Q    You indicated –

Page 191

PDO20105.TXT

19        COMM. VINAL:  The witness is giving

20    summary testimony about his investigation and

21    what it uncovered.  This is coming from him.  I

22    don't have any phone records.

23            MS. BAPTISTE:  If I can have a moment,

24    your Honor?

25            COMM. VINAL:  Yes.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0


135

1                Teran - Direct

2            This examination of the phone records

3    that you said you made, did you prepare a report

4    regarding that?

5            THE WITNESS:  No.

6            I personally didn't review the records,

7    it was a Detective Paul Carr, who is now retired

8    from the Department.  He was in charge of

9    obtaining the records and reviewing them.

Page 192

PDO2O1O5.TXT

10    COMM. VINAL:  Detective – what is the

11    first name?

12        THE WITNESS:  Paul Carr.

13        COMM. VINAL:  How do you spell the last

14    name?

15        THE WITNESS:  C-a-r-r.

16        COMM. VINAL:  Okay.

17        He informed you that he had reviewed

18    phone records?

19        He is part of this investigation?

20        THE WITNESS:  Yes.

21        COMM. VINAL:  He is a Group 41 member?

22        THE WITNESS:  Yes.

23        COMM. VINAL:  Okay.

24        THE WITNESS:  He obtained the records –

25        COMM. VINAL:  Mr. Karasyk.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□

136

Page 193

PD020105.TXT

1              Teran - Direct

2              MR. KARASYK:  I will object to him

3      testifying about the phone records, if he had

4      no – he didn't review the records, he didn't see

5      the records.  He has no basis to lay a foundation

6      for these records whatsoever, Commissioner.

7              A retired Detective who is not here is

8      the one who did that.  I don't know if he had the

9      records.

10             We will do preliminary questioning, to

11     find out.

12             Detective Carr told you what?

13             THE WITNESS:  He initially reviewed the

14     records.

15             COMM. VINAL:  You said the records?

16             THE WITNESS:  Yes.

17             COMM. VINAL:  What records?

18             THE WITNESS:  The phone records.

19             He conveyed what he had found.  I

20     reviewed the records.  I then –

21             COMM. VINAL:  You kept saying the

Page 194

PD020105.TXT

22    records.  The phone records from who?

23             THE WITNESS:  Diaz, Louis NievesDiaz.

24             COMM. VINAL:  I need to be clear on

25    that.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0


137

1                    Teran - Direct

2             This is strictly background at this

3    point.

4             What I have is that on December 12,

5    2003, you attended a session where Vasquez was

6    being interviewed, correct?

7             THE WITNESS:  Yes.

8             COMM. VINAL:  And he implicated

9    Lieutenant Louis NievesDiaz in committing a rip

10    with him?

11             THE WITNESS:  Correct.

12             COMM. VINAL:  Okay.

Page 195

PDO2O1O5.TXT

13          At that point, IAB decided to get the

14   phone records of the residence of this Detective

15   Diaz.

16          I need to know what phone records you

17   are talking about here.

18          THE WITNESS:  Yes, IAB requested – the

19   federal, the FBI requested the records of

20   Detective Diaz's home phone, cell phone.

21          COMM. VINAL:  Home, cell, anything else?

22          THE WITNESS:  Anything else?

23          COMM. VINAL:  That the FBI obtained.

24          THE WITNESS:  I'm sorry?

25          COMM. VINAL:  Home and cell?

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

ם

138

1          Teran - Direct

2          THE WITNESS:  Yes.

3          COMM. VINAL:  Not relating to any work

Page 196

PDO2O1O5.TXT

4      location?

5              THE WITNESS:  No.

6              COMM. VINAL:  Okay.

7              Were you involved in gathering these

8      records?

9              THE WITNESS:  The FBI did that.

10             COMM. VINAL:  Detective Carr examined

11     the records the FBI gave him?

12             THE WITNESS:  Yes.

13             COMM. VINAL:  Okay.

14             What did Detective Carr tell you

15     regarding these records?

16             THE WITNESS:  That there was, in fact, a

17     member of the New York City Police Department who

18     had phone contact with Detective NievesDiaz on

19     that date, on the date of the 27th.

20             COMM. VINAL:  Did you get the name of

21     the individual?

22             THE WITNESS:  Yes.

23             COMM. VINAL:  This is your conversation

24     with Detective Carr?

Page 197

PDO2O1O5.TXT

25          THE WITNESS: Yes.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□

139

1                Teran - Direct

2          COMM. VINAL: What did he say to you?

3          THE WITNESS: He told me that Detective

4    Dones is a member of the New York City Police

5    Department who is currently assigned to IAB Group

6    51.

7          COMM. VINAL: He said he found calls?

8          THE WITNESS: In the phone records,

9    there was Detective Dones' home phone number in

10   the records, in the telephone records.

11          With that, those numbers were

12   cross-referenced to the NYPD database, and it

13   showed that that is his home phone number.

14          COMM. VINAL: Did Detective Carr

15   indicate how Detective Dones' home phone number

PDO2O1O5.TXT

16    was in these records?

