UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
LISSANDER DONES,

                            Plaintiff,

       -against-

THE CITY OF NEW YORK, POLICE COMMISSIONER
RAYMOND KELLY, in his official capacity,
SERGEANT FRANK TERAN, in his official and
individual capacity, CAPTAIN THOMAS SCOLLAN,
in his official and Individual Capacity,
et al.,

                          Defendants.
----------------------------------------X

**PLAINTIFF'S RESPONSE TO
DEFENDANTS'RULE 56.1
STATEMENT OF UNDISPUTED
FACTS AND COUNTER RULE
56.1 STATEMENT OF FACTS**

**07 CV 3085 (SAS)**

### PLAINTIFF'S RESPONSE TO DEFENDANTS'
### LOCAL RULE 56.1 STATEMENT AND
### COUNTER STATEMENT OF FACTS

     Pursuant to Rule 56.1 of the Southern District of New York,

plaintiff LISSANDER DONES, submits this Statement of Disputed

Material Facts in Opposition to Defendants' Local Rule 56.1

Statement of Facts.  Further, plaintiff respectfully avers that in

addition to those assertions made by defendants which are disputed

here, this document is provided, pursuant to Local Civil Rules

56.1, as a counter statement of facts in support of plaintiff's

contentions that genuine facts are in dispute.  The facts and

contentions listed below in plaintiff's counter statement are not

all inclusive of each and every disputed issue, but are provided

to demonstrate the level and complexity of the disputed issues

which permeate this case.  Further, references provided in support
of each of the issues raised are not all-inclusive, and are
offered to comply with the Local Rule.

### RESPONSE TO DEFENDANTS' <br> <u>STATEMENT OF UNDISPUTED FACTS</u>

1.    Plaintiff admits that he is a former New York City
Police Department Detective who was improperly detained and denied
union representation and a lawyer in violation of his rights under
the 14th Amendment to the United States Constitution and that
defendants placed him on modified duty in violation of 42 U.S.C.
§1985(3).

2.    Plaintiff admits that he began working as an NYPD
officer on or about January 21, 1985.

3.    Plaintiff admits that on or about January 1986 he was
assigned to the NYPD 50th Precinct and while assigned to said 50th
Precinct, plaintiff met former NYPD Officer Luis Nieves-Diaz.

4.    Plaintiff denies that he was promoted to the rank of
detective in or around 1989.  Plaintiff was promoted to detective
in 1991.  Plaintiff admits that he was transferred to the
Manhattan Narcotics Unit in 1989.

5.    Plaintiff admits that while working at the Manhattan
Narcotics Unit he met former NYPD Officer Julio Vasquez, who
trained plaintiff as an undercover officer.

6.    Plaintiff denies that he was transferred to Internal Affairs Bureau Group 51 on or about May 1995.  Plaintiff admits that he was transferred to Group 52 on or about May 1995. Plaintiff went to Group 51 on or about 2001/2002.

7.    Plaintiff admits that he remained in contact with Mr. Nieves-Diaz after his transfer to IAB.  However he denies he remained in contact with Mr. Vasquez after his transfer to IAB. Plaintiff last spoke with Mr. Vasquez approximately 2001/2002 after he transferred to Group 51.  (See Exhibit "1" pp. 32-33)

8.    Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 8 and as such can neither deny nor admit to its truthfulness.

9.    Plaintiff admits that officers from IAB Group 41 were involved in the investigation as it involved NYPD Officers. Teran and Scollan oversaw the investigation for the NYPD.

10.    Plaintiff learned after the fact that Kenneth Hosey was the FBI agent assigned to the case.

11.    Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 11 and as such can neither deny nor admit to its truthfulness.

12.    Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 12 and as such can neither deny nor admit to its truthfulness.

13.  Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 13 and as such can neither deny nor admit to its truthfulness.

14.  Plaintiff admits that on November 27, 2003 Mr. Vasquez was arrested in Queens County, New York.  Plaintiff does not know who the arresting officer was.

15.  Plaintiff denies that he used his unique computer ID to access computer files concerning the FBI/IAB investigation on November 28, 2003 or any time thereafter.  (See Dones Declaration).

16.  Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 16 and as such can neither deny nor admit to its truthfulness.

17.  Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 17 and as such can neither deny nor admit to its truthfulness.

