**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X
                       :

**LISSANDER DONES,**                :

                       :      **OPINION AND ORDER**

                       :

          **Plaintiff,**     :      **07 Civ. 3085 (SAS)**

                       :

          **- against -**     :

                       :

**THE CITY OF NEW YORK, POLICE**  :
**COMMISSIONER RAYMOND**          :
**KELLY, in his official capacity,**     :
**SERGEANT FRANK TERAN, in his**  :
**official and individual capacity,**   :
**CAPTAIN THOMAS SCOLLAN, in his** :
**official and individual capacity,**   :
**LIEUTENANT RON MEJIA, in his**  :
**official and individual capacity, and** :
**SERGEANT JULIUS MORTON, in his** :
**official and individual capacity,**   :

                       :

          **Defendants.**    :
-------------------------------------------------------- X



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       Lissander Dones brings this action alleging violations of his due process and equal protection rights, as well as conspiracy claims related to those alleged violations. Following the close of discovery, all defendants moved for summary judgment as to all claims. For the reasons set forth below, defendants' motion is granted in its entirety.

## II.    BACKGROUND

### A.    Factual Background

At approximately 7:00 a.m. on July 8, 2004, Dones, an Hispanic

detective with the New York City Police Department ("NYPD"), was approached

outside of his residence by Federal Bureau of Investigation ("FBI") Agent

Kenneth Hosey and three NYPD officers, Captain Thomas Scollan, Sergeant

Julius Morton, and Lieutenant Ron Mejia.[1]  Sergeant Frank Teran arrived shortly

thereafter.[2]  The officers surrounded Dones as Agent Hosey questioned him about

telephone records and his association with Detective Luis Nieves-Diaz.[3]

Telephone logs showed that Dones had contacted Detective Nieves-Diaz within

days after Dones's unique access code was used to access NYPD Internal Affairs

Bureau ("IAB") database records pertaining to an investigation of Detective Julio

---

[1]    *See* Plaintiff's Amended Response to Defendants' Rule 56.1 Statement of Undisputed Facts and Amended Counter Rule 56.1 Statement of Facts ("Pl. 56.1") ¶¶ 20-21, 49, 54; 4/15/08 Declaration of Defendant Francis X. Teran in Support of Defendants' Motion for Summary Judgment ("Teran Decl.") ¶¶ 16-17.

[2]    *See* Pl. 56.1 ¶ 21; Teran Decl. ¶ 17.

[3]    *See* Pl. 56.1 ¶¶ 22, 54; 2/20/08 Deposition Testimony of Lissander Dones ("Dones Dep.") at 33:2-6, 17-22; 36:1-2, 18-25, Ex. 1 to 5/9/08 Amended Declaration of Rocco G. Avallone, counsel to plaintiff ("Avallone Decl.").

Vasquez.[4] Detective Vasquez had been arrested in connection with state and

federal drug trafficking investigations.[5] Detective Nieves-Diaz was implicated by

Detective Vasquez in stealing money from drug couriers. There had been

information leaks in the drug trafficking investigations involving Detectives

Vasquez and Nieves-Diaz.[6]

At some point during Agent Hosey's questioning, Sergeant Teran

began questioning Dones.[7] Due to the nature of Sergeant Teran's questioning,

Dones informed the officers that he felt he was being questioned as the subject of

an official investigation.[8] As a result, Dones asked that he be permitted to obtain

counsel prior to any further questioning and to have a union representative

present.[9] Dones also requested that he be allowed to leave in order to seek legal

---

[4]    *See* Defendant's Local Rule 56.1 Statement of Undisputed Facts
("Def. 56.1") ¶¶ 15, 18; Teran Decl. ¶¶ 10, 12.

[5]    *See* Teran Decl. ¶ 7.

[6]    *See* Def. 56.1 ¶¶ 11, 17; Teran Decl. ¶¶ 5, 8.

[7]    *See* Dones Dep., Ex. 1 to Avallone Decl., at 33:15.

[8]    *See* Pl. 56.1 ¶ 56; Dones Dep., Ex. 1 to Avallone Decl., at 38:1-5.

[9]    *See* Pl. 56.1 ¶ 56; Dones Dep., Ex. 1 to Avallone Decl., at 38:1-5;
Patrol Guide No: 206-13 Interrogation of Members of the Service ("P.G. 206-13"),
Ex. 5 to Avallone Decl.

counsel and union representation.[10] While Dones was never told that he was the subject of an official investigation, and all of his requests were denied,[11] the questioning ceased.[12]

Shortly afterwards, Dones's neighbors began leaving their homes to go to work. Uncomfortable with the presence of neighbors, the defendants requested that Dones accompany them to Yankee Stadium.[13] Although Dones was not physically forced into the officers' car, he felt that his only option was to comply with their request.[14]

Once at Yankee Stadium, Dones remained inside the car. Dones felt that he was not free to leave as the officers conferred and made phone calls outside

---

[10]    See Pl. 56.1 ¶ 56; Dones Dep., Ex. 1 to Avallone Decl., at 38:4-5.

[11]    See Pl. 56.1 ¶¶ 26, 56; Dones Dep., Ex. 1 to Avallone Decl., at 38:7-8.

[12]    See Dones Dep., Ex. 1 to Avallone Decl., at 38:7-8, 17-18.