17           As a number called by Diaz?

18           THE WITNESS:  By showing me the phone

19    records themselves.

20           COMM. VINAL:  Outgoing calls from Diaz's

21    phone?

22           I need a little more information, if you

23    know it.

24           THE WITNESS:  I believe it was on his

25    cell phone, Louis NievesDiaz's cell phone, that

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

□

140

1           Teran - Direct

2    he had reached out to Detective Dones.

3    Q    You were referring to Sprint records, or

4 cell phone records you had reviewed?

5    A    Yes.

6           COMM. VINAL:  You actually reviewed the

PDO20105.TXT

7   records personally?

8            THE WITNESS:  Yes.

9        Q   And these were the billing records of

10  Louis NievesDiaz?

11       A   Yes.

12           MS. BAPTISTE:  I show you what I will

13  ask to be marked as Department's Exhibit No. 3

14  for identification.

15           COMM. VINAL:  It will be deemed marked

16  Department's Exhibit 3 for identification.

17           (Document marked Department's Exhibit 3

18  for identification.)

19           (Witness reviewing documents.)

20       A   Yes.

21       Q   Do you recognize what I am showing you?

22       A   Yes.

23       Q   And what do you recognize it to be?

24       A   A copy of phone records that I reviewed

25  pertaining to Detective Louis NievesDiaz's cell

*PDO2O105.TXT*

*141*

1                          *Teran - Direct*

2 *phone.*

3         *Q    Is that a fair and accurate copy of the*

4 *phone records, the Sprint phone records, from Louis*

5 *NievesDiaz's phone?*

6         *A    Yes.*

7             *MR. KARASYK:  Commissioner, I am going*

8     *to object.*

9             *There has been no foundation laid for*

10     *the accuracy or validity of these records.*

11             *He himself testified that he didn't*

12     *obtain these records, he said the FBI obtained*

13     *them.*

14             *COMM. VINAL:  Ms. Baptiste, the witness*

15     *testified that the FBI provided these phone*

16     *records.*

17             *I have not heard any foundation*

18     *questions from you regarding whether they checked*

*Page 201*

PDO2O1O5.TXT

19   the phone numbers, to see if they were Mr. Diaz's

20   phone number, how they got that number.

21           It has to be done in a logical sequence

22   in terms of establishing that these records are

23   what they purport to be.

24           The only testimony so far is that the

25   FBI obtained telephone records from the home

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

*0*

142

1               Teran - Direct

2    phone number and the Sprint cell phone of

3    Detective Diaz.

4           MR. KARASYK:  He didn't even get these

5    phone records from the FBI, he said he got them

6    from another Detective.

7           I don't know the records, where he got

8    them from.

9           COMM. VINAL:  How do you know that these

Page 202

PDO2O1O5.TXT

10    records came to Detective Carr from the FBI?  Is

11    that what Detective Carr told you?

12         THE WITNESS:  Yes.

13         COMM. VINAL:  We need foundation

14    questions with regard to the records.

15         There is a proper manner to introduce

16    records of this sort.

17         We need background questions, as opposed

18    to just putting it in evidence.

19    Q    Did you verify that the phone number on

20 that phone call was the phone number to Mr. Diaz?

21         COMM. VINAL:  "From," he said.  He

22    indicated phone records of the cell telephone,

23    Sprint.

24         Is that the telephone company?

25         THE WITNESS:  Yes.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

o

143

Page 2O3

PDO2O105.TXT

1          Teran - Direct

2          COMM. VINAL:  Did you confirm that this

3    is Detective Diaz's cell phone number?

4          THE WITNESS:  Through an interview

5    conducted of Louis NievesDiaz, he provided us

6    with this cell phone number.

7      Q    That is how you found out the number?

8      A    Yes.  Looking at the name of the

9    records.

10          MR. KARASYK:  He is testifying to

11    documents not in evidence.

12          COMM. VINAL:  He said Detective Diaz

13    told us.

14          Were you present?

15    THE WITNESS:  Yes.

16          It was an interview that was conducted

17    in January of 2004 at Detective Nieves'

18    residence.

19          Myself, Special Agent Hosey and a

20    Sergeant Tribigno were present.

21          COMM. VINAL:  I didn't ask you who else

Page 204

PDO2O1O5.TXT

22    was present.  You are just extending the record.

23         This is what I need.

24         I need questions regarding what this

25    witness did in terms of the investigation


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*

144

1              Teran - Direct

2    relevant to the records you are trying to put in.

3         MS. BAPTISTE:  Your Honor –

4         COMM. VINAL:  All you have to ask him

5    is, "Did you interview Diaz?"

6         I'm trying to take it in a way that

7    makes sense.

8         I need to know where these records came

9    from, and what was confirmed regarding the

10    records.

11    Q    Did you interview NievesDiaz?

12    A    Yes.

Page 205

*PDO2O1O5.TXT*

13      Q    And he confirmed that those are his

14 phone records?

15      A    Yes.

16      Q    And he also indicated that he had called

17 Detective Dones?

18      A    That he had spoken with Detective Dones,

19 yes.

20          COMM. VINAL:  Not spoken with him, the

21 question is, did he call him on his cell phone?