18.  Plaintiff admits that he did speak to Luis Nieves-Diaz regarding the arrest of Julio Vasquez based on information that he obtained from the newspapers, conversations with other IAB officers at OCID and rumors floating around Group 51.  (See Exhibit "1", p. 29).

19.  Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 19 and as such can neither deny nor admit to its truthfulness.

20.  Plaintiff admits that on July 8, 2004 Agent Hosey, SGT. TERAN, CAPT. SCOLLAN, LT. MORTON and LT. MEJIA arrived at plaintiff's residence at approximately 6:30 a.m.

21.  Plaintiff admits that when he exited his residence at approximately 7:00 a.m., Agent Hosey approached plaintiff and SGT. TERAN arrived shortly thereafter.

22.  Plaintiff admits that Agent Hosey asked plaintiff about his communications with Nieves-Diaz but denies that he was asked if he had accessed the computer files concerning the drug trafficking investigation.  (See Exhibit "1", pp. 33-37).

23.  Plaintiff admits that he did leave with the defendants and Agent Hosey from in front of his house after the defendants and Hosey told him that they should go somewhere else because the neighbors were becoming curious concerning the commotion in front of plaintiff's home. (See Exhibit "1" pp. 38-39)

24.  Plaintiff admits that he entered on the NYPD officer's vehicles, however he believed he did not have a choice.  (See Dones Declaration).

25.  Plaintiff admits that he was not physically forced to enter one of the NYPD officer's vehicle, but he did testify that he did not believe that he was free to leave.

26.  Plaintiff admits that he was not informed that he was the subject of an official NYPD investigation, despite the fact that Teran testified at plaintiff's Trial Room hearing that

plaintiff was a subject of an investigation by IAB and the FBI as early as December 2003. (See Teran's Declaration and Exhibit "6" pp.195-199, 207).

27. Plaintiff denies that he did not ask to leave while being interrogated by FBI Agent Hosey and the individual defendants. (See Dones Declaration Exhibit "1", p. 38).

28. Plaintiff admits that he was driven to Yankee Stadium by the defendants, and that it was close to plaintiff's home and later taken to IAB Group 1 in lower Manhattan.

29. Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 29 and as such can neither deny nor admit to its truthfulness.

30. Plaintiff denies that he was placed on modified duty and his guns were removed upon arriving at Group 1. Plaintiff was told he was going to be placed on modified duty by Scollan at approximately 5:00 p.m. Plaintiff was not put on modified duty until he went to Group 52 where he had to hand in his weapons to a Sergeant. (See Exhibit "1", pp. 48-53).

31. Plaintiff denies knowledge or information sufficient to form a belief as to the contents of paragraph 31 and as such can neither deny nor admit to its truthfulness.

32. Plaintiff admits that defendant Scollan informed him that the Department would pay plaintiff for July 8, 2004. Plaintiff denies he told Scollan he did not want to be paid for

the day but rather told Scollan that he had already put in for an
emergency day off with his immediate supervisor at Group 51.

33.  Plaintiff denies knowledge or information sufficient to
form a belief as to the contents of paragraph 33 and as such can
neither deny nor admit to its truthfulness.

34.  Plaintiff admits that on September 7, 2004 defendant
Teran questioned him under the provisions of the NYPD Patrol Guide
with a union representative present concerning his contacts with
Vasquez and Diaz and whether plaintiff accessed the IAB computer
files.

35.  Plaintiff admits that he denied he accessed computer
files concerning the drug trafficking investigation on November
28, 2003.

36.  Plaintiff admits that he was suspended without pay
effective September 7, 2004.  However, Plaintiff denies knowledge
or information sufficient to form a belief as to what the NYPD had
in its possession concerning plaintiff's activities.

37.  Plaintiff admits that on September 9, 2004 and October
26, 2004 he was served with five Charges and Specifications.

38.  Plaintiff admits that on February 1 and 2, 2005 a
hearing was held on these disciplinary charges.

39.  Plaintiff admits that on June 1, 2005 plaintiff was
found guilty on two of the five charges:  divulging official
department business to Detective Diaz and assessing computer files

without permission and was found **not guilty** on the three other charges: interfering with an IAB investigation by speaking with Nieves-Diaz concerning the investigation in 2003; making false and misleading statements at the official interview on September 7, 2004; and using a department vehicle without permission on November 28, 2003. Plaintiff admits he only received the loss of twenty vacation days.