[13]    See Pl. 56.1 ¶ 23; Dones Dep., Ex. 1 to Avallone Decl., at 38:25. See also Dones Dep., Ex. 2 to 4/15/08 Declaration of Carolyn Walker-Diallo, counsel to defendants ("Walker-Diallo Decl."), at 39:1-14.

[14]    See Pl. 56.1 ¶¶ 24-25; Dones Dep., Ex. 1 to Avallone Decl., at 38:25. See also Dones Dep., Ex. 2 to Walker-Diallo Decl., at 39:1-14. The record is unclear as to Agent Hosey's whereabouts or if he had any further involvement in the events of July 8, 2004.

4

of the car.[15] Ultimately, Dones was asked to call Detective Nieves-Diaz, but he

refused to do so because no one would tell Dones why he should make the call.[16]

Despite being threatened with the loss of his current job assignment if he did not

make the call, Dones persisted in refusing.[17]

Defendants then took Dones to the lunchroom at the IAB

headquarters, where one of the defendants asked him to relinquish his weapon in

accordance with an unofficial IAB headquarters policy.[18]  Although Dones did not

agree with this policy, he relinquished his weapon.[19]  Dones remained in the

lunchroom until approximately 5:00 p.m.[20]  Except to tell his partner that he would

not be coming to work that day, and to make an official request for the day off,

Dones was not given the opportunity to contact anyone.[21]  Dones did not request

---

[15]     *See* Dones Dep., Ex. 1 to Avallone Decl., at 42:25. *See also* Dones
Dep., Ex. 2 to Walker-Diallo Decl., at 43:1-16.

[16]     *See* Dones Dep., Ex. 1 to Avallone Decl., at 42:5-8, 17-20; 47:7-9.

[17]     *See id*. at 42:10-20.

[18]     *See id*. at 42:22-25; 46:5-12. *See also* Dones Dep., Ex. 2 to Walker-
Diallo Decl., at 43:1-24.

[19]     *See* Dones Dep., Ex. 1 to Avallone Decl., at 46:5-12.

[20]     *See id*. at 48:14-15.

[21]     *See* Dones Dep., Ex. 2 to Walker-Diallo Decl., at 43:15-21.

5

any food, nor was he offered any.  He was, however, allowed to use the bathroom,

although when he went to the bathroom, he was guarded as if he were a prisoner.[22]

At approximately 5:00 p.m., Dones was asked again if he would call

Detective Nieves-Diaz, and he again refused.[23]  Dones was then informed that he

would be placed on modified assignment.  The official reported reason for this

modified assignment was Dones's involvement in a domestic incident.[24]  However,

it was understood by Dones, and stated by the officer placing him on modified

assignment, that the true reason for the assignment modification was Dones's

refusal to make the requested phone call; the domestic incident was merely the

official reason for his assignment modification.[25]  The purpose of reporting a

domestic incident as the reason for the assignment modification was to leave open

the possibility that Dones would later help in the investigation of Detective

Vasquez.[26]  Dones was then taken to his office and officially placed on modified

---

[22]    *See* Dones Dep., Ex. 1 to Avallone Decl., at 47:22-35; 48:1-7, 15-16;
50:1-4.

[23]    *See id*. at 48:16-21.

[24]    *See id*. at 48:17-25; 49:12-25.

[25]    *See id*.

[26]    *See id*. at 49:15-18.

6

assignment.[27]  At no time was Dones physically restrained or told that he was

under arrest or not free to leave, but he felt that he was in custody.[28]

Approximately two months later, on September 7, 2004, Dones was

subject to an official interrogation that resulted in his suspension without pay.[29]

Dones was later served with five charges and specifications, and a departmental

trial was held on February 1 and 2, 2005 to determine if he violated any provision

of the Patrol Guide.[30]  Notably, only one of the charges was related to the events of

July 8, 2004.[31]  Dones was found not guilty of this charge because all of the

---

[27]     *See id*. at 53:4-23; 55:7-9.

[28]     *See* Dones Dep., Ex. 2 to Walker-Diallo Decl., at 43:6-7.  *See also*
Dones Dep., Ex. 1 to Avallone Decl., at 46:1-3, 17-25; 47:1-2, 10-13, 22-25.

[29]     *See* Pl. 56.1 ¶¶ 34, 36; 9/7/04 Report of Suspension/Modified
Assignment for Lissander Dones ("Dones Report"), Ex. A to 4/15/08 Declaration
of Patrick Sullivan, NYPD attorney, in Support of Defendant's Motion for
Summary Judgment ("Sullivan Decl."), at 1.

[30]     *See* Pl. 56.1 ¶¶ 37-38; 9/10/04 Charges and Specifications
("Charges"), Ex. B to Sullivan Decl., at 3; 10/6/04 Notice of Amendment of
Charges ("Amended Charges"), Ex. C to Sullivan Decl., at 7.

[31]     Dones was charged with making false or misleading statements to an
investigator during his official interrogation on September 7, 2004.  The basis for
the charges was that Dones's statements on September 7, 2004 allegedly
contradicted statements he made on July 8, 2004.  *See* 6/13/05 Decision from the
Trial Room ("Tr. Rm. Decision"), Ex. 4 to Avallone Decl., at 11-13.