22          Did he tell you that he did that, or he

23 didn't?

24      Q    If you recall.

25      A    Can I review the documents?


          (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁞

�口


                    145

1              Teran - Direct

2          COMM. VINAL:  I'm going to take a

3 ten-minute recess and ask counsel to approach,

                Page 206

PDO20105.TXT

4     please.

5              (Bench conference held.)

6              COMM. VINAL:  Put the record aside for

7     one second, please.

8              Next question.

9       Q     Based on information you received,

10   Detective Dones became the subject of an

11   investigation; is that correct?

12        A     Yes.

13        Q     All right.

14              Now, what specific steps did you take in

15   the investigation of Detective Lissander Dones and

16   his connection with Julio Vasquez and NievesDiaz?

17        A     We interviewed NievesDiaz, we conducted

18   record checks, we requested phone records of

19   Detective NievesDiaz and of Detective Dones.

20              COMM. VINAL:  Okay.

21              You already said NievesDiaz.

22              You said you requested phone records of

23   Detective Dones.  What records, and how did you

24   request them, and when did this all happen?

Page 207

*PDO20105.TXT*
25          THE WITNESS:  I'm saying, well, it was


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235


146

1                    Teran - Direct

2    part of a team, it was a joint investigation

3    conducted with members of Internal Affairs Bureau

4    Group 41 with the FBI.

5       Q    Did you also look into the computer

6 entry, computer log, of Detective Dones?

7       A    Yes.

8          COMM. VINAL:  How did you do that?  When

9    did you do that?

10         MS. BAPTISTE:  I was going to list all

11   the investigative steps, and then list them point

12   by point.

13         COMM. VINAL:  All right.

14      Q    You investigated the computer entries by

15 Detective Dones?

Page 208

PDO20105.TXT

16   A   Yes.

17   Q   How exactly did you do that?

18   A   Detective Carr, who was handling the

19 computer records, was in contact with Group 7, who

20 handles all of the computer aspects of Internal

21 Affairs.

22       He obtained the records through Group 7.

23       COMM. VINAL:  What records did Detective

24   Carr obtain?

25       THE WITNESS:  The computer records.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□


147

1           Teran - Direct

2       COMM. VINAL:  What does that mean?

3       THE WITNESS:  The printouts, a printout

4   of all logs checked by Detective Dones in the IAB

5   database.

6       They have a database that lists all

Page 209

PDO2O105.TXT

7    logs, allegations of misconduct against members

8    of the service.

9         Detective Dones, with his code, accessed

10    the computer.

11         We were able to obtain all information

12    that he was looking at through Group 7.

13    Q    You were actually able to obtain the

14 logs of Detective Dones' computer entries?

15    A    Yes.

16    Q    And you specifically obtained the logs

17 examining Detective Dones' November 28th examination

18 of files on that date?

19    A    Yes.

20    Q    Did you ever obtain a printout of that

21 information, his examination into the log?

22    A    Yes.

23         MR. KARASYK:  Objection.  He testified

24    that he was not the one who obtained these logs,

25    that it was Detective Carr who obtained these

PDO2O1O5.TXT

148

1                      Teran - Direct

2     logs.

3              Where he got them, how he got them, who

4     he got them from, we have no basis to refer to

5     these logs.

6              This witness has no actual knowledge of

7     how and where these logs were obtained, and by

8     whom.

9         Q    How were the logs –

10             COMM. VINAL:  There is an objection, Ms.

11     Baptiste.

12             If he makes an objection, you have to

13     wait for me to rule on it, before you can ask any

14     more questions.

15             MS. BAPTISTE:  Okay.

16             COMM. VINAL:  The witness indicated that

17     he is a member of the team, different

18     investigators were investigating different

Page 211

PDO2O1O5.TXT

19    aspects, and they were pooling their evidentiary

20    findings; is that correct?

21         THE WITNESS:  Yes.

22         COMM. VINAL:  I will allow conversations

23    between him and any member of his team regarding

24    what they found.

25         We need to be clear as to what the

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0

149

1              Teran - Direct

2    witness knows in terms of this Detective Carr,

3    who is the one who accessed the logs generated by

4    the IAB computer.

5         MR. KARASYK:  He wasn't even there when

6    he obtained the logs.

7         COMM. VINAL:  One second.

8         I am going to allow him to testify to

9    what was obtained, and whether he personally

Page 212

*PDO2O1O5.TXT*

10      reviewed any records that Detective Carr

11      obtained.

12              I will allow him to do that.

13              Go ahead.

14 BY MS. BAPTISTE:

15      Q    Did you personally review any records

16 obtained by Detective Carr?

17      A    Yes.

18      Q    And if you know, where did Detective

19 Carr get his information regarding the log of

20 Detective Dones' entries into the computer?

21      A    Through Group 7 of the Internal Affairs

22 Bureau.  They handle all computer aspects of Internal

23 Affairs.

24      Q    It is Group 7 that handles all the

25 computer stuff in Internal Affairs?