40. Plaintiff admits he retired from the force in August 2006 after twenty-one years of service.

41. Plaintiff admits that he alleges in the complaint that his constitutional rights were violated because, among other things, he should have been afforded an attorney and/or a union representative when he was interrogated by FBI Agent Hosey and Sgt. Teran on July 8, 2004.

42. Plaintiff admits that on July 8, 2004 he was not told that he was under arrest nor did defendants specifically tell him he could not leave. Plaintiff at all times on July 8, 2004 believed he could not leave under his own free will based on the questioning, the amount of IAB officers that had surrounded him and the FBI agent's presence. (See Dones Declaration and Exhibit "1").

43. Plaintiff admits that on July 8, 2004 he was not informed that he was the subject of an official NYPD investigation.

44.  See response to paragraph 32 above.

45.  Plaintiff admits that defendants conspired with the FBI to place him on modified duty by issuing false charges against him relating to a domestic incident.

46.  Plaintiff admits that his coworkers began to treat him differently as a result of being placed on modified duty on July 8, 2004.  Plaintiff also admits that he spoke with his partner and union officials about what had occurred on July 8, 2004. Plaintiff also admits that he did not know if any of the defendants spoke with his coworkers regarding the issues of July 8, 2004.

However, he later learned that defendants did in fact speak with several of his coworkers and supervisors pursuant to Patrol Guide Procedure 206-13 in September of 2004.

47.  Plaintiff admits that he was placed on modified duty because he refused to assist the NYPD and the FBI in placing a call to Det. Nieves-Diaz.

Plaintiff has no knowledge as to when Det. Diaz was terminated.

48.  Plaintiff denies that he testified that the only basis that plaintiff's constitutional were violated was that "these people … have college degrees.  All I have is a high school education, and I knew that."  Plaintiff on numerous occasions during his deposition testified that his rights were violated

because he justifiably refused to place a phone call to Det. Diaz. (See Exhibit "1").

## PLAINTIFF'S COUNTER STATEMENT OF FACTS

49.  Plaintiff was employed with the NYPD from January 21, 1985 until his retirement in August of 2006.  (See Exhibit "1", Deposition Transcript of DONES, p. 14).

50.  Plaintiff is a male Hispanic and as such is a member of a protected class.  (See Dones Declaration).

51.  Plaintiff has never been married nor does he have any children.  (See Exhibit "1", Deposition Transcript of DONES, p. 10).

52.  Plaintiff was scheduled to retire on January 21, 2005, after completing twenty years of service but was prevented from doing so by the defendants because he was improperly and falsely placed on modified duty. (See Exhibit "1", Deposition Transcript of DONES, p. 15).

53.  In 1995, plaintiff was transferred from a Detective in Narcotics to Internal Affairs Bureau.  (See Exhibit "1", Deposition Transcript of DONES, pp. 19-20).

54.  Plaintiff performed integrity tests for IAB against other police officers as an undercover Detective for IAB. Plaintiff also performed undercover drug buy and busts for IAB

in a new program targeting members of the service.  (See Exhibit "1", Deposition Transcript of DONES, pp. 20-21).

55.  Plaintiff remained with IAB performing drug busts and integrity tests involving members of the service until he was improperly modified and transferred to VIPER 9 in the Bronx. (See Exhibit "1", Deposition Transcript of DONES, pp. 21-22).

56.  While plaintiff was assigned to IAB from 1995 until he was placed on modified duty in July 2004, plaintiff was earning 15 hours of overtime per week.  (See Exhibit "1", Deposition Transcript of DONES, p. 22).

57.  Plaintiff first became aware that Julio Vasquez, an NYPD Detective, was involved in stealing drugs and money from drug dealers, on or about Thanksgiving of 2003 from plaintiff's supervisors, Sgt. Schumacher or Sgt. Garland.  (See Exhibit "1", Deposition Transcript of DONES, pp. 25-29).

58.  Plaintiff first found out that Detective Luis Nieves-Diaz was being investigated by the FBI and NYPD on July 8, 2004 when defendants TERAN, SCOLLAN, MORTON, MEJIA along with an FBI agent, came to plaintiff's residence.  (See Exhibit "1", Deposition Transcript of DONES, p. 29).