7

evidence obtained on July 8, 2004 was excluded from the trial.[32]  Dones was found

guilty of two of the charges:  (1) improperly divulging official department

business, and (2) improperly accessing the IAB database.[33]  The tribunal found

that Dones did not have a corrupt reason for these violations,[34] and imposed a

forfeiture of twenty vacation days.[35]  The investigation and trial were conducted in

accordance with all applicable NYPD regulations.[36]

In addition to his suspension without pay and his loss of twenty

vacation days, Dones remained on modified assignment for approximately two

years before he retired in 2006.[37]  During this time, Dones was unable to work

overtime and was embarrassed by his modified assignment to purely

administrative duties.[38]  Other non-Hispanic officers who admitted to accessing

---

[32]    *See* 6/13/05 Disposition of Charges ("Disposition"), Ex. 10 to
Avallone Decl.; Tr. Rm. Decision at 11-13.

[33]    *See* Disposition.

[34]    *See* Tr. Rm. Decision at 17.

[35]    *See* Pl. 56.1 ¶ 39; Disposition.

[36]    *See* Pl. 56.1 ¶ 34.

[37]    *See id*. ¶ 73.

[38]    *See* Dones Dep., Ex. 1 to Avallone Decl., at 53:8-9; 55:15-17.

the same database as Dones were not subjected to any disciplinary action.[39]

## B.    Claims

### 1.    Procedural Due Process Rights

#### a.    Property Interests

Dones claims that he was wrongfully denied his right to counsel and union representation as provided for in Patrol Guide Section 206-13 during his questioning by the FBI and the NYPD on July 8, 2004.[40]  Dones alleges that on July 8, 2004 he was interrogated as the subject of an official investigation by the NYPD, and that pursuant to section 206-13 of the Patrol Guide, he was entitled to confer with counsel before, and have a union representative present, during this alleged interrogation.[41]

Dones also claims that his wrongful placement on modified assignment deprived him of the ability to work overtime, as well as the prestige of

---

[39]    *See* 2/1/05 Transcript from Trial Room Testimony of Sergeant Gregory Garland ("Tr. Rm. Garland"), Ex. 6 to Avallone Decl., at 77:23-24; 78:4-12.

A class action lawsuit was brought against the NYPD by minority police officers for discriminatory disciplinary practices.  That law suit was settled in 2004 or 2005 for twenty million dollars.  *See* Pl. 56.1 ¶ 87.

[40]    *See* Complaint ("Compl.") ¶ 33.

[41]    *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp. Mem.") at 6-8.

9

his regular assignment, and that his assignment and ability to work overtime are constitutionally protected property interests created by the collective bargaining agreement between the NYPD and its officers.[42]  Dones asserts that a false allegation of his involvement in a domestic incident was used as the basis for his modified assignment, and that he never received a fair hearing to determine if this domestic incident, or any other any wrongful conduct, would justify his modified assignment.[43]

### b.    Liberty Interests

Dones asserts that his constitutional rights were violated when defendants falsely alleged that he was involved in a domestic incident, which caused him to be personally and professionally embarrassed, and used this as an excuse to place him on modified assignment.[44]  Dones alleges that defendants made this allegation known to his fellow officers and that he was then treated differently by those officers.[45]

Dones further contends that defendants unlawfully detained him on

---

[42]    *See id.* at 7.

[43]    *See id.*; Compl. ¶ 34.

[44]    *See* Compl. ¶¶ 34-35; Opp. Mem. at 5-8.

[45]    *See* Pl. 56.1 ¶ 46.

July 8, 2004.[46] He alleges that defendants surrounded him outside of his home and denied his request to leave and seek counsel and union representation. He alleges that he felt forced to accompany defendants to Yankee Stadium and then to IAB headquarters. He next alleges that once at IAB headquarters defendants kept him in the lunchroom for approximately five hours, denied him the opportunity to contact anyone except his partner and supervisor,[47] deprived him of food, and guarded him as if he were a prisoner when he was allowed to use the bathroom.[48]

### 2.    Equal Protection Rights

Dones claims that in retaliation for his refusal to call Detective Nieves-Diaz, defendants fabricated an allegation that Dones was involved in a domestic incident with the goal of placing Dones on modified assignment and initiating groundless disciplinary procedures against him.[49] Defendants' alleged motivation in fabricating this charge was to deprive Dones of his employment or some of the benefits of that employment.[50] Dones claims that defendants had no

---

[46]    *See* Compl. ¶ 33.

[47]    *See id.* ¶¶ 14-25, 54.

[48]    *See* Dones Dep., Ex. 1 to Avallone Decl., at 47:22-25; 48:1-3, 14-16.

[49]    *See* Compl. ¶¶ 34-35; Opp. Mem. at 5.

[50]    *See* Opp. Mem. at 5.

11

legitimate, discernable basis for treating him differently from non-Hispanic
officers when they singled him out for modified assignment and disciplinary
action based on his unauthorized access of the IAB database and that defendants
were also motivated by racial animus when they denied him counsel and union
representation.[51] Dones asserts that his disparate treatment fits into an established
custom and practice of discriminatory disciplinary actions by the NYPD against
minority officers.[52]

### 3.    The Alleged Conspiracy to Deprive Plaintiff of His Constitutional Rights

Dones alleges that the FBI, through Agent Hosey, conspired with
defendants to deprive Dones of his constitutional rights.[53] Dones claims that
defendants and Agent Hosey worked together to deny Dones access to counsel and
union representation, to make and file false allegations of Dones's involvement in
a domestic incident, and to falsely imprison him, place him on modified
assignment, and initiate groundless disciplinary proceedings.[54] Dones further

---

[51]    *See* Pl. 56.1 ¶ 82; Opp. Mem. at 4-6.