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

*□*

150

Page 213

PDO2O105.TXT

```
 1                Teran - Direct

 2      A   Yes.

 3      Q   They would be the people to call on to

 4 give you that information?

 5      A   Yes.

 6      Q   And Detective Carr obtained that

 7 information from them?

 8      A   That's correct.

 9      Q   As part of the team of investigators

10 along with Detective Carr, yourself, you also

11 received that information?

12      A   Yes, I reviewed them, yes.

13      Q   And you reviewed them?

14      A   Yes.

15      Q   You reviewed them as part of your

16 investigation?

17      A   Yes.

18      Q   Specifically, you reviewed the dates

19 involving November 28, 2003, involving computer

20 entries made by Detective Dones?

21      A   Yes.
```

PDO20105.TXT

22      COMM. VINAL:  So the record is clear,

23  and so I'm clear, also, these computer records

24  that Detective Carr obtained indicated to you

25  that what they showed is the Respondent's access

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

ロ

151

1                  Teran - Direct

2  code had been utilized to access certain logs?

3          Is that correct?

4          THE WITNESS:  A review of the form

5  states his name, the log on, the time he logged

6  on, the date he logged on, and his name, and his

7  tax number.

8          Through that, you are able to see what

9  it is exactly that he was looking at inside the

10   computer database.

11      Q   And was a determination made based on

12 your review of this file, was a determination made

Page 215

PDO20105.TXT

13  that Detective Dones was looking into the corruption

14  case involving Julio Vasquez?

15      A    Yes.

16          MS. BAPTISTE:  I ask that this be

17  marked.

18          COMM. VINAL:  Department's 4 for

19  identification.

20          (Document marked Department's Exhibit 4

21  for identification.)

22          COMM. VINAL:  Do you recognize that

23  document?

24          THE WITNESS:  Yes.

25          COMM. VINAL:  What is it?


          (212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

_n_


                              152

1              Teran - Voir Dire

2              THE WITNESS:  A printout of the computer

3  checks that were conducted by Detective Dones.

                    Page 216

PDO20105.TXT

4          COMM. VINAL:  On a specific date?

5          THE WITNESS:  On numerous dates.

6      Q    And on November 28th?

7          THE WITNESS:  Yes, on November 28, 2003.

8      Q    Does that printout represent a fair and

9  accurate representation of the log as you had

10 reviewed it and received it from Group 7?

11     A    Yes.

12         MS. BAPTISTE:  At this time I would ask

13    that the computer log be moved into evidence as

14    Department's Exhibit No. 4.

15         MR. KARASYK:  Voir dire?

16         COMM. VINAL:  Yes.

17 VOIR DIRE EXAMINATION

18 BY MR. KARASYK:

19     Q    Detective, when did you receive this

20 log?

21     A    The exact date, I'm not sure of the

22 date – what log are you referring to?

23     Q    The log that you just identified.

24     A    This?

Page 217

*PDO20105.TXT*

25      Q   Yes.


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

*0*


*153*

1                *Teran - Voir Dire*

2              *When did you receive that log; do you*

3 *know?*

4        A   *I'm not sure.  The exact date, I'm not*

5 *sure.*

6        Q   *Was it in November of '03, December of*

7 *'03?*

8        A   *No, it was later, it was in 2004.  In*

9 *2004, I received it.*

10       Q   *January of '04, February?*

11       A   *June.*

12       Q   *June?*

13       A   *June of 2004, approximately.*

14       Q   *You are saying that based on what?*

15             *Do you have a worksheet?*

*Page 218*

PD020105.TXT

16    A   No.

17    Q   Did you make up a worksheet as to when

18 you received that log?

19    A   No.

20    Q   And who did you receive the log from?

21    A   Detective Carr.

22    Q   Where were you when you received this

23 log from Detective Carr?

24    A   At the Office of Group 41.

25    Q   And who else was present when you

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

*□*

154

1                 Teran - Voir Dire

2 received it?

3    A   When I reviewed it?

4    Q   When you received it from Detective

5 Carr, who else was present?

6    A   Just Detective Carr and myself.

Page 219

PDO2O1O5.TXT

7    Q    Just you and him?

8    A    Yes.

9    Q    You are sure about that?

10    A    Yes.

11    Q    Could other people have been there?

12    A    I don't recall other people being

13 around.

14    Q    When did Detective Carr tell you this

15 log was generated?

16    A    I don't recall.

17    Q    Is there a date as to when the log was

18 generated?

19    A    I'm not sure.

20    Q    Look at it.

21    A    Okay.

22    Q    Is there any date on it as to when it

23 was generated?

24    A    No, there isn't.

25    Q    Detective Carr worked in your group?

*PDO2O1O5.TXT*

☐

155

1              Teran - Voir Dire

2        A    Yes.

3        Q    You worked in 41?

4        A    Yes.

5        Q    Okay.

6             Did he tell you where he obtained this

7 log, Detective Carr?

8        A    Yes.

9        Q    What did he tell you?

10       A    From Group 7.

11       Q    Did he say who ran the log for him?

12       A    No.

13       Q    Did he say how he obtained it?

14       A    Did he say how he obtained it?

15       Q    Yes.

16       A    No.

17       Q    Did he tell you who gave it to him?

18       A    We knew – I knew that he was requesting

*Page 221*

*PDO2O1O5.TXT*

19 this through Group 7.