59.  On or about July 8, 2004, plaintiff was confronted by FBI Agent Kenneth Hosey in front of plaintiff's residence.  (See Exhibit "1", Deposition Transcript of DONES, p. 31).

60.  After plaintiff became aware that Det. Julio Vasquez was the subject of an investigation on or about Thanksgiving 2003, plaintiff did not have any further contact with him.  (See Exhibit "1", Deposition Transcript of DONES, pp. 32-33).

61.  While FBI Agent Hosey began to question plaintiff, the rest of the field team, including defendants TERAN, SCOLLAN, MORTON, MEJIA and a Sgt. Crowley, appeared and surrounded plaintiff in front of his home.  (See Exhibit "1", Deposition Transcript of DONES, pp. 33, 36, 39).

62.  While being surrounded by the FBI Agent and the defendants, plaintiff began to be interrogated.  (See Exhibit "1", Deposition Transcript of DONES, pp. 33-38).

63.  Defendants and Agent Hosey became very condescending towards plaintiff.  Plaintiff immediately informed the defendants that "This sounds like an official investigation.  I want to go to the 48 Precinct so I can get a delegate and a lawyer."  (See Exhibit "1", Deposition Transcript of DONES, p. 38).

64.  Defendant SCOLLAN denied plaintiff's request to leave and get a lawyer and union representation.  (See Exhibit "1", Deposition Transcript of DONES, p. 38).

65.  Defendants told plaintiff to get into their car and plaintiff reluctantly agreed.  Plaintiff was taken to Yankee

Stadium, near the "Bat", in defendant MEJIA's vehicle.  (See Exhibit "1", Deposition Transcript of DONES, pp. 38-39).

66.  While at Yankee Stadium plaintiff was told to place a call to Det. Nieves-Diaz.  Plaintiff asked them what he should say to Det. Diaz and what Det. Diaz had done?  Defendants declined to tell plaintiff why Det. Diaz was being investigated.  (See Exhibit "1", Deposition Transcript of DONES, pp. 41-42).

67.  Plaintiff declined to place the phone call to Det. Diaz, after defendants refused to tell plaintiff why Det. Diaz was being investigated.  (See Exhibit "1", Deposition Transcript of DONES, p. 42).

68.  Defendant TERAN began to threaten plaintiff and told plaintiff that if he does not place the phone call, plaintiff was going to lose his detail (the Police Impersonations Unit).  (See Exhibit "1", Deposition Transcript of DONES, p. 42, 68).

69.  Plaintiff told defendant TERAN that Det. Diaz was his friend and if they were not going to tell him why he was placing a call to Det. Diaz, he was not going to do it. (See Exhibit "1").

70.  The defendants and FBI Agent Hosey began to privately confer with each other, away from the presence of the plaintiff, and phone calls were made by defendants.  Subsequently, defendants re-approached the plaintiff and ordered him to go

with them to Group One (IAB) Headquarters.  (See Exhibit "1",
Deposition Transcript of DONES, pp. 42-43).

71.  While plaintiff was in the car at Yankee Stadium with
the defendants, defendants would not allow plaintiff to leave
under his own free will.  (See Exhibit "1", Deposition
Transcript of DONES, pp. 43, 46).

72.  Plaintiff informed defendants that his partner was
waiting for him to go to work that morning and he had to inform
his supervisor that he wasn't coming into work or else he would
have been classified as AWOL.  (See Exhibit "1", Deposition
Transcript of DONES, p. 43).

73.  Plaintiff was eventually allowed to call his immediate
supervisor while they were walking into Group 1 office, which is
approximately 25-30 minutes away from Yankee Stadium.  (See
Exhibit "1", Deposition Transcript of DONES, p. 43-44).

74.  Plaintiff was told by the defendants not to tell his
direct supervisor that they were with him.  Therefore plaintiff
was forced to lie to his sergeant and claim that he had a family
emergency and could not come to work.  (See Exhibit "1",
Deposition Transcript of DONES, p. 45).

75.  While at the Group 1 Office, plaintiff was told to
relinquish his weapon by being given a fabricated reason that
because they are in Group 1, "They don't like people here with

weapons". (See Exhibit "1", Deposition Transcript of DONES, p. 46).