[52]    *See* Opp. Mem. at 6, 13; Compl. ¶ 31.

[53]    *See id*. at 8.

[54]    *See id*.

alleges that the conspiracy was motivated by racial animus.[55]

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[56] An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[57] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[58] "It is the movant's burden to show that no genuine factual dispute exists."[59]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than

---

[55]    *See id.* at 9.

[56]    Fed. R. Civ. P. 56(c).

[57]    *Ricci v. Destefano*, — F.3d —, No. 06 Civ. 4996, 2008 WL 2404956, at *19 (2d Cir. June 12, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[58]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

[59]    *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

show that there is "'some metaphysical doubt as to the material facts,'"[60] and it

"'may not rely on conclusory allegations or unsubstantiated speculation.'"[61]

However, "'all that is required [from a non-moving party] is that sufficient

evidence supporting the claimed factual dispute be shown to require a jury or

judge to resolve the parties' differing versions of the truth at trial.'"[62]

> Where the burden of proof at trial would fall on the non-
> moving party, it ordinarily is sufficient for the movant to
> point to a lack of evidence to go to the trier of fact on an
> essential element of the non-movant's claim. In that event,
> the non-moving party must come forward with admissible
> evidence sufficient to raise a genuine issue of fact for trial
> in order to avoid summary judgment.[63]

In determining whether a genuine issue of material fact exists, the

court must construe the evidence in the light most favorable to the non-moving

---

[60]    *Higazy*, 505 F.3d at 169 (quoting *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[61]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express
Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[62]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *First
Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[63]    *Rodriguez v. City of New York*, 535 F. Supp. 2d 436, 440 (S.D.N.Y.
2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl.
Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001)).

14

party and draw all justifiable inferences in that party's favor.[64] However, "[i]t is a

settled rule that '[c]redibility assessments, choices between conflicting versions of

the events, and the weighing of evidence are matters for the jury, not for the court

on a motion for summary judgment.'"[65] Summary judgment is therefore

inappropriate "'if there is any evidence in the record that could reasonably support

a jury's verdict for the non-moving party.'"[66]

## IV.    APPLICABLE LAW

### A.    Section 1983

Section 1983 "does not create a federal right or benefit; it simply

provides a mechanism for enforcing a right or benefit established elsewhere."[67] In

order to state a claim under section 1983, a plaintiff must show that the conduct

---

[64]      *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d
450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305,
312 (2d Cir. 1997)).

[65]      *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50,
55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[66]      *American Home Assurance Co. v. Hapag Lloyd Container Linie,
GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v.
Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

[67]      *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*,
423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808,
816 (1985)).

15

complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[68]

## B.  Due Process

Pursuant to the Due Process Clause of the Fourteenth Amendment, a state may not deprive an individual of liberty or property without due process of law.[69]  In order to prevail on a procedural due process claim, a plaintiff must identify a constitutionally protected liberty or property interest and demonstrate that the state has deprived him of that interest without due process of law.[70]

### 1.  Property Interest

The "nature and contours" of claimed property interests are defined not by the Constitution, but by some independent source.[71]  To have a protected property interest, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead,

---

[68]    *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004).

[69]    U.S. Const. amend. XIV, § 1.

[70]    *See Weinstein v. Albright*, 261 F.3d 127, 134 (2d Cir. 2001).  *See also Local 342 v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994).

[71]    *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991).  *Accord Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003).

16

have a legitimate claim of entitlement to it."[72] A plaintiff's interest in a benefit is a property interest for due process purposes if there are "such rules or mutually explicit understandings" – such as a statute, regulation, or contract – that support his claim of entitlement to the benefit and that may be invoked at a hearing.[73] "[W]hen state law supports a party's legitimate claim of entitlement to a governmental benefit, that benefit cannot be stripped without procedural due process."[74] It should be noted, however, that procedures themselves are not entitlements within the purview of due process protection. The right to a procedure exists only insofar as the procedure is essential to the realization of a previously established "parent right."[75]

### 2.    Liberty Interest

#### a.    Freedom from Defamatory Remarks

It is well established that damage to one's reputation is not "by itself

---

[72]    *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

[73]    *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

[74]    *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir. 1991).