20      Q   Okay.

21          I know that you knew that.

22          When Detective Carr gave you this log,

23 did he say who ran this log for him?

24      A   No.

25      Q   Did he say how the log was run?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

◻


156

1          Teran - Voir Dire

2      A   He might have.  I don't recall.

3      Q   Who gave Detective Carr the dates to

4 request for the log, for this log?

5      A   I'm sorry?

6      Q   The time period, who gave Detective Carr

7 the time period o request for this log?

8          Do you know, yes or no?

9      A   I don't know.

*Page 222*

*PDO2O1O5.TXT*

10      Q    *Who gave Detective Carr Detective Dones'*

11 *log-on access code?*

12      A    *Who, I don't know.  You can just call up*

13 *the MICE unit.  Being that we are conducting an*

14 *investigation, the MICE unit would supply that, Group*

15 *7, who is also known as MICE, would supply that.*

16      Q    *Did you make that phone call?*

17      A    *No.*

18      Q    *Do you know who made that phone call?*

19      A    *No.*

20      Q    *You don't even know if that phone call*

21 *was made, you are assuming that is what happened, yes*

22 *or no?*

23      A    *It was done.*

24      Q    *How do you know?*

25      A    *We have the records.*

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

*157*

*Page 223*

PDO2O1O5.TXT

1                Teran - Voir Dire

2      Q    I'm asking you, do you know who gave

3 Detective Carr the ID number of Dones, his computer

4 access code?

5      A    No.

6      Q    You don't know who gave him the code,

7 you don't know who ran the sheet, you don't know the

8 date the sheet was run, correct?

9      A    That's correct.

10      Q    But you know that you got it from

11 Detective Carr?

12      A    Yes.

13           I'm looking at one page of seven.

14      Q    Yes.

15      A    I don't know if, on the first page, it

16 might have a date of when these records were

17 obtained.

18      Q    It doesn't have any such date.

19      A    All right.

20           MR. KARASYK:  Commissioner, I don't

21   believe that a sufficient foundation has been

Page 224

PDO2O1O5.TXT

22    laid as to how this document came into existence,

23    how it came to be here today.

24          This witness has no knowledge as to how

25    this document was generated, by whom it was

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523ε

*o*

158

1

2    generated, when it was generated, or how it was

3    obtained, or how even the numbers that coincide

4    to Detective Dones' ID were obtained.

5          There has been no foundation laid for

6    the proper introduction of this document.

7          MS. BAPTISTE:  It would be the

8    Department's position that a proper foundation

9    has been laid.

10          It is accepted policy that one

11    investigator can rely on the steps of another

12    investigator.

Page 225

PDO2O1O5.TXT

13        Sergeant Teran is clear about the unit

14    in which this information came from.  He is clear

15    about the procedure that was used in generating

16    that.

17            It's a separate procedure that

18    investigators can rely on the investigator's

19    efforts done by another investigator, and he can

20    base his investigation on that, and proceed from

21    there, based on his reliance on another

22    investigator's steps.

23            COMM. VINAL:  I haven't heard the

24    witness –

25            MR. KARASYK:  It may be accepted

□


159

1

2    procedure that that is the manner in which it is

3    obtained.

Page 226

PDO20105.TXT

4          There is still legal evidentiary

5      foundation that has to be laid which the Police

6      Department procedure cannot override, and that

7      foundation has not been laid.

8              MS. BAPTISTE:  It is the Department's

9      position that that foundation has been laid.

10             The Sergeant is quite clear about

11     specifically the unit that his Group 41 goes to

12     and receives this information from, Group 7,

13     which is the MICE Unit, which is a computer unit

14     that their job is to generate this type of

15     information, their job is to generate this log,

16     their job is to provide that log, and the

17     information about who accesses the computer to

18     the different investigation groups.

19             COMM. VINAL:  May I have the document,

20     please?

21             MS. BAPTISTE:  That is their specific

22     job.

23             Investigators from Internal Affairs

24     units must be able to rely on the fact that

Page 227

PDO20105.TXT
25    Group 7 has that job, and get that information


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0


160

1

2    from.  He is clear about that.

3          COMM. VINAL:  Is it your testimony that

4    you sat down with Carr, and went over this with

5    him?

6          THE WITNESS:  Yes.

7          COMM. VINAL:  A foundation has been laid

8    that Group 7 is in charge of getting information

9    from the computer, and Carr, in the regular

10    course of business, obtained this from Group 7.

11          The only problem I'm having with it,

12    though it is not so much as to its admissibility,

13    but what weight can be afforded the document.

14          I note in the left-hand column it

15    contains the Respondent's name and rank.

Page 228

*PDO2O1O5.TXT*

16          Then immediately I see a date.   The

17     witness said a tax number has to be placed on it.

18          I will allow it in evidence as

19     Department's Exhibit 4.

20          It is admitted into evidence.

21          The weight afforded the document will be

22     determined based on further testimony I hear

23     regarding the document, cross-examination of this

24     document.