76. Whenever plaintiff used the restroom while at Group 1, he was followed and accompanied by defendant MORTON in the same manner as plaintiff had done in the past with his own prisoners once they were in custody. (See Exhibit "1", Deposition Transcript of DONES, pp. 47-48, 54).

77. Plaintiff remained at Group 1 Headquarters from approximately 8:00 a.m. until 5:00 p.m., without being able to eat, have a meal or use a telephone. (See Exhibit "1", Deposition Transcript of DONES, p. 48).

78. While at Group 1, defendant SCOLLAN calls Sgt. Crowley or defendant MORTON on their cell phone and one of them gave plaintiff their phone in order to speak to SCOLLAN. SCOLLAN once again told plaintiff to place a phone call to Det. Diaz and plaintiff declined. (See Exhibit "1", Deposition Transcript of DONES, pp. 48-49.

79. Defendant SCOLLAN told plaintiff that they were going to place him on modified assignment based on a fabricated domestic problem. (See Exhibit "1", Deposition Transcript of DONES, p. 49, 68).

80. Plaintiff was wrongly and improperly placed on modified assignment because of a fabricated domestic dispute

problem due to the fact that he would not make a call to Det. Diaz. (See Exhibit "1", Deposition Transcript of DONES, p. 49).

81. From the Group 1 Headquarters, plaintiff was ordered to go to Group 52 Headquarters in order to relinquish his weapons he had in his locker at Group 51. (See Exhibit "1", Deposition Transcript of DONES, p. 52-53).

82. While at Group 51, defendants informed plaintiff's immediate supervisor that plaintiff was going to be placed on modified duty. (See Exhibit "1", Deposition Transcript of DONES, p. 53).

83. Plaintiff was eventually driven home by defendant MORTON and his partner after relinquishing his guns and I.D. card at Group 52. (See Exhibit "1", Deposition Transcript of DONES, pp. 54-55).

84. Immediately upon arriving home, plaintiff contacted his Union (DEA) and informed them as to what had happened to him that day. (See Exhibit "1", Deposition Transcript of DONES, pp. 55-56).

85. Defendants conspired with the FBI in order to circumvent the Patrol Guide and Rules of the NYPD regarding the questioning of a subject in an investigation. (See Exhibit "1", Deposition Transcript of DONES, pp. 50-51; Exhibit "5").

86. Plaintiff was placed on modified assignment doing administrative work without a gun. This caused plaintiff to be

unable to go out on patrol and do undercover work and earn
overtime.  (See Exhibit "1", Deposition Transcript of DONES, pp.
51, 55).

    87.  Plaintiff remained on modified assignment from July 8,
2004 until approximately two or three weeks before he retired in
August 2006.  (See Exhibit "1", Deposition Transcript of DONES,
p. 52).

    88.  While on modified duty, plaintiff was not allowed to
work overtime.  (See Exhibit "1", Deposition Transcript of
DONES, p. 55).

    89.  After July 8, 2004, plaintiff never accessed NYPD
computer records from the data system regarding Det. Luis
Nieves-Diaz.  (See Exhibit "1", Deposition Transcript of DONES,
pp. 49-60).

    90.  Subsequent to being modified, plaintiff was ordered to
attend a "GO-15" (206-13) interrogation on or about September
2004.  (See Exhibit "1", Deposition Transcript of DONES, p. 60).

    91.  At the GO-15, plaintiff was suspended for
approximately thirty days without pay.  (See Exhibit "1", p. 60;
Dones Declaration).

    92.  On or about September 10, 2004, plaintiff was issued
Charges and Specifications that 1) He wrongfully and without
just cause prevent or interfere with an official department
investigation; 2) He wrongfully divulged or disclosed official

department business.  (See Exhibit "2", Charges and
Specifications).

93.  On or about October 22, 2004, plaintiff received a
Notice of Amendment of Charges adding the following Charges:  3)
that on September 7, 2004, pursuant to the provisions of Patrol
Guide Section 206-13 (GO-15 hearing), plaintiff wrongfully made
false and misleading statements; 4) on or about November 28,
2004, while off duty, did wrongfully and without just cause
operate a department vehicle without permission or authority to
do so; and 5) on or about November 28, 2004, while off duty, did
access a department computer and make unofficial inquiries for
non-departmental purposes.  (See Exhibit "3", Notice of
Amendment of Charges).