[75]    *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981). *Accord Febres v. City of New York,* 238 F.R.D. 377, 389 (S.D.N.Y. 2006) ("even when 'detailed and comprehensive procedures [are] . . . mandated by state law[,] . . . such procedures, standing alone, create no independent substantive entitlements, whose deprivation might trigger application of the Due Process Clause.'" (quoting *Sealed*, 332 F.3d at 57)).

sufficient to invoke the procedural protection of the Due Process Clause."[76]  As

the Court stated in *Paul v. Davis*:

> While we have in a number of our prior cases pointed out
> the frequently drastic effect of the "stigma" which may
> result from defamation by the government in a variety of
> contexts, this line of cases does not establish the
> proposition that reputation alone, apart from some more
> tangible interests such as employment, is either "liberty" or
> "property" by itself sufficient to invoke the procedural
> protection of the Due Process Clause.[77]

The Second Circuit has interpreted this to mean that "stigma plus" is required to

establish a constitutional violation where reputation is the primary issue.[78]  To

prevail on a "stigma plus" claim, a plaintiff must establish the following:  (1) a

"stigma" by showing "the utterance of a statement sufficiently derogatory to injure

his or her reputation, that is capable of being proved false, and that he or she

claims is false;" (2) a "plus" by showing "a material state-imposed burden or

state-imposed alteration of the plaintiff's status or rights;"[79] and (3) that "both

---

[76]    *Paul v. Davis*, 424 U.S. 693, 701 (1976).

[77]    *Id*.

[78]    *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).  *Accord Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994) (citing *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989)).

[79]    *Sadallah*, 383 F.3d at 38.

18

'stigma' and 'plus' are claimed to be sufficiently proximate."[80]

Establishment of a stigma requires the plaintiff to prove that the injurious remarks are false[81] and that defendants' actions "will result in stigma, that is, in 'public opprobrium' and damage to [his] reputation."[82] Remarks that cast aspersions on plaintiff's moral character or indicate moral turpitude are sufficient.[83] In the context of job performance, the remarks must "'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that

---

[80]    *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2004).

[81]    *See Segal v. City of New York*, 459 F.3d 207, 213 n.5 (2d Cir. 2006) ("A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false.") (quotations and citations omitted).

[82]    *Valmonte*, 18 F.3d at 999 (quoting *Bohn v. County of Dakota*, 772 F.2d 1433, 1436 n.4 (8th Cir. 1985)). *Accord Patterson v. City of Utica*, 370 F.3d 322, 330, 336 (2d Cir. 2004) (holding that the defamatory statements must have been made public); *Velez*, 401 F.3d at 87 ("The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest.").

[83]    *See Segal*, 459 F.3d at 212. *See also Velez*, 401 F.3d at 75 (holding that "allegedly trumped-up charges of criminal behavior" are sufficient to create the requisite stigma); *Doe v. Department of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001) (holding that public dissemination of a state compiled list of registered sex offenders was sufficient to create a stigma for the "stigma plus" test), *rev'd on other grounds*, 538 U.S. 1 (2003).

employee's continued ability to practice his . . . profession.'"[84]  A statement that an

employee merely performed a job poorly or acted in an improper manner is not

enough.[85]

To establish the "plus," a plaintiff cannot rely merely on "'the

deleterious effects which flow directly from sullied reputation'"[86] such as "the

impact that defamation might have on job prospects, or, for that matter, romantic

aspirations, friendships, self-esteem, or any other typical consequence of a bad

reputation."[87]

> The state-imposed burden or alteration of status must be
> "in addition to the stigmatizing statement."  Thus, even
> where a plaintiff's allegations would be sufficient to
> demonstrate a government-imposed stigma, such
> defamation is not, absent more, a deprivation of a liberty or

---

[84]    *Segal*, 459 F.3d at 212 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996)).

[85]    *See O'Neill v. City of Auburn*, 23 F.3d 685, 692 (2d Cir. 1992) (holding that a governmental announcement that an employee is incompetent is "considerably graver and carries more potential for future disqualification from employment than a statement that the individual performed a job poorly").

[86]    *Velez*, 401 F.3d at 38 (quoting *Valmonte*, 18 F.3d at 1001).

[87]    *Valmonte*, 18 F.3d at 1001. *Accord Siegert v. Gilley*, 500 U.S. 226, 234 (1991) ("Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action.").

property interest protected by due process.[88]

Although "it is not entirely clear what the 'plus' is,"[89] the Second Circuit has

determined that the "plus" is satisfied by deprivation of the plaintiff's property or

termination of the plaintiff's government job or some other right or status.[90]

A sufficiently proximate relationship between the "stigma" and the

"plus"

> will be satisfied where (1) the stigma and plus would, to a
> reasonable observer, appear connected – for example, due
> to their order of occurrence, or their origin – and (2) the
> actor imposing the plus adopted (explicitly or implicitly)
> those statements in doing so.    There is no rigid
> requirement, therefore, that both the 'stigma' and the 'plus'
> must issue from the same government actor or at the same
> time.[91]

### b.    False Arrest and Imprisonment

A section 1983 claim for false arrest arises under the Fourth

Amendment right to be free from unreasonable seizures and is identical to a claim

---

[88]    *Sadallah*, 383 F.3d at 38 (quoting *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 1 (2003); citing *Siegert*, 500 U.S. at 233).

[89]    *Neu*, 869 F.2d at 667. *Accord Sadallah*, 383 F.3d at 38.

[90]    *See Sadallah*, 383 F.3d at 38 (suggesting a Second Circuit willingness to broaden the scope of recognized burdens to include "direct interference with a plaintiff's business").

[91]    *Velez*, 401 F.3d at 89.

21

for false arrest under New York law.[92] False arrest and false imprisonment are synonymous under New York law.[93] To establish a claim for false arrest or false imprisonment, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."[94] "A confinement is privileged if probable cause exists for its initiation."[95]

The existence of probable cause to arrest is a complete defense to a false arrest claim.[96] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the

---

[92]    See *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). *See also Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992).