25          (Department's Exhibit 4 received in


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

*¤*


*161*

1               Teran - Direct

2     evidence.)

3          COMM. VINAL:  I will note for the record

4     the document says "page 7" in the upper

5     right-hand corner.

6          For identification purposes,

*Page 229*

PD020105.TXT

7    Department's Exhibit 4 is received in evidence.

8         Ask your next question.

9 CONTINUED DIRECT EXAMINATION

10 BY MS. BAPTISTE:

11       Q    Specifically directing your attention to

12 the entries on November 28, 2003, please indicate

13 what it demonstrates, or explain what it shows about

14 Detective Dones' entries into the computer.

15       A    On 11/28/2003, at 1414 hours, there is a

16 log-on at Computer Terminal 17655 as net user Dones.

17         COMM. VINAL:  One second.

18         The document is in evidence.

19         Indicating a log-on at 1414 hours, then

20   a computer number?

21         THE WITNESS:  Yes.

22         COMM. VINAL:  In the course of your

23   investigation, did you determine where that

24   computer was?

25         THE WITNESS:  Based on information

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

Page 230

PD020105.TXT

*口*

162

1                    Teran - Direct

2        provided by Lieutenant Carr to myself, he said

3        those are the computer terminals.

4             COMM. VINAL:  Where?

5             THE WITNESS:  At Group 51, Internal

6        Affairs Bureau.

7             MR. KARASYK:  Commissioner, just one

8        point?

9             COMM. VINAL:  Yes.

10            MR. KARASYK:  The document that I have

11       reads a log-on at 1337 hours, not 1414 hours.

12            COMM. VINAL:  That is why I don't want

13       the witness to read from the document.

14            It's okay to direct him to a specific

15       line on the document.  You can indicate what the

16       document indicates based on the witness'

17       understanding, his conversation with Detective

18       Carr, or anyone else, regarding interpreting the

Page 231

*PDO20105.TXT*

19    *document –*

20        *Q    What does the document indicate –*

21            *COMM. VINAL:  – the specific entry on*

22    *the document.*

23            *He indicated the Respondent's name is*

24    *here, and then he says 1414 hours.*

25            *Is that the line you are directing him*

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£*

*0*

*163*

1                *Teran - Direct*

2    *to?*

3            *MS. BAPTISTE:  There is –*

4            *COMM. VINAL:  You are allowed to point*

5    *him to any line on the document, ask him to*

6    *identify it, and then ask him what it means.*

7        *Q    Referring to the first entry of*

8 *Detective Dones, on November 28th –*

9            *COMM. VINAL:  2003.*

*Page 232*

PDO20105.TXT

10          Show me what you are referring to.

11          MS. BAPTISTE:  Explain –

12          COMM. VINAL:  Show me which one you are

13     looking at.

14          THE WITNESS:  The first entry for the

15     28th is here.  This is the terminal, and there is

16     someone else who logged on at a different

17     terminal.

18          Detective Dones logged on right

19     underneath, on a different terminal.

20          COMM. VINAL:  You are directing the

21     witness to which entry?

22       Q    Please explain the first entry, the one

23 at 1337.  Please explain what that shows.

24       A    That another member of the service, not

25 Detective Dones, logged on at 1337 hours on Computer

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523⁵

□

164

*PDO20105.TXT*

1                        *Teran - Direct*

2 *Terminal 17656.*

3        *Q    How do you know that it wasn't Detective*

4 *Dones?*

5        *A    On the computer printout, it had another*

6 *member of the service's name and tax number.*

7              *COMM. VINAL:  It has Detective Dones'*

8    *name.*

9              *THE WITNESS:  That is underneath, at*

10    *1414 hours, there is an entry which pertains to*

11    *him.*

12              *COMM. VINAL:  May I see it again?*

13              *MR. KARASYK:  The witness represented –*

14              *COMM. VINAL:  Please.  I have been very*

15    *patient, heard a lot of argument.  I'm trying to*

16    *interpret a document in evidence.*

17              *Ms. Baptiste, you asked about 1337 on*

18    *November 28th.*

19              *It says Detective Lissander on the left.*

20              *I need an explanation why it is under*

21    *his name, if the witness is testifying that*

*Page 234*

*PDO2O1O5.TXT*

22    someone else logged on.

23      Q    Is it your testimony that that first

24 entry is one from Detective Lissander Dones; the one

25 at 1337?

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

□

165

1                    Teran - Direct

2      A    No, it's a log-on of another member of

3 the service.

4           COMM. VINAL:  Why is the Respondent's

5 name on the left-hand side there?

6           Why does it say Detective Investigator

7 Lissander to the left of that entry?

8           THE WITNESS:  That is the person they

9 were looking at.

10          When the unit conducted the check, there

11 was a Lissander Dones that they were looking at.

12          COMM. VINAL:  The left-hand column, all

Page 235

*PDO2O1O5.TXT*

13    those names, they are all the same, and they are

14    all his name?

15         THE WITNESS:  Yes.

16         COMM. VINAL:  It indicates what?

17         THE WITNESS:  The way the MICE, Group 7

18    runs it, they put the investigator's name on the

19    side, and a printout comes up of the entire

20    command.