94.  Plaintiff did not have access to the computer records
from Group 41 conducting the investigation of Det. Luis Nieves-
Diaz.  (See Exhibit "1", Deposition Transcript of DONES, pp. 84-
86).

95.  Plaintiff was not at Group 51 on November 28, 2003.
(See Exhibit "7", Transcript of Section 206-13 interview of Det.
Donald Mantz, p.9; Exhibit "8", Transcript of Section 206-13
interview of Det. Michael Siraco, p. 10; Exhibit "9";
Declaration of Dones).

96.  On February 1 and 2, 2005, plaintiff was subjected to
a Departmental Trial in regards to the five Charges and

Specifications.  (See Exhibit "4", Memorandum Decision dated
June 1, 2005).

97.  Detective Michael Clohossy testified at the
Departmental Trial of the plaintiff that he was plaintiff's
partner during 2003 at IAB Group 51.  (See Exhibit "4",
Memorandum Decision dated June 1, 2005, p. 3). Detective
Clohossy also testified that a Group 51 detective who has not
used his personal code number to log onto the computer will ask
a colleague who has logged on to "run info" that only the non-
logged detective is interested in. (See Exhibit "4", p. 4).
Detective Clohossy also admitted at the Department Trial that he
sometimes uses his code number to ascertain computer records of
IAB files that he is not assigned to in order to "see what's
going on".  (See Exhibit "4", p. 4). (other computer codes)

98.  Defendant TERAN was aware that plaintiff was a subject
of formal investigation as early as December 2003, well before
July 8, 2004, and therefore plaintiff was entitled to the
protections pursuant to NYPD Patrol Guide and Constitutional
Rights about being questioned while no attorney was present,
especially once plaintiff demanded one on July 8, 2004 while in
front of his home. (See Declaration of FRANCIS TERAN, paragraphs
11, 12, 14 and 15 attached to Defendants' motion papers; Exhibit
"5" and Trial Room transcript testimony of TERAN attached as
Exhibit "6" pp.195-199, 207).

99. There are no rules in Group 51, which prohibit members from accessing IAB Corruption Logs. (Exhibit "4" p.5; Exhibit "6" pp.65, 78-80).

100. Other Group 51 personnel have accessed corruption logs out of curiosity including but not limited to Det. Michael Clohossy and Sgt. Gregory Garland. (See Exhibit "4" pp. 4-5; Exhibit "6", Trial Room Testimonies of Clohossy and Garland, p.49 and pp. 77-78, 89-90).

101. Sgt. Garland admitted to looking up information about Det. Vasquez on IAB computers for curiosity prior to July 8, 2004. (See Exhibit "6" pp.78-80).

102. The information regarding Det. Vasquez was not considered confidential and was openly discussed by the entire squad at Group 51. (See Exhibit "6" p.47, 82-86).

103. Det. Clohossy and Sgt. Garland have seen computers remain logged on for days at a time when an officer forgets to log off. This enables other police officers to scroll through the records if they so desire under someone else's code. (Exhibit "6" pp.56-57, pp.90-94).

104. No one other than plaintiff has ever been disciplined for logging on to IAB computer records regarding Det. Vasquez despite Sgt. Garland's admission to looking at the records for curiosity reasons. (See Dones Declaration).

105. Defendants have a past practice of discriminating and retaliating against Hispanic police officers by issuing discriminatory discipline.  A Class Action lawsuit regarding discriminatory discipline being handed out by NYPD against minority police officers was settled by the City of New York in the amount of approximately $20,000,000.00 in 2004/2005.  (See LOA v. City of New York, et al., USDC/SDNY, Docket No.: 99 Civ 9568 (LAK)).

106. The FBI and NYPD IAB corroborated in investigating the plaintiff and were both responsible in the false imprisonment of the plaintiff on July 8, 2004 and denial of an attorney while plaintiff was being questioned by the defendants and FBI.  (See TERAN Declaration paragraphs 14-18, 22-24, Exhibit "6" pp.195-199, 207)


Dated:      Lake Success, New York
            May 6, 2008

                              CRONIN & BYCZEK, LLP


                              Rocco G. Avallone (RA8055)
                              Attorneys for Plaintiff
                              1983 Marcus Avenue, Suite C-120
                              Lake Success, New York 11042
                              (516) 358-1700