[93]    See *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (noting that false arrest and false imprisonment have identical elements). *See also Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991).

[94]    *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994).

[95]    *Bail v. Ramirez*, No. 04 Civ. 5084, 2007 WL 959045, at *6 (S.D.N.Y. Mar. 29, 2007).

[96]    See *Gaskins v. City of New York*, No. 03 Civ. 0605, 2004 WL 1777585, at *2 (S.D.N.Y. Aug. 6, 2004) (citing *Hyde v. Arresting Officer Caputo*, No. 98 Civ. 6722, 2001 WL 521699, at *2-4 (E.D.N.Y. May 11, 2001)).

person to be arrested has committed or is committing a crime."[97] However, in order to establish probable cause, "it is not necessary to make 'a prima facie showing of criminal activity' or to demonstrate that it is more probable than not that a crime has been or is being committed."[98] In contrast, "probable cause requires only the possibility of criminal activity or the possibility that evidence of a crime will be found."[99] Moreover, "courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not."[100] Further, it is well-settled that "the question of whether or not probable cause existed may be determin[ed] as a matter of law if there is *no* dispute as to the pertinent events and the knowledge of the officers."[101] Conversely, "[w]here the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to

---

[97]   *Id.* (quotation marks and citation omitted). *Accord Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe than an individual has committed even a very minor criminal offense . . . he may, without violating the Fourth Amendment, arrest the offender.").

[98]   *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987) (quoting *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983)).

[99]   *Id.*

[100]   *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004).

[101]   *Weyant*, 101 F.3d at 852 (emphasis added).

the pertinent events, the existence *vel non* of probable cause is to be decided by the jury."[102]

## C.    Equal Protection Claims

### 1.    'Class of One' Equal Protection Claim

"While the Equal Protection Clause is most commonly used to bring claims alleging discrimination based on membership in a protected class, where . . . the plaintiff does not allege membership in such a class, he or she can still prevail in what is known as a 'class of one' equal protection claim."[103] "A successful equal protection claim may be 'brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"[104]  The Second Circuit has emphasized that in order to prevail on such a claim, a plaintiff is "required to show, not only 'irrational and wholly arbitrary' acts . . . but also *intentional* disparate treatment."[105]  The Second Circuit has also emphasized that

---

[102]    *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997).

[103]    *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005).

[104]    *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

[105]    *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001) (quoting *Village of Willowbrook*, 528 U.S. at 565) (emphasis in original).

"the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high."[106]  It should be noted, however, that "class of one" equal protection claims can no longer be asserted in the context of public employment.[107]

### 2.   Selective Enforcement or Treatment

To maintain a "selective enforcement" equal protection claim, the plaintiff must show that

> (1) the [plaintiff], compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.[108]

The Second Circuit has emphasized that in order to prevail on such a claim, the

---

[106]   *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 110 (2d Cir. 2006) ("The plaintiff must show that (1) 'no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [(2)] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.'" (citing *Neilson*, 409 F.3d at 104-05)).

[107]   *See Engquist v. Oregon Dept. of Agr.*, — U.S. —, No. 07 Civ. 474, 2008 WL 2329768, at *11-12 (June 9, 2008) (holding that the federal courts are not an appropriate forum for reviewing personnel decisions of public entities).

[108]   *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992). *Accord Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2003).

selective treatment must result from the impermissible considerations.[109]

Furthermore, the standard for "similarly situated" when bringing a selective

enforcement claim is the same as in a "class of one" claim.[110]

## V.     DISCUSSION

### A.     Due Process

#### 1.     Property Interest

##### a.     Right to Counsel and Representation by a Union Representative

Dones claims that he was entitled to confer with counsel and have a

union representative present as set forth in P.G. 206-13 when he was questioned as

the subject of an official investigation on July 8, 2004.[111]  Section 206-13 does

entitle "a member of the service . . . who is the subject or a witness in an official

investigation"[112] to confer with counsel and to union representation.  However, the

Patrol Guide is internal NYPD procedure, which, "standing alone, create[s] no

independent substantive entitlements, whose deprivation might trigger application

---

[109]     *See Cobb*, 363 F.3d at 110.

[110]     *See infra* note 106 and accompanying text (setting forth the standard for establishing "similarly situated").

[111]     Opp. Mem. at 7.

[112]     P.G. 206-13.

of the Due Process Clause."[113]   Accordingly, defendants are entitled to summary

judgment on Dones's property interest due process claim regarding right to

counsel and union representation.

### b.    Particular Assignment and Overtime

Absent extraordinary circumstances, courts in the Second Circuit

have not recognized overtime,[114] particular assignments, or the prestige of a given

assignment as property interests protected by due process.[115]   Dones has not

offered any evidence of a mutual expectation of overtime or any particular

---

[113]   *Febres*, 238 F.R.D. at 389 ("A state or local agency's internal
administrative procedures, however, generally do not give rise to property interests
that are subject to protection under the Fourteenth Amendment." (citing *Sealed*,
332 F.3d at 57; *Castro v. City of New York*, No. 94 Civ. 5114, 94 Civ. 6767, 1996
WL 617341, at *2 (S.D.N.Y. Oct. 25, 1996) ("Whatever the language of the cited
Police Department policy, it does not confer on the officers a property or liberty
entitlement"))).