21         Any time his name popped up, any time

22    his log-on code shows up, it would show it off to

23    the right.

24         COMM. VINAL:  This is why I need an

25    interpretation of the document.


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523‍5

□


166

1         Teran - Direct

2         His name on the left-hand column for all

3    entries on the page, that is in evidence as

*Page 236*

PDO2O1O5.TXT

4    Department's 4.  We should start there in terms

5    of what does that mean.

6            What it is saying to you means someone

7    is running his name, what?

8            THE WITNESS:  What computers he had

9    accessed.

10           COMM. VINAL:  Then you are indicating

11    the 1337 entry he did not access, another MOS

12    logged on?

13           THE WITNESS:  That's correct.

14           COMM. VINAL:  Ms. Baptiste.

15    Q    The following entry –

16           COMM. VINAL:  What does that mean?

17    Q    What does that mean?

18           COMM. VINAL:  I need to know.

19           I have total confusion on this document.

20           It's in evidence, the Department put it

21    into evidence.  You have to get the witness to,

22    explain what all these entries mean.

23    Q    What does that first entry mean?

24    A    Group 7 conducted a check of all entries

Page 237

*PDO20105.TXT*
25 into Group 51, to find out what terminals were run by


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

0


167

1                    Teran - Direct

2 Detective Dones.

3            His name is appearing in the left hand

4 column of the document all the way down.  Then there

5 is a date, a time and a log-on at the time Detective

6 Dones accessed the computer.

7            COMM. VINAL:  What does it mean to the

8    right, 1337?

9            THE WITNESS:  Where it says log on?

10            COMM. VINAL:  Yes.

11            THE WITNESS:  That means someone else

12    logged on on Terminal 76056, they logged onto

13    that terminal.

14            COMM. VINAL:  Using what code?

15            THE WITNESS:  Their own code.

Page 238

*PDO2O1O5.TXT*

16          COMM. VINAL:  Okay.

17          Next question.

18      Q   What does the next entry underneath that

19  indicate?

20      A   It says Detective – off to the left, it

21  says Detective Lissander Dones.  The date is –

22          COMM. VINAL:  I don't need you to read

23      it.

24          THE WITNESS:  There is an entry –

25          COMM. VINAL:  What does it mean, 1414,


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523

o


168

1              Teran - Direct

2   is that what you are directing him to?

3          MS. BAPTISTE:  Yes.

4          COMM. VINAL:  Direct him to a specific

5   line, and a specific point on the line.

6          You can approach the witness.

Page 239

PDO20105.TXT

7             Do you have a copy of the document right

8    now?

9             MS. BAPTISTE:  No.

10            COMM. VINAL:  Then you don't you need to

11    approach.

12            Stand next to the witness and ask him

13    questions.

14            Direct him to a specific line.

15       Q    What does the entry on November 28,

16 2002, at 1414, indicate?

17       A    That a member of the service logged onto

18 Terminal 17655.

19            Then it says net user, Detective Dones,

20 and his tax number.

21       Q    What does that mean?

22       A    That he accessed the computer.

23       Q    And following that initial log-on, what

24 does the next entry indicate?

25            COMM. VINAL:  You can read the time.

*PDO2O1O5.TXT*

*169*

1                    Teran - Direct

2        Q    The next entry, at 1414, after having

3 logged on; the next one is at 1414, as well?

4            COMM. VINAL:  You just talked about

5    1414.

6            THE WITNESS:  There is another one right

7    after that.

8            COMM. VINAL:  The same time?

9            THE WITNESS:  Yes.

10            COMM. VINAL:  I'm not looking at the

11    document.

12        Q    What does that indicate?

13        A    It indicates that Detective Dones looked

14 into one of the allegations that were in the computer

15 database.

16        Q    Specifically, what type of case was it

17 that he accessed?

18        A    It was a corruption case.

*Page 241*

*PDO2O1O5.TXT*

19      Q    Did you later obtain information about

20  what corruption case he was looking into?

21      A    Yes.

22      Q    What corruption case was it that he was

23  looking into?

24          COMM. VINAL:  How did you obtain the

25    information, from where?


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

□


170

1              Teran - Direct

2      Q    How did you obtain that information?

3          COMM. VINAL:  The source of the

4    information is always very important.

5      A    Through Detective Carr, who provided me

6  with copies of what he printed out regarding every

7  case number that was looked at through Detective

8  Dones.

9      Q    There was a printout made specifically

*Page 242*

PD020105.TXT

10 stating what that entry or log was about?

11 A Yes.

12 Q Was that information compiled on any

13 specific form, memorialized in any way?

14 A Yes.

15 Q Who prepared that form that memorialized

16 what he had gained access to?

17 A I believe – to the best of my

18 recollection, it was Special Agent Hosey who put

19 everything on a piece of paper, along with telephone

20 numbers, and then each log that was accessed in a

21 brief –

22 Q A brief caption?

23 A A brief caption of what the log

24 detailed.