[114]   *See Cassidy v. Scoppetta*, 365 F. Supp. 2d 283, 287 (E.D.N.Y. 2005)
("Every court in this circuit that has considered the issue of whether there exists a
constitutionally protected property interest in overtime pay has answered in the
negative, and with good reason.").

[115]   *See Kane v. Krebser*, 44 F. Supp. 2d 542, 549-50 (S.D.N.Y. 1999)
("[L]ower courts have ruled that a governmental employer may specifically create
a property interest in a non-economic benefit, such as a particular work
assignment . . . . However, we note that . . . the creation of such a non-economic
property interest is exceedingly rare . . . . That is, conferral of the benefit [must
be] virtually a matter of right, so that the process is so nearly automatic as virtually
to assure conferral of the benefit.") (quotations and citations omitted).

assignment.

Sections 206-7 and 206-10 – which describe the reasons for, as well as the course of action that must be taken when, placing an officer on modified assignment – make it clear that Dones's superior officers have substantial discretion to place him on modified assignment prior to any formal disciplinary action.[116] While Dones alleges that he was placed on modified assignment based on false charges,[117] this claim is without merit because it is directly contradicted by Dones's own deposition testimony.[118] Dones stated that he was told by the officers (and believed) that he was placed on modified assignment because of his refusal to assist with the investigation of another detective.[119]

There is, however, a suggestion in section 206-10 that disciplinary

---

[116]    *See* Sections 206-07and 206-10 of The Patrol Guide ("P.G. 206-07, 206-10"), Ex. 12 to 5/27/08 Supplemental Declaration of Carolyn Walker-Diallo, at 00001 ("[The NYPD may] place a uniformed member of the service on modified assignment, when, in their opinion, such action is necessary.").

[117]    *See* Opp. Mem. at 7-8.

[118]    *See Jones v. New York City Health & Hosp. Corp.*, No. 00 Civ. 7002, 2003 WL 30412, at *4 (S.D.N.Y. Jan. 3, 2003) ("'It is well settled . . . that a party's affidavit which contradicts [one's] own prior deposition testimony should be disregarded on a motion for summary judgment.'" (quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)), *aff'd*, 102 Fed. App'x. 223 (2d Cir. July 9, 2004) (unpublished decision).

[119]    *See* Dones Dep., Ex. 1 to Avallone Decl., at 49:12-25.

action may be part of the post-assignment modification process.[120] Even assuming

that some official disciplinary action is required post-modification, Dones was

later subject to a full disciplinary investigation and trial that the parties agree was

performed in accordance with all applicable regulations. Importantly, the trial

determined that Dones violated Patrol Guide regulations. Accordingly, summary

judgment is granted to defendants on Dones's due process claims regarding the

loss of his particular assignment and overtime.

### 2.    Liberty Interest

#### a.    Freedom from Defamatory Remarks

Defendants have also moved for summary judgment on Dones's

liberty interest due process claim. Dones claims that defendants submitted a

fabricated official report stating that Dones was involved in a domestic incident

and that as a result he was placed on modified assignment.[121] Dones further

alleges that his fellow officers had knowledge of this fabricated report.[122]

---

[120]    *See* P.G. 206-07, 206-10 at 3 ("When placing a uniformed member of
the service on modified assignment:
RANKING OFFICER IN CHARGE
1.    Inform member that assignment is contingent upon being available for
prompt departmental disciplinary trial.").

[121]    *See* Opp. Mem. at 7-8.

[122]    *See* Pl. 56.1 ¶ 46.

29

Even assuming that the allegation of Dones's involvement in a
domestic incident sullied his reputation, infringement of his liberty interest
requires a deprivation beyond the "typical consequence[s] of a bad reputation."[123]
Because Dones's modified assignment did not deprive him of his rights or
property, he has failed to show any injury beyond his allegedly tainted reputation.
Accordingly, summary judgment is granted to defendants on Dones's liberty
interest due process claim regarding freedom from defamatory remarks.

### b.    False Imprisonment

Drawing every inference in Dones's favor, I must assume that Dones
was confined by defendants against his will.  However, the undisputed facts show
that defendants had probable cause for arresting Dones.  As a result, defendants
have a complete defense to Dones's false imprisonment claim.[124]  It is undisputed
that Dones was implicated by objective evidence – telephone records and network
access logs – in disclosing confidential NYPD information regarding the
investigation of Detective Vasquez to Detective Nieves-Diaz.[125]  Detective Nieves-
Diaz was also under investigation for criminal activity and was believed to be

---

[123]    *Valmonte*, 18 F.3d at 1001.

[124]    *See Bail*, 2007 WL 959045, at *6.

[125]    *See* Teran Decl. ¶¶ 5, 10, 12.

30

involved with Detective Vasquez, who had already been arrested.[126]  Therefore,

defendants had probable cause to believe that Dones had committed a crime or

aided in the commission of a crime.  Accordingly, summary judgement is granted

on Dones's false imprisonment claim.