25 COMM. VINAL:  Phone numbers?

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

171

Page 243

PDO20105.TXT

1                   Teran - Direct

2          THE WITNESS:  Phone numbers.

3              There is a phone that he had sent over.

4              It's a worksheet that he might have

5      prepared, that he prepared, where it had

6      telephone numbers and the actual logs.

7          Q    Did you prepare something, memorialize

8 something, to keep track of what the different log

9 entries were?

10         A    No, I didn't.

11         Q    Again, you stated the corruption case he

12 accessed was the case involving Louis Vasquez?

13         A    Julio Vasquez.

14             COMM. VINAL:  We don't have a Louis

15     Vasquez.

16         Q    Julio Vasquez?

17         A    Some of them, yes.

18             Some of them, I would have to look at

19 what each case is.

20             To the best of my recollection, yes, he

21 went into prior logs that involved Detective Julio

Page 244

PDO2O1O5.TXT

22 Vasquez and Detective Rachko, and other members of

23 the service.

24        Q    How many entries do you see on the 28th

25 that demonstrate that Detective Dones accessed

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!

*0*

172

1                    Teran - Direct

2 information about the case involving Julio Vasquez

3 and retired Detective Rachko?

4        A    There were eleven logs that were viewed

5 by Detective Dones — a total of thirteen entries.

6 He looked at thirteen different allegations, however,

7 eleven of those were actual complaints.

8        Q    What was the time frame that he took in

9 looking at those entries?  What time did he start

10 looking at the entries?

11        A    1414 hours.

12        Q    And what time did he stop or finish

Page 245

*PDO20105.TXT*

13 looking at the entries?

14          What time was the last entry that he

15 looked at?

16     A   1425 hours.

17     Q   From 1314 to 1425, Detective Dones was

18 looking into the corruption case involving Julio

19 Vasquez and retired Detective Rachko?

20     A   Yes.

21     Q   I'm finished with the log for now.  I

22 can just put it down.

23     A   All right.

24     Q   Sergeant, did you memorialize all your

25 efforts in the same way you would do a normal


(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523£

☐


                              173

1                  Teran - Direct

2 investigation?

3     A   No.

                    Page 246

*PDO2O105.TXT*

4    Q    *Why didn't you memorialize your efforts*

5 *regarding the investigation of Detective Dones in the*

6 *same way you would memorialize it for another case?*

7    A    *Because of the fact that Detective Dones*

8 *was working in Internal Affairs, and there were other*

9 *officers, other Detectives, that worked in our*

10 *office, who worked alongside with Detective Dones.*

11           *We didn't want to put everything on*

12 *paper, fearing that — we didn't know where the leak*

13 *was coming from, if there was a leak, in this*

14 *investigation.*

15    Q    *It was your goal to keep the paperwork*

16 *to a minimum?*

17    A    *Yes.*

18    Q    *As part of your investigation, did you*

19 *have an opportunity to review the E-ZPass records of*

20 *the car that was assigned to Detective Dones?*

21    A    *Yes.*

22    Q    *And how did you receive those records?*

23    A    *The date that Detective Dones was*

24 *interviewed, I believe it was September 7th of 2004,*

*Page 247*

*PDO2O1O5.TXT*
*25 he was interviewed under Patrol Guide procedure*


*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235*

*o*


*174*

*1                    Teran - Direct*

*2 2O6-13 at 315 Hudson Street.*

*3            Captain Mavricos –*

*4            COMM. VINAL:  The question wasn't who*

*5    was present.*

*6            THE WITNESS:  He obtained, Captain*

*7    Mavricos' obtained, a disk and a printout copy of*

*8    all E-ZPass usage to the Vehicle 169 that was*

*9    assigned to the Bronx IAB Group 51.*

*10       Q    And where did he obtain that from?*

*11       A    Where?*

*12       Q    Who did he obtain it from?*

*13       A    Through the Car Coordinator on Hudson*

*14 Street.*

*15       Q    Did you have an opportunity to review*

*Page 248*

*PDO2O1O5.TXT*

16 that?

17     A   Yes, I did.

18     Q   Did Detective Carr tell you who

19 specifically he got it from?

20     A   It wasn't Captain Carr, it was Captain

21 Mavricos who obtained the record.

22     Q   I'm sorry.

23         Did he tell you who he had obtained it

24 from, or the group that he had obtained it from?

25     A   From the group that he had obtained it

*(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-523!*

*□*

*175*

1               Teran - Direct

2 from.

3     Q   You used that printout as part of your

4 investigation?

5     A   Yes.

6     Q   What day was that information generated?

*Page 249*

PDO2O1O5.TXT

7      A    The date of the printout?

8      Q    Yes.

9      A    September 7, 2004.

10      Q    Okay.

11           That was the date it was generated?

12      A    Yes.

13      Q    And do you know what, if any, specific

14 date was in question when the document was being

15 obtained?

16      A    Yes.

17           We were interested in the E-ZPass usage

18 for that vehicle for November 28, 2003.

19           MS. BAPTISTE:  I show you what I will

20    ask to have marked as Department's Exhibit 5 for

21    identification.

22           COMM. VINAL:  It will be deemed marked

23    Department's Exhibit 5 for identification.

24           (Document marked Department's Exhibit 5

25    for identification.)