### B.    Equal Protection

Because Dones is a public employee, he cannot bring a "class of one"

equal protection claim.[127]  Dones's remaining equal protection claim for selective

treatment motivated by racial animus or defendants' desire to harm him requires

that Dones meet a very high standard of similarity with those against whom he is

compared.  The applicable standard is that "no rational person could regard the

circumstances of the plaintiff to differ from those of a comparator to a degree that

would justify the differential treatment on the basis of a legitimate government

policy."[128]  Because Dones only compares himself to officers who were not

implicated in, or found guilty of, improperly divulging confidential departmental

---

[126]    *See id.* ¶¶ 6-9.

[127]    *See Engquist*, 2008 WL 2329768, at *12 ("In short, ratifying a class-of-one theory of equal protection in the context of public employment would impermissibly constitutionalize the employee grievance.  The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies.").

[128]    *Skehan*, 465 F.3d at 110.

information, Dones fails to provide evidence of such similarity.[129]

I recognize that "[g]enerally, whether two entities are similarly situated is a factual issue that should be submitted to the jury. But this rule is not absolute and 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'"[130] The undisputed facts here can lead to no conclusion other than that Dones was not similarly situated to those against whom he is compared.

Although Dones continues to maintain that he was not involved in any improper information access or dissemination,[131] it is undisputed that on July 8, 2004 Dones was implicated by objective evidence in improperly divulging

---

[129]    Dones compares himself to two officers who allegedly admitted to accessing the IAB database without authorization: Sergeant Gregory Garland and Detective Michael Clohessy. *See* Opp. Mem. at 6-7; Tr. Rm. Garland at 77:23-24; 78:4-12; 2/1/05 Transcript from Trial Room Testimony of Detective Michael Clohessy ("Tr. Rm. Clohessy"), Ex. 11 to Avallone Decl., at 49. Dones's comparisons are insufficient because there is no evidence that either Detective Clohessy or Sergeant Garland were implicated in improperly divulging confidential departmental information. The comparison between Dones and Detective Clohessy is particularly deficient because Detective Clohessy testified that his duties required his allegedly unauthorized access, and no evidence has been offered disputing his testimony. *See* Tr. Rm. Clohessy at 49.

[130]    *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (quoting *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

[131]    *See* 5/6/08 Declaration of Lissander Dones ¶¶ 4-5.

32

information regarding an investigation raising internal security concerns.[132] It is also undisputed that Dones was ultimately found guilty of improperly divulging official information in violation of the Patrol Guide.[133] As such, there is certainly a rational foundation for treating an officer in Dones's position differently from others not similarly implicated in, and ultimately found guilty of, Patrol Guide violations.[134]

Therefore, in order for Dones to claim similarity to other NYPD officers who were treated differently, he must produce evidence showing that other officers who were similarly implicated in, and later found guilty of, improperly divulging departmental information were not subject to similar treatment. There is absolutely no evidence that the NYPD officers to whom Dones compared himself share this characteristic. Because there is no reasonable basis upon which a jury could base a finding for Dones on his remaining equal protection claim, defendants' motion for summary judgment is granted as to Dones's selective enforcement or treatment claim.

---

[132]    See Teran Decl. ¶¶ 5, 10, 12.

[133]    See Tr. Rm. Decision at 9-10, 16.

[134]    See Neilson, 409 F.3d at 106 (holding that differences in conduct such as admitting fault or drawing a weapon create a rational basis for differing treatment).

33

## C.    Conspiracy[135] and Municipal Liability Claims

Because none of Dones's claims alleging the violation of a federal

right survive summary judgment, and Dones's remaining conspiracy and

municipal liability claims require that he prove a violation of his constitutional

rights, defendants' motion for summary judgment is granted on these claims.[136]

---

[135]    It is unclear from the Complaint whether Dones set forth a section 1983 conspiracy claim as well as a section 1985 conspiracy claim, or only a section 1985 conspiracy claim. *See* Complaint ¶ 37.  "Rule 15(a) directs that leave to amend should be 'freely given.'  The Second Circuit has held that a Rule 15(a) motion 'should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.'" *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) (quoting *Richardson Greenshields Sec. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987)).  Dones's 1983 conspiracy claim does not allege any new violations of his constitutional rights, and the section 1985(3) claim gives notice of his allegation of conspiracy.  Accordingly, even if the inclusion of a 1983 conspiracy claim is an amendment of the Complaint, there is no prejudice to defendants, and I find no other grounds on which to deny the claim.

[136]    *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690-91 (1978) (holding that a municipal liability attaches to actual deprivations of constitutional rights). *Accord Board of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)); *Vives v. City of New York*, 524 F.3d 346, 357 (2d Cir. 2008). *See also Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("[A] plaintiff alleging a § 1983 conspiracy must prove an actual violation of constitutional rights"); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (holding that a plaintiff alleging a section 1985 conspiracy must prove an injury to person or property or the deprivation of any right of a citizen of the United States) (citing *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)).

34

## VI.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.  The Clerk of the Court is directed to close this motion [docket no. 28] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 9, 2008

35

## -Appearances-

### For Plaintiff:

Rocco G. Avallone, Esq.
Cronin & Byczek LLP
1983 Marcus Avenue
Suite C-120
Lake Success, New York 11042
(516) 368-1700

### For Defendants:

Carolyn Walker-Diallo
Assistant Corporation Counsel for the City of New York
100 Church Street
Room 2-140
New York, New York 10007
(212) 788-